IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v.  ) | Case No. 1:07-CR-192 |
| ) | |
| STEPHEN COOK, ) | Hon. Ellen S. Huvelle |
| ) | |
| Defendant. ) | |

**DEFENDANT STEPHEN COOK'S CONSOLIDATED REPLY TO THE GOVERNMENT'S MEMORANDA IN OPPOSITION TO HIS PRE-TRIAL MOTIONS**

NOW COMES, the Accused Stephen Cook, by and through undersigned counsel, respectfully replying to the government's Memoranda in Opposition to Mr. Cook's Motion to Compel the Government to Elect Between Multiplicitous Counts, Mr. Cook's Motion to Dismiss for Outrageous Government Conduct, and Mr. Cook's Motion to Suppress Involuntary Statements. Mr. Cook replies as follows:

**I.   THE COURT SHOULD COMPEL THE GOVERNMENT TO ELECT BETWEEN THE MULTIPLICITOUS COUNTS**

While Mr. Cook vociferously disputes the government's proffered version of the two telephone calls between himself and the testifying grand jury witness, Mr. Cook will use the government's version of the events to demonstrate the multiplicity of Counts Four and Five and Counts Six and Seven.[1] Specifically, the government alleges that the conduct underlying all four Counts is Mr. Cook "repeatedly [telling] the Deputy to stick to his report when he testified before

---

[1] Mr. Cook contends that the phone calls, made by his former deputy friend, demonstrate entrapment on the part of the government. If the deputy had never called him, Mr. Cook would never have reached out to the deputy. Furthermore, the deputy voices concern to Mr. Cook about being nervous in front of the grand jury, and all that Mr. Cook does is assuage his fears by telling him to use his initial report as a guide because the initial report was the truthful version of the events.

the Grand Jury." Gov. Memorandum in Opposition to Multiplicity Motion at 2. The government, in fact, "acknowledges that Counts Four and Five, and Counts Six and Seven of the Indictment are based on the same underlying facts." Gov. Memorandum in Opposition to Multiplicity Motion at 2. Therefore, it is undisputable that the same factual conduct, Mr. Cook's allegedly repeatedly urging the grand jury witness to stick to his report, is used as proof for both 18 U.S.C. §§ 1512(b)(1) and 1512[c](2).

However, the government is correct in asserting that "a defendant can receive multiple punishments based on the same course of conduct without offending the Double Jeopardy Clause." Gov. Memorandum in Opposition to Multiplicity Motion at 2 (citing United States v. McLaughlin, 164 F.3d 1, 8 (D.C. Cir. 1998)). Essentially, the correct analysis is one of statutory construction, looking to the intent of Congress in enacting the allegedly multiplicitous statutory subsections. Therefore, where the intent of Congress is not plain on the face of the subsections, a court should determine "whether each provision requires proof of a fact which the other does not."[2] Blockburger v. United States, 284 U.S. 299, 304 (1932).

Here, Mr. Cook argues that it was Congress' intent that Section 1512(b)(1) is a lesser included offense of Section 1512[c](2). Mr. Cook asserts that the only difference between the two subsections is the level of intent required by the Accused. In Section 1512(b)(1), the Accused must intend "to influence, delay, or prevent the testimony of any person in an official proceeding." In Section 1512[c](2), the Accused must intend to "obstruct, influence, or impede"

---

[2] It should be noted that the government relies upon United States v. Bridges, 717 F.2d 1444 (D.C. Cir. 1983) as analogous to the case at bar. However, the government incorrectly states the holding of Bridges. In Bridges, the D.C. Circuit found that charges for making false statements to a grand jury and obstruction of justice were not multiplicitous. The government incorrectly states that the holding delineated between perjury and making false statements to a grand jury.

the official proceeding itself. The government is wrong in contending that the focus on both statutes is the "effect that the corrupt intent has" on either the person or the proceeding itself. Gov. Memo in Opposition to Multiplicity Motion at 5. Explicitly, both of these subsections are *not* concerned with effect, but rather with the intent of the person in engaging in the witness tampering. Neither subsection requires that the government prove the effect of the Accused behavior, but the subsections only require proof of the intent of the Accused.[3]

The government, in its Memorandum of Opposition, conveniently ignores the Accused argument that the obstruction prohibition under Section 1512[c](2) only applies to endeavored obstruction through witness tampering. The government's reliance on United States v. LeMoure, 474 F.3d 37 (1st Cir. 2007) is therefore misplaced, as the court only found that Section 1503 is not multiplicitous with Section 1512(b)(1). While Section 1503 concerns obstruction of justice that may involve witness tampering as well as other forms of obstruction, Section 1512[c](2) only concerns obstruction of justice that involves witness tampering.[4] As stated in the original motion, rules of statutory interpretation indicate such intent on the part of Congress.[5] See Mr.

---

[3] The government states that proof of the mens rea of both subsections only requires that the effect of such actions was foreseeable and relies upon United States v. Reich, 420 F.Supp.2d 75, 84 (E.D.N.Y. 2006), in making such an argument. That case, however, does not stand for such a proposition. Instead, the court states that "a violation of [Section 1512[c](2)] occurs where, as here, a person acts with the intent to deceive... with the reasonable expectation that the deception will interfere with a judicial proceeding." Id. Thus, the focus is still on the corrupt intent of the Accused, not on the actual or foreseeable effect on the person or the proceeding.

The focus is on the intent of a defendant, much like the difference between murder and the lesser-included offense of manslaughter, where the focus is on the intent of a defendant- whether a defendant intended premeditation in killing a person or whether a defendant acted with criminal negligence.

[4] Furthermore, in Lemoure, the government had charged that the witness tampering in violation of Section 1512(b)(1) occurred when the defendant requested that his friends give false statements to the grand jury and during their civil depositions. The government had charged that Section 1503 obstruction of justice occurred when the defendant fabricated the false statements. Id. at 39.

[5] It should be noted that the government contradicts its basic premise that the test of multiplicity is one of statutory interpretation. In Footnote 4 of the Memorandum in Opposition to the Multiplicity Motion, the government

Cook's Multiplicity Motion at 11-14. Therefore, because Section 1512[c](2) necessarily requires that the Accused engaged in some form of witness tampering (in this case an alleged violation of Section 1512(b)(1)), the only difference between the subsections is that Section 1512[c](2) requires an intent to obstruct the grand jury, while Section 1512(b)(1) only requires an intent to obstruct the testimony of a witness appearing before the grand jury. Necessarily, if the government proves Section 1512[c](2), it will also have proven a violation of Section 1512(b)(1), as every element of Section 1512(b)(1) is included in Section 1512[c](2).

Essentially, the government will have to prove Section 1512[c](2) by establishing that Mr. Cook attempted to persuade the grand jury witness to testify falsely, with an intent to obstruct the grand jury. It follows that upon proof of these elements, the elements of Section 1512(b)(1) will also be satisfied, as Mr. Cook attempted to persuade the grand jury witness to testify falsely before the official proceeding, the grand jury. The proof of Mr. Cook's intent to obstruct the grand jury, necessarily includes the lesser intent to influence the grand jury witness' testimony, thus satisfying the mens rea requirement of Section 1512(b)(1).

Finally, Mr. Cook suggests that the Court should enter an order compelling the government to elect between these multiplicitous Counts before the jury trial begins. Mr. Cook will inherently be prejudiced by allowing the jury to deliberate as to the multiplicitous counts. Including all four counts, despite the fact that Mr. Cook cannot be punished for all four counts, will cause the jury to believe that Mr. Cook has engaged in greater criminal conduct than he

---

attempts to imply that United States v. Kenny, 973 F.2d 339 (4th Cir. 1992), does not apply because it is either dicta or inconsistent with case law in the D.C. Circuit. However, what Kenny stands for in its holding is that in interpreting a subsection, a court must pay close attention to the context in which the subsection is placed. Thus, the Kenny court found that Section 1512 was a more specific statute than Section 1503, as the subsections of Section 1512 specifically apply to conduct constituting witness tampering. Id. at 342.

allegedly has engaged in. Because the multiplicitous counts rely on the same exact conduct, and because one is a lesser-included offense of the other, the government should not be allowed to charge both accounts in the indictment, thus suggesting to the jury that Mr. Cook has engaged in greater criminal activity than is actually alleged. Therefore, Mr. Cook respectfully requests that the Court grant his motion to compel the government to elect between Counts 4 or 5 and Counts 6 or 7.

**II.     THE COURT SHOULD EITHER DISMISS THE INDICTMENT BASED UPON OUTRAGEOUS GOVERNMENT MISCONDUCT OR ALTERNATIVELY SUPPRESS MR. COOK'S INVOLUNTARY STATEMENTS GIVEN IN HIS FIELD AND USE OF FORCE REPORT**

Mr. Cook suggests to this Court that the government misconduct motion and the involuntary statement motion are inherently interrelated. Essentially, SDUSM Paul Rivers' coercion of Mr. Cook's involuntary statements without affording him Garrity protections is but one act of misconduct on the part of Rivers in an overarching scheme to improperly and maliciously investigate and prosecute Mr. Cook. Mr. Cook is but a pawn in the scheme of Rivers to level all the blame and publicity of the failing District of Columbia Superior United States Marshal system upon the shoulders of a scapegoat.

**A.     The Government Cannot Prove By a Preponderance of the Evidence that Mr. Cook's Statements Were Made Voluntarily**

The government is correct in stating that they shoulder the burden of proving that statements were voluntarily made by a preponderance of the evidence. Lego v. Twomey, 404 U.S. 477, 488 (1972). Therefore, the government fails to carry its burden of proving that statements were made voluntarily when the government fails to produce the testimony of the officials who the defendant claimed coerced the involuntary statement. Sims v. Georgia, 389

5

U.S. 404, 406-07 (1967). Thus, under the government's burden of proof, it should be required to produce testimony of Rivers at the evidentiary hearing to attempt to demonstrate that Mr. Cook's statements were not involuntarily coerced.

Mr. Cook avers that the government cannot prove by a preponderance of the evidence that his statements were made voluntarily. The evidence reveals that Mr. Cook's will was overborne when Rivers demanded that he write the Field and Use of Force Report. First, it is worth noting that involuntary statements can be coerced through either physical actions, threats or more subtle forms of coercion. The totality of the circumstances test reveals that Mr. Cook's will was over-borne, not by direct physical coercion, but by more subtle forms of investigative overreaching and coercive investigative conduct. See United States v. Hsin-Yung, 97 F.Supp.2d 24 (D.D.C. 2000); United States v. Pelham, 749 F. Supp. 304, 312 (D.D.C. 1990).

First, the fact that Mr. Cook was not apprised of his constitutional rights before Rivers obtained Mr. Cook's coerced statements indicates that Mr. Cook's statements were not voluntary. See Schneckloth v. Bustamonte, 412 U.S. 218 (1973) (citing Davis v. North Carolina, 384 U.S. 737 (1966), for the proposition that the "lack of any advice to the accused of his constitutional rights" may demonstrate an over-borne will). Essentially, it was River's intentional omission of informing Mr. Cook of his right to have a union representative available before his statements were taken that led to the deprivation of Mr. Cook's constitutional rights. The violation of the United States Marshal Policies and Procedures was not in itself a violation of the constitutional rights of Mr. Cook, but the failure to follow these procedures prevented Mr. Cook from conferring with a union representative, who would have informed Mr. Cook about his Fifth Amendment right to remain silent. Because Rivers did not inform Mr. Cook about his right to

contact a union representative, Mr. Cook was never advised as to his constitutional right against self-incrimination.

Furthermore, the government's contention that Rivers merely made a 'request' for Mr. Cook to write a report is misguided.  A request is simply asking someone to do something.  That is not the case here.  Mr. Cook was coerced and compelled to give his statements, without being apprised of his constitutional rights, by the threat of impending sanctions, including removal, for a refusal to comply with River's 'request.'  When such a threat is looming over a 'request,' that 'request' begins to resemble a 'demand' or 'coercion.'  While Rivers did not explicitly preface the refusal to make a statement in the reports with removal, he did not have to.  Mr. Cook was aware of the relationship that he had with Mr. Rivers; a relationship that involved increasingly petty, punitive actions based upon supposed errors that other deputies of the United States Marshal's Service were not sanctioned for.  Mr. Cook was also aware of the possible sanction of removal for refusing to cooperate in an investigation.  Furthermore, Mr. Cook was aware that an investigation had begun, as indicated by River's showing Mr. Cook the incident report filed by Omar Hunter.  Faced with his supervisor's willingness to punish Mr. Cook for innocuous errors and aware of the possible severe sanctions for refusing to cooperate with an investigation, Mr. Cook's will was over-borne, and he was coerced into making the statements in his Field and Use of Force Report.  Therefore, the government cannot prove by a preponderance of the evidence that his statements were voluntary.

**B.     Mr. Cook Should Be Given <u>Garrity</u> Immunity for His Compelled Statements**

The government offers the proposition that an officer's answers should not be used in a subsequent criminal proceeding, only if "under an explicit threat that the officer will be fired if

he or she invokes the privilege against self-incrimination." Gov. Memorandum in Opposition to Involuntary Statements Motion at 6. The government relies upon Morgan v. Tandy, No. IP 99-535, 2000 WL 682659 (S.D. Ind. Feb. 28, 2000), an unreported case from the District Court for the Southern District of Indiana to make this assertion that Garrity protections only attach if there is an explicit threat that the officer will be fired if he or she raises her privilege against self-incrimination. Despite this strong leading statement, the government contradicts it by citing to a reported case that held that "[t]he threat of job loss need not be explicit; indirect coercion is also prohibited." Gov. Memorandum in Opposition to Involuntary Statements Motion at 7 (citing United States v. Vangates, 287 F.3d 1315, 1321-22 (11 th Cir. 2002), for the proposition that "absen[t]... a direct threat" of loss of employment, courts determine if a statement was compelled by examining the officer's "belief and... the objective circumstances surrounding it").

      Furthermore, the government fails to quote relevant language in Morgan that a defendant "could establish a violation of his Fifth Amendment privilege in one of two general ways. The first would be to show that he was coerced into waiving his Fifth Amendment privilege by the threat of discharge, that he answered questions based on that threat, and that his answers were then used against him in a criminal proceeding." Morgan, 2000 WL 682659 at *6. Thus, the government recognizes that the D.C. Circuit has held that an officer claiming Garrity protection "must have in fact believed his statements to be compelled on threat of loss of job, and this belief must have been objectively reasonable." United States v. Friedrick, 842 F.2d 382, 395 (D.C. Cir. 1988).

      In this case, based upon Rivers past behavior toward Mr. Cook and Mr. Cook's knowledge of the possible sanction of removal for refusing to comply with an administrative

investigation, Mr. Cook subjectively believed that he was compelled to give a statement upon the threat of the loss of employment. Furthermore, an objectively reasonable Deputy United States Marshal aware of an investigation being conducted into his conduct, combined with knowledge of the explicitly written sanction of removal for refusing to cooperate with and investigation and the fact that his supervisor was historically malicious toward the deputy, would believe that he was compelled to give a statement under threat of job loss.

1. **Field and Use of Force Reports Do Not Fall Under the Routine Report Exception to Garrity**

The government attempts to argue that the Field and Use of Force Reports are routine reports, with the statements contained within not receiving Garrity protections. Such an argument fails for two reasons. First, although the privilege against self incrimination "only protects against any disclosures that the witness reasonably believes could be used in a criminal prosecution or could lead to other evidence that might be so used" it is clear that in the case of Field and Use of Force Reports, the statements made in these reports could objectively be used in criminal proceedings. See Devine v. Goodstein, 680 F.2d 243 (D.C. Cir. 1982) (citing Kastigar v. United States, 406 U.S. 441, 444 (1972)). It is common sense that these reports are used for both administrative investigations as well as possible criminal investigations into the activities of the United States Marshals.

It is also apparent from the facts of this case that Mr. Cook would subjectively believe that his statements made in these reports would be used in a criminal prosecution. Mr. Cook was aware that Omar Hunter had filed a complaint against him before Rivers coerced Mr. Cook into submitting the reports. Mr. Cook was aware that complaints against Deputy United States

Marshals and other law enforcement officers occasionally lead to criminal charges. Combined with Mr. Cook's knowledge that Rivers was maliciously punitive toward him and that Rivers was looking to clean up the image of the United States Marshals Service, Mr. Cook subjectively believed that the statements in his report could be used in a criminal prosecution.

This argument by the government also fails because Field and Use of Force Reports are not usually required where a Deputy United States Marshal states that no incident occurred. In Mr. Cook's mind there was no reason to fill out either report, as there was no precipitating incident. Only upon Rivers' demand to write the reports, not his official duties, was Mr. Cook compelled to make the statements. The government attempts to circumvent this fact, by stating that Mr. Cook's own admission that he assisted Omar Hunter out of the van necessitates the filing of a Field or Use of Force Report. However, it should be noted that Deputy United States Marshals are always required to assist prisoners out of the van because the prisoners are flex-cuffed together. Without the assistance of the DUSMs, the prisoners would be unable to get off the van. Furthermore, nor does 'assistance' indicate physical force greater than minor restraint that would necessitate the writing of the reports.

    **2.    Mr. Cook Did Not Voluntarily Waive His Fifth Amendment Privilege Against Self-Incrimination**

Some cases from other circuits have found that the investigating officer does not have an affirmative duty to inform the subject of questioning of her Fifth Amendment privilege against self-incrimination and that when a person answers the questions reluctantly, she waives her Fifth Amendment privilege and any protections afforded by <u>Garrity</u>. However, in this case, while Rivers did not have an affirmative duty to inform Mr. Cook of his right to claim the privilege

against self-incrimination, Rivers did have a duty to inform Mr. Cook that he was the subject of an administrative and criminal investigation and to inform Mr. Cook that he had the right to consult with a union representative. Rivers did not comply with this duty. Had Mr. Cook been informed of and acted upon his right to obtain union representation, a minimally competent union representative would have informed Mr. Cook about his Fifth Amendment privilege and the right to ask for Garrity immunity for his statements. Thus, had Rivers complied with his duty to inform Mr. Cook of his right to obtain union representation, Mr. Cook would not have given the statements in his reports.

Moreover, though, it was the specific implied threat of a sanction of removal for not complying with the investigation that coerced Mr. Cook into making the statements contained in the Field and Use of Force Reports. Thus, his statements were compelled and any waiver of his Fifth Amendment privilege cannot be described as voluntary. Therefore, Mr. Cook respectfully requests that the Court find that Mr. Cook's statements were subject to Garrity immunity, and should not be used in the forthcoming criminal proceedings.[6]

## CONCLUSION

WHEREFORE, Mr. Cook respectfully requests that the Court issue an order compelling

---

[6] Mr. Cook also objects to other arguments forwarded by the government, but, for want of time, will address these particular arguments at the hearing. One argument, however, that should be quickly discounted is that the United States Marshal Service Guidelines do not specifically mandate removal for not cooperating with an investigation. The government relies upon United States v. Indorato, 628 F.2d 711, 715 (1st Cir. 1980), for this assertion. However, the regulations in Indorato are inapposite to the regulations in this case. In Indorato, Rule 10.7 of police departmental rules stated that all police officers "shall promptly obey any lawful order emanating from any superior." Id. Rule 10.2, which applied to all of the police rules, stated that any violation of the rules "may be subject to dismissal or such disciplinary action" that an executive officer may direct. Id. While this sanction set the range for a wide variety of other rules, the rule in this case, that an officer shall cooperate with any investigation, specifically mandates a punishment from reprimand to removal. It does not set out the general range of punishment for all USMS rules, but rather provides that an officer may be removed specifically for the offense of failing to cooperate with an investigation. Thus, the threat of removal is sufficiently specific to the rule that Mr. Cook would have been violating for not cooperating with the investigation.

the government to elect between multiplicitous counts, dismissing the indictment based upon outrageous government misconduct, and suppressing the statements made by Mr. Cook in his Field and Use of Force Report because the statements are involuntary or subject to <u>Garrity</u> immunity.

                                                  Respectfully Submitted,

                                                  **/s/ William B. Moffitt**
WILLIAM B. MOFFITT
Moffitt & Brodnax, Ltd.
11582 Greenwich Point Road
Reston, VA 20194
Phone: (703) 834-0204
Fax: (703) 834-0206
Email: wbmoffitt_esq@yahoo.com

## CERTIFICATE OF SERVICE

The undersigned attorney hereby certifies that the **Consolidated Reply to Government's Memoranda in Opposition** was served upon the following individual on October 12, 2007 by electronic means through the ECF system:

John M. Cummings
U.S. Attorney's Office
555 Fourth Street, NW
Washington, DC 20530
(202) 305-1637

                                            Respectfully Submitted,

                                            **/s/ William B. Moffitt**
                                            WILLIAM B. MOFFITT
                                            Moffitt & Brodnax, Ltd.
                                            11582 Greenwich Point Road
                                            Reston, VA 20194
                                            Phone: (703) 834-0204
                                            Fax: (703) 834-0206
                                            Email: wbmoffitt_esq@yahoo.com