UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

FILED
OCT 1 9 2007
NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

|  |  |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| v.  ) | Criminal No. 07-192 (ESH) |
| ) | |
| STEPHEN COOK, ) | |
| ) | |
| Defendant. ) | |

## MEMORANDUM OPINION AND ORDER

Defendant Stephen Cook, a Deputy United States Marshal, was allegedly involved in an incident with Omar Hunter while Hunter was in the custody of the United States Marshal Service ("USMS") on August 30, 2005. As a result, Hunter filed a Citizen Complaint Report the same day claiming that Cook assaulted him in the sallyport in the Superior Court. Immediately after receiving the complaint, defendant's supervisor, Supervisory Deputy United States Marshal Paul Rivers, instructed defendant to complete a USM-210 Field Report and a USM-133 Use of Force Report concerning the incident. Defendant did so.

On May 11, 2006, the government filed a seven-count indictment against defendant.[1] Count 1 charges defendant with using unreasonable force against Omar Hunter, thereby depriving him of his liberty without due process of law, in violation of 18 U.S.C. § 242. Count 2 alleges that Cook made false statements by filing a false Field Report in violation of 18 U.S.C. §§ 1001(a)(1) and (a)(2). Count 3 alleges that Cook conspired with others to submit false Field Reports and to testify falsely before the grand jury in violation of 18 U.S.C. § 371. Finally, Counts 4 and 6 allege that

---

[1] The government has subsequently dismissed Counts 5 and 7.

Cook tampered with a grand jury witness in violation of 18 U.S.C. § 1512 (b)(1).

Defendant Stephen Cook has moved this Court to suppress the statements he made in his Field and Use of Force Reports, arguing that their use against him in a criminal prosecution violates his due process rights and his privilege against self-incrimination pursuant to *Garrity v. New Jersey*, 385 U.S. 493 (1967). (Def.'s Mot. at 1.) The Court held an evidentiary hearing on October 15, 2007, at which the defendant, Supervisory Deputy United States Marshal Paul Rivers, and Chief Inspector Stanley E. Griscavage testified. At the conclusion of the hearing, the Court ruled from the bench denying defendant's due process claim, but took defendant's *Garrity* argument under advisement and requested supplemental pleadings regarding the applicability of *United States v. Veal*, 153 F.3d 1233 (11th Cir. 1998), *cert. denied*, 526 U.S. 1147 (1999). Having now reviewed the testimony, the pleadings, and the relevant law, the Court denies defendant's motion based on the following findings of fact and conclusions of law.

## FINDINGS OF FACT

### I.     Hearing Testimony

#### A.     Supervisory Deputy United States Marshal Paul Rivers

Supervisory Deputy United States Marshal Paul Rivers testified that he has been employed with the United States Marshal Service since October 1990. Since April 2004, Rivers has been a Supervisory Deputy in Superior Court. As a Supervisory Deputy, Rivers is responsible for handling prisoners, managing deputy rotations, and handling personnel matters for the deputies he supervises.

Rivers testified that pursuant to USMS policies and procedures, deputies are required to file a USM-210 Field Report whenever any incident occurs that is "out of the ordinary," which could

include anything from finding contraband to someone falling on the stairs. If the incident involves any use of force, the deputy must also file a USM-133 Use of Force Report as well as the Field Report. Use of Force Reports are required when the physical force used is anything beyond that necessary for a "come along hold" or an "escort stand." Rivers testified that the use of both of these reports is routine. He receives Field Reports daily and between one and three Use of Force Reports per week. Upon receiving these reports, Rivers checks for spelling and grammar errors, and then forwards them to Chief Greg Petchel. He is not responsible for evaluating whether the claims have merit or for determining whether to initiate a formal administrative or criminal investigation. He simply collects the reports and forwards them to the chief.

On August 31, 2005, Rivers, who was employed as the AM cell block supervisor at the Superior Court, received from his secretary a Citizen Complaint Report that had been filed by Omar Hunter. He alleged that on August 30, 2005, an unnamed deputy had used excessive force on the complainant while he was in the custody of the USMS in the sallyport in the Superior Court. (Def.'s Ex. 1.) The physical description of the deputy did not match any of the marshals, so Rivers asked Cook, who happened to be nearby, if he knew anything about the incident. Cook identified himself as the deputy against whom the allegations had been made. Cook told him that nothing had happened -- he just had to help a guy off the prisoner van. Rivers then instructed Cook to fill out the "basic" forms, the USM-210 and the USM-133, in the next couple of days, and confirmed with him which other officers had been present at the time of the alleged incident. He did not give Cook any *Garrity* warning prior to requesting the reports, nor was he aware of what *Garrity* was at the time of this incident. Rivers did not remember questioning Cook any further about the incident. He also instructed the other deputies who had been present at the scene (Deputies Sharpstene, Behringer,

Greenlee, and Ramsey) to fill out USM-210 reports. Rivers testified that he did not threaten Cook or any of the other deputies with termination or any other form of discipline if they failed to file the report.

Once Rivers received the reports from Cook and the other deputies, as well as from the Deputy-in-Charge Steve Long, he turned them over to the chief. He did no further investigation and made no recommendation either written or oral to any superior. The matter did not seem urgent to Rivers, for as he explained, while he has been a supervisor there have been several major incidents, including seizures, injuries, and attacks, and this incident did not seem "like a big deal" so he spent "very little" time on it.

### B.     Defendant Stephen Cook

Cook testified that he has been employed at the USMS since January 2003 and is currently on leave. He did not have a smooth relationship with his supervisor Rivers, and he believed that Rivers "singled him out" for discipline. However, prior to this incident, Cook had never been subject to any form of discipline, and he had always received successful evaluations from Rivers. Cook was aware that he had previously been subjected to a "handful" of internal affairs investigations between 2003 and 2005, but he had never been interviewed in connection with any of them. He learned of these investigations only after he received letters saying that investigations had been opened and closed. Cook also testified that he had previously filled out both Field and Use of Force Reports. He had filled out between six and eight Use of Force Reports prior to this incident, sometimes on his own initiative and sometimes when told to do so by his supervisor. In all of these cases, Cook believed that he had used force.

Cook's testimony about his conversation on August 31 did not differ substantially from River's account. Cook explained that he was present when Rivers received the complaint and, after reading it, he identified himself as its subject. He was not concerned when Rivers instructed him to file a Field Report because such reports are routine. However, after he submitted the Field Report,[2] Rivers then told him to file a Use of Force Report.[3] Cook responded that no force had been used, but Rivers instructed him to file the report anyways. Rivers never threatened him with any possibility of discipline for failing to file, nor did Rivers question him about the incident involving Hunter. Cook described Rivers's tone as being "conversational" and admitted that Rivers never "ordered" him to file the report. He believed that it was "abnormal" for Rivers to instruct him to file a report having been told that no force had been used. He nonetheless went to the computer and "copied and pasted" the contents of his Field Report into his Use of Force Report and submitted it

---

[2] The Field Report included the following description of the incident:

> On August 30, 2005 while working in the AM cell block, I was checking in prisoner vans from the central cell block. I was attempting to verify prisoner Hunter, Omar Buens identity by asking for his first name and he would not respond. I repeatedly asked Hunger for his last name and he refused to answer me. I then asked Hunter to step off the van and he refused to move stating that he was not going anywhere. After asking Mr. Hunter at least three more times to exit the van, and if there was any medical reason that might prevent him from exiting the van. After he responded that there was not, I entered the van and assisted Mr. Hunter out of the van.
> Mr. Hunter was then escorted up to the main cell block. There were no injuries to Marshals Service personnel or prisoners during this incident.

(Gov't Ex. 2.)

[3] Rivers claimed that he requested and received both reports simultaneously. This difference in the witnesses' testimony is not material to the Court's analysis.

to Rivers. (*See* Gov't Ex. 3.)

Cook testified that at the time he believed that if he failed to file the report, he could be fired. He believed this because another deputy, Christopher Christian, had been told by the chief that he would be fired if he failed to file a report. Cook was unable to recall whether he learned about Christian's situation before or after August 31, 2005. Cook also testified that he was not familiar with the particular USM policy that explains the penalty for failing to file a report or failing to follow an order, but said that he received training prior to August 2005, at which time he was told that he was required to cooperate in an investigation by answering questions and filling out reports.

### C. Chief Inspector Stanley E. Griscavage

Stanley E. Griscavage, Chief Inspector of the Office of Internal Investigations ("OII") for the USMS, testified to the policies and procedures for reporting and investigating incidents involving the use of force. He explained that any use of force must be documented in a USM-133 Report. This report is used in the normal course of business to document incidents ranging from "physical control" to the discharge of a firearm. As an example, Griscavage indicated that no report would be necessary if an officer was required to touch a suspect in order to place handcuffs on him, but if the suspect resisted, then the force used to restrain him would be reportable. Deputies have the obligation to fill out a USM-133 Report any time they use force (*see* Gov't Reply Ex. 3 [Use of Force Report] at 3),[4] and it is the responsibility of the supervisor to ensure that the report is completed.

---

[4] The instructions for the Use of Force Report provide, in relevant part, that "[t]he USMS employee will complete this report, within 24 hours, whenever the employee . . . [u]ses . . . physical force greater than minor restraint."

After the reports of an incident are completed, they are then automatically forwarded to OII, where Griscavage reviews them. If he determines that the use of force was appropriate and proper, and absent any formal complaint, the reports are processed and filed for statistical purposes. If a formal citizen complaint is filed for which no previous USM-133 or USM-210 has been submitted, the complaint is usually sent to OII without any accompanying documentation. In such a situation, the policies and procedures are silent as to whether a supervisor should request a USM-133 or USM-210 before sending the complaint to OII. However, according to Griscavage, it is very unusual for a supervisor to request that a USM-133 or a USM-210 be completed after a citizen complaint has been filed, especially where there has been a passage of time between the alleged incident and the filing of the complaint.

If OII believes that a USM-133 report requires further investigation or if there is a formal citizen complaint that alleges excessive force, that report is automatically forwarded to both the Office of the Inspector General ("OIG") and DOJ's Civil Rights Division. The large majority of cases where no citizen complaint has been filed are reviewed and closed by OII without being forwarded. Griscavage testified that he was not familiar with the internal review process of either OIG or Civil Rights, but explained the possible outcomes of sending a case to these offices. After reviewing the complaint, Civil Rights either sends a notification that it will pursue its own investigation (usually by using the FBI) or sends a letter of declination. OIG either refers the case back to OII to handle as a management issue; retains it for its own administrative or criminal investigation; or initiates a joint investigation with OII. Griscavage explained that the forwarding of a case to OIG and Civil Rights officially opens an administrative investigation because it triggers the opening of a case in the database and the assignment of a case number. Local supervisors do

not have the responsibility for determining when or if an administrative or criminal investigation should be initiated, nor do they conduct investigations. In fact, it would be "improper" for them to do so.

Once an administrative or criminal investigation has been opened, the deputy receives certain procedural protections pursuant to *Garrity*, which are explained in Article 39 of the Master Agreement between the Marshal Service and the union. (*See* Court's Ex. 3.) The deputy is notified that an administrative action is being pursued and that he has the right to seek representation. OII makes the decision when to provide the *Garrity* notice, and a line supervisor may not decide to do so before OIG and DOJ have had the opportunity to review the matter. However, *Garrity* protections do not apply prior to the initiation of the administrative or criminal investigation.

If a deputy is instructed to file a report by his supervisor, he has no choice but to respond or to face possible discipline. This decision to discipline is not made by the line supervisor. The report of insubordination is submitted to OII, which forwards it to OIG. OIG can either choose to pursue its own investigation of the matter; refer it back to OII to open an administrative action; or pursue a joint investigation with OII. Once OII has completed its investigation, it forwards its conclusions to a disciplinary panel. The panel reviews the case, issues a proposal letter based on its findings to the deciding official, and the deciding official then meets with the subject employee or reviews his or her paperwork and makes a determination as to what kind of disciplinary action is appropriate. Griscavage was unaware of any instance where a marshal with a clean disciplinary record was terminated for failing to file a necessary report.

## CONCLUSIONS OF LAW

I.      **Governing Principles of Law**

Cook argues that his Field and Use of Force Reports may not be used against him because they were obtained in violation of his Fifth Amendment right against self-incrimination. He maintains that because Hunter's complaint alleged possible criminal conduct, Rivers's instruction to write these reports should have been accompanied by a *Garrity* warning, and in the absence of such a warning, his statements were coerced and must be suppressed. Cook's argument is based on a misunderstanding of the protections to which he is entitled under *Garrity*.

In *Garrity*, officers under investigation for corruption were warned before questioning "(1) that anything [they] said might be used against [them] in any state criminal proceeding; (2) that [they] had the privilege to refuse to answer if the disclosure would tend to incriminate [them]; but (3) that if [they] refused to answer [they] would be subject to removal from office." 385 U.S. at 494. The Supreme Court determined that the choice presented to the officers "either to forfeit their jobs or to incriminate themselves" was "likely to exert such pressure upon an individual as to disable from making a free and rational choice" and therefore could not "be sustained as voluntary . . . ." *Id.* at 497-98 (internal quotation marks omitted). The Court concluded that "the protection of the individual under the Fourteenth Amendment against coerced statements prohibits use in subsequent criminal proceedings of statements obtained under the threat of removal from office . . . ." *Id.* at 500.

"Although the Supreme Court has not recently revisited the *Garrity* line of cases, a number of the circuits have focused on the 'coercion' issue emphasized by the Court in those cases, making it a claim dependent on such a showing." *United States v. Trevino*, 215 Fed. App. 319, 321 (5th Cir. 2007) (citing *McKinley v. City of Mansfield*, 404 F.3d 418, 436 (6th Cir. 2005); *United States v. Vangates*, 287 F.3d 1315, 1321-22 (11th Cir. 2002); *Chan v. Wodnicki*, 123 F.3d 1005, 1009-10 (7th

Cir. 1997); *Singer v. Maine*, 49 F.3d 837, 847 (1st Cir. 1995); *Benjamin v. City of Montgomery*, 785 F.2d 959, 961-62 (11th Cir. 1986)). To make out a *Garrity* claim, the officer must demonstrate that he had been put "between the rock and the whirlpool," *Garrity*, 385 U.S. at 498, by having to choose whether to incriminate himself or to lose his job. In this Circuit, an officer claiming the protection of *Garrity* "must have in fact believed his . . . statements to be compelled on threat of loss of job and this belief must have been objectively reasonable." *United States. v. Friedrick,* 842 F.2d 382, 395 (D.C. Cir. 1988).

Cook has failed to meet his burden under *Garrity*. First, his claim that he subjectively believed he would be fired if he failed to file the Use of Force Report is, at best, dubious. Cook admitted to being unfamiliar with the USMS policy setting out the disciplinary consequences of failing to follow an order to write a report, and he further admitted that he never knew of anyone who had been terminated on these grounds.[5] The only evidence he offered to support his belief that refusal to submit a report would be punished by termination was that another deputy claimed to have been told that he would be fired if he refused to submit a report.[6] However, Cook was unable to

---

[5] Cook represents in his Supplemental Memorandum that he "was aware of the USMS regulations that sanctioned refusal to cooperate with an investigation with the punishment of possible dismissal." (Def.'s Supp. Mem. at 7.) This directly contradicts Cook's testimony at the evidentiary hearing. Cook testified that he "thought [he] would be fired." When asked by the Court upon what that belief was based, Cook responded "[t]he situation with the prior Deputy and the policy. I don't know exactly what the policy states." The Court then asked, "You don't know what the policy states?" and Cook replied, "No."

Cook was asked again under cross-examination whether he understood the potential consequences of refusing to file his report and he again stated, "I don't know exactly what the policy says. I read the policy a long time ago."

[6] Cook testified that he was told during training of his obligation to file reports and answer questions if ordered, but did not claim to have been told of the specific consequences of a failure to comply.

remember with certainty whether he learned this information in August 2005 or thereafter,[7] and he admitted that he knew nothing about that deputy's prior disciplinary record or any other details of the situation.[8] When told by Rivers that he needed to write the USM-133 despite his contention that no force had been used, Cook did not object, refuse, or request representation. He simply copied the contents of his USM-210 into the USM-133 and submitted it later that day. Under these circumstances, Cook's contention that he was coerced into making the report for fear of being fired is implausible.[9]

But even if his testimony about his subjective belief were credible, Cook has failed to demonstrate that his belief that he would be fired for refusing to submit a report was "objectively reasonable." *Friedrick*, 842 F.2d at 395. The USMS Master Agreement specifies the disciplinary actions that may be taken for specific offenses. Failure to carry out orders, work assignments, or instructions is punished on a sliding scale: a first offense may be punished by anything between a

---

[7] In his Supplemental Memorandum, Cook represents that he "heard a chief threaten to fire another deputy if the deputy did not write a report immediately." (Def.'s Supp. Mem. at 7.) In fact, Cook testified that "Deputy Christian told [him] he was notified by the chief that he would be fired if he didn't write [a statement] when they asked him to write it."

[8] Cook represents in his Supplemental Memorandum that he learned about Christian's situation prior to the alleged incident involving Omar Hunter. (Def.'s Supp. Mem. at 7.) This is inconsistent with his testimony. At the evidentiary hearing, Cook first said that he didn't "know the exact timing [of that conversation], a couple years ago, two years ago," but thought it "was after" August 2005. A few moments later, Cook revised his position and said he "[thought] that [conversation] was before '05." Finally, he said, "I don't know exactly, but possibly early 05."

[9] In fact, given Cook's concession at the evidentiary hearing that Rivers's request for the Field Report was not unusual because his request for these reports was part of the daily routine in the cell block, Cook's argument that he felt coerced can only apply to Rivers's direction to write the USM-133 Use of Force Report. Given the fact that Cook's statement in the two forms is identical, it is somewhat illogical for Cook to argue that the first statement was not a product of coercion but the second one was, as "the cat was out of the bag" before he even wrote the USM-133.

reprimand and removal; a second offense may be punished by anything between a 15-day suspension and removal; and a third offense is punished by removal.[10] For a first time offender like Cook, removal is not mandated, nor, according to Griscavage, is it likely. Given the lack of any policy mandating removal, as well as the absence of any precedent where removal had been invoked, it would not have been objectively reasonable for Cook to believe that he would be terminated if he declined to file the reports.[11]

Contrary to Cook's argument, *Garrity* does not stand for the proposition that a statement made in a standard report is coerced whenever an officer faces both the remote possibility of criminal prosecution if he files the report and the arguably even more speculative possibility of termination if he declines to do so. Rather, the touchstone of the *Garrity* inquiry is whether the defendant's statements were coerced and therefore involuntary. In Cook's case, both the possibility of prosecution and the possibility of termination were far too tenuous to support a finding that he was between "the rock and the whirlpool" at the time he filed his reports. In fact, the circumstances of the case, as testified to by both Cook and Rivers, support a finding that no coercion was involved when Cook decided to file the reports. *See Trevino*, 215 Fed. App. at 320 (finding no coercion even

---

[10] The same sliding scale of penalties is applied for refusal to cooperate in any government inquiry. (*See* Def.'s Mot. Ex. 2 [Dept. Of Justice and U.S. Marshals Service Table of Offenses and Penalties] ¶ 19.)

[11] Defense counsel has argued that Cook reasonably feared that he would be disciplined if he failed to follow his supervisor's order. Whether this is true is legally irrelevant. In order for a statement to be compelled under *Garrity*, the officer must have an objectively reasonable fear of *termination*, not just of *discipline*. The Fifth Amendment "does not shield a person from every adverse social or economic consequence which may flow from testifying." *In re Grand Jury Proceedings*, 835 F.2d 375, 376 (1st Cir. 1987). *See also Chan v. Wodnicki*, 123 F.3d 1005, 1009 (7th Cir. 1997) ("[T]he jurisprudence of the Supreme Court . . . makes clear that not every consequence of invoking the Fifth Amendment is considered sufficiently severe to amount to coercion to waive the right.").

when off-duty officer was called into the station for questioning and escorted into the interrogation room by the Chief of Police).

Furthermore, the presumption underlying *Garrity* and its progeny is that the subject employee is under investigation at the time the challenged statement is made. *See, e.g., Garrity*, 385 U.S. at 494 (police officers interviewed as part of an internal investigation led by the Attorney General); *Lefkowitz v. Cunningham*, 431 U.S. 801, 803 (1977) (public official subpoenaed to appear before a grand jury); *Friedrick*, 842 F.2d at 386 (FBI agent interviewed as part of administrative and criminal investigations). As the testimony of Griscavage clearly demonstrates, Cook was not under either administrative or criminal investigation when Rivers requested his reports.[12] Cook cites no case, nor has the Court located any, to support the position that *Garrity* should be applied prior to the initiation of an administrative or criminal investigation. To interpret *Garrity* as defendant advocates would be both unprecedented and impracticable. It would mean that when a supervisor receives a complaint against an officer that has even the slightest potential of resulting in criminal charges, the supervisor could not follow up by requesting the standard paperwork without providing the officer with *Garrity* protections, because the request could be construed as an "order" to comply with an "investigation." This scenario would be unworkable for a number of reasons, not the least of which is that it would require line supervisors to make legal judgments about the potential criminality of the conduct alleged. Given the witnesses' testimony as to the frequency with which

---

[12] Rivers testified on cross-examination that his collection of reports could be characterized as an "informal administrative investigation." This characterization is of no relevance to the *Garrity* inquiry. As Griscavage explained, under USMS policy, an administrative investigation begins only with the referral of the complaint to the appropriate section of the Department of Justice, and any questioning of the subject employee after this point can only occur with *Garrity* protections.

force is and must be used, extending *Garrity* protections to the moment a complaint is filed would create a tremendous and unnecessary administrative burden. The Court therefore declines to adopt this unwarranted extension of the *Garrity* doctrine.

Moreover, even if Cook could demonstrate that *Garrity* is applicable here, which he has not, he could not rely upon it to prevent the introduction of his reports as evidence with respect to Counts 2, 3, 4, and 6. *Garrity* provides that an officer under investigation may choose between refusing to cooperate with the investigation and losing his job or providing an incriminating statement and avoiding prosecution on that matter. "An accused may not abuse *Garrity* by committing a crime involving false statements and thereafter rely on *Garrity* to provide a safe haven by foreclosing any use of such statements in a prosecution for perjury, false statements, or obstruction of justice." *United States v. Veal*, 153 F.3d at 1243. *See also United States ex rel. Annunziato v. Deegan*, 440 F.2d 304, 306 (2d Cir. 1971) (upholding perjury conviction because "appellant was not prosecuted for past criminal activity based on what he was forced to reveal about himself; he was prosecuted for the commission of a crime while testifying . . . ."); *United States v. Devitt*, 499 F.2d 135, 142 (7th Cir. 1974)(holding that *Garrity* and its progeny "provide adequate protection of the witness's Fifth Amendment rights. We find no reason or justification for extending this umbrella of protection to shield a witness against prosecution for knowingly giving false testimony."); *United States v. White*, 887 F.2d 267, 274 (D.C. Cir. 1989)(Ginsburg, J.)(explaining that the decision to lie is not protected by *Garrity*).

Cook attempts to escape this well-established rule by arguing that at the time he was told to write the reports, he was being investigated for both the alleged assault and a possible cover-up. (Def.'s Supp. Mem. at 3-6.) This contention is without evidentiary support. First, Cook cannot

demonstrate that he was the subject of any type of investigation, least of all a criminal investigation, at the time he was instructed to write the reports. As Griscavage explained, the decision whether to initiate a criminal investigation occurs much later after the complaint and any accompanying documentation have been forwarded to OII and then to OIG and the Civil Rights Division.[13] Both Rivers and Cook testified that Rivers had just received the complaint, which had been dropped off at the Superior Court, at the time of their first conversation. Therefore, it is simply not possible that a criminal investigation was in progress (or even contemplated) at the time Rivers told Cook to write the reports.

More importantly, there is no basis for Cook's argument that he was the subject of an investigation for a potential cover-up at the time he was asked to complete the reports. (Def.'s Supp. Mem. at 3-6.) Also, to the extent that Cook argues that Rivers was also investigating Cook's failure to file a report, this is irrelevant. Cook is not being prosecuted for failing to file a report -- he is being prosecuted for filing a false Field Report and for conspiring with others to support his version of the incident by filing false reports and giving false testimony to the grand jury. Obviously, none of these offenses could have been the subject of the investigation prior to the filing of the reports, and, therefore, they could not qualify for *Garrity* immunity.

---

[13] Cook incorrectly states that "[o]nce [a] citizen complaint[] report[] [is] forwarded to the Department of Justice, a criminal investigation is commenced to determine whether to bring charges based on the complaint." (Def.'s Supp. Mem. at 4.) In fact, Griscavage testified that the decision whether to bring a criminal investigation is made by OIG and Civil Rights. A criminal investigation is not automatically initiated by the forwarding of the complaint to these sections.

## CONCLUSION

For the foregoing reasons, defendant's motion to suppress his statements [Dkt #7] is DENIED.

/s/ Ellen S. Huvelle
ELLEN SEGAL HUVELLE
United States District Judge

DATE: October 18, 2007