IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| v. | ) | Crim. No. 1:07-CR-192 |
| | ) | |
| STEPHEN COOK, | ) | Hon. Ellen S. Huvelle |
| | ) | |
| Defendant. | ) | |

## DEFENDANT STEPHEN COOK'S POST TRIAL MOTIONS

COMES NOW, Defendant Stephen Cook, by and through undersigned counsel, pursuant to Federal Rules of Criminal Procedure 29 and 33, respectfully moving this Court for a judgment of acquittal or alternatively moving this Court to vacate the verdict and grant a new trial. In support of these motions, Mr. Cook states as follows:

## I.    FEDERAL RULE OF CRIMINAL PROCEDURE 33 STANDARD FOR GRANTING A NEW TRIAL

Federal Rule of Criminal Procedure 33 states that "the court may vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. Pro. 33 (2007). The general standard under Rule 33 is that a defendant is "entitled to a retrial on the basis of newly discovered evidence [if] he can show that 'a new trial would *probably* produce an acquittal'"[1] United States v. Williams, 233 F.3d 592, 593 (D.C. Cir. 2000) (quoting Thompson v. United States, 188 F.2d 652, 653 (D.C. Cir. 1951)).

## A.    Mr. Cook Is Entitled to a Retrial Based on the Government's Failure to Disclose Exculpatory and Impeachment Evidence

---

[1] Mr. Cook moved for a Rule 29 motion at the end of the government's evidence and a the end of the trial. Rather than repeating the grounds for such a motion, Mr. Cook respectfully renews and incorporates his arguments made in his oral Rule 29 motions.

In order to obtain a new trial based on the government's failure to disclose exculpatory evidence a defendant must only demonstrate "a reasonable probability that, had the evidence been disclosed, the outcome of the proceeding would have differed.  A reasonable probability is a probability sufficient to undermine confidence in the outcome." United States v. Dean, 55 F.3d 640 (D.C. Cir. 1995) (citations omitted).  Where the Brady evidence was disclosed during the course of trial, the defendant has "the burden to show that 'had the statements been disclosed earlier, there is a probability sufficient to undermine our confidence in the actual outcome that the jury would have acquitted.'" United States v. Wilson, 160 F.3d 732, 742 (D.C. Cir. 1998) (quoting United States v. Tarantino, 846 F.2d 1384, 1417 (D.C. Cir. 1988).  Thus, the government has a duty to disclose favorable evidence in a timely manner so that it is useful to the defense.  A new trial is not required, where the defendant "effectively used, or had an opportunity to use, all the late-disclosed or unsegregated exculpatory evidence at trial." Dean, 55 F.3d at 664. Furthermore, though, a defendant's

> claim for relief based upon a breach of the prosecutor's duty of disclosure challenges the fairness, and therefore the validity, of the proceedings, and relief,... on a motion for a new trial..., may not depend on whether more able, diligent or fortunate counsel might possibly have come upon the evidence on his own.  A criminal trial is not a game of wits between opposing counsel, the cleverer party, or the one with the greater resources, to be the 'winner.'

Levin v. Katzenbach, 363 F.2d 287, 291 (D.C. Cir. 1966) (finding that a Brady violation may occur when the government fails to disclose to the defense that certain witnesses do not remember the incident occurring).

In the seminal case on the prosecutor's duty to disclose exculpatory evidence to the defendant, the Supreme Court held "that the suppression by the prosecution of evidence favorable

to an accused upon request violates due process where the evidence is material to guilty or punishment, irrespective of good faith or bad faith of the prosecution." Brady v. Maryland, 373 U.S. 83, 87 (1963). In United States v. Bagley, the Supreme Court further clarified this standard by finding that there was no difference between exculpatory evidence and impeachment evidence under Brady and that any request, general or specific, for favorable evidence that is material triggers the government's duty. 473 U.S. 667, 682 (1985). The Bagley Court found that there is a due process violation where the government suppresses favorable, material evidence "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." Id.

In Kyles v. Whitley 514 U.S. 419 (1995), the Supreme Court further developed the Brady standard by emphasizing four aspects of materiality. First, "[a]lthough the constitutional duty is triggered by the potential impact of favorable but undisclosed evidence, a showing of materiality does not require demonstration by a preponderance that disclosure of the suppressed evidence would have resulted ultimately in the defendant's acquittal." Id. at 434. The test for materiality should not focus on "whether the defendant would more likely than not receive a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence. A 'reasonable probability' of a different result is accordingly shown when the government's evidentiary suppression 'undermines confidence in the outcome of the trial." Id. (quoting Bagley, 473 U.S. at 678).

Second, Bagley materiality is not a test of the sufficiency of the evidence. Id. "The possibility of an acquittal on a criminal charge does not imply an insufficient evidentiary basis to convict. One does not show a Brady violation by demonstrating that some of the inculpatory

evidence should have been excluded, but by showing that the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." Id. at 435.  Third, once constitutional error is shown through a reasonable probability of a different result, there is no need for further harmless error review.  Id.  Once the favorable evidence is found to be material, the constitutional error in suppressing that evidence precludes the finding that the evidence is harmless.  Id.

Finally, the Kyles Court found that the cumulative effect of the evidence must be examined, rather than an item by item review of the suppressed evidence.  Id. at 436.  Kyles imposes a burden upon the prosecutor to disclose favorable evidence once that evidence, taken as a whole, reaches the level of reasonable probability.  Thus, "[t]his in turn means that the individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police." Id. at 437.  Such a burden "serve[s] to justify trust in the prosecutor as 'the representative...of a sovereignty...whose interest...in a criminal prosecution is not that it shall win a case, but that justice shall be done.'" Id. at 439 (citing Berger v. United States, 295 US 78, 88 (1935)).

In summary, Mr. Cook is entitled to a new trial based upon the government's failure to disclose exculpatory evidence, including impeachment evidence.  To demonstrate materiality, Mr. Cook only needs to show that there is a reasonable probability that the outcome of the case would have differed had the evidence been disclosed, with reasonable probability defined as a probability to undermine confidence in the outcome.  Furthermore, the evidence must be examined cumulatively to determine if its disclosure would undermine confidence in Mr. Cook's conviction. Finally, the government has a duty to disclose exculpatory and impeachment evidence in a timely

manner, so that Mr. Cook had a fair opportunity to use and investigate the evidence to his advantage.

In the instant case, the government repeatedly and continually violated its Brady obligations, which ultimately deprived the defendant, Stephen Cook, of a fair trial. The defendant learned each time of the favorable evidence after opening statements, in the middle of trial, during a witness's testimony. On each occasion the government was aware of the favorable evidence long before the trial begins.

1.    *The Government Failed to Disclose Favorable and Material Impeachment Evidence*
      *Concerning the Complaining Witness, Omar Hunter.*

These continuing violations began with the government suppressing evidence of the attitudes and behaviors of the complaining witness, Omar Hunter. Not only did the government not provide the defendant with information in its possession concerning the attitude and behavior of Mr. Hunter, the government attempted preclude the defendant from impeaching Mr. Hunter with general information, arguing to the Court that the information lacked relevancy. This information concerning Mr. Hunter's use of a copyright symbol to protect his name was only discovered through the defendant's own research.[2] This began a series of untimely disclosures made begrudgingly by the government to the defendant in a less than forthcoming manner. These disclosures only occurred after the opening statements, brought to light by information elicited from witnesses on cross examination.

_____

[2] It is not known how long the government had this information in its possession. They at least had a duty to bring any relevancy issues to the Court before trial instead of continually assuring the Court that the government did not have any Brady evidence. The government's attempt to hide this information does not just extend to a failure to disclose but rather to an insidious desire to preclude any introduction of Mr. Hunter's state of mind.

5

2.    *The Government Failed to Disclose Favorable and Material Impeachment Evidence*

   *Concerning a Testifying Eyewitness, Bernard Thornton*

Next, the government also failed to inform the defense that its witness, Bernard Thornton, was removed to St. Elizabeth's for a competency evaluation a mere two months after being arrested and sharing a CCB cell and a van with Mr. Hunter.  The government felt satisfied with the information that he was eventually found competent after a three-month stay at the hospital, and suppressed this evidence from the defense.

Not only did the government not inform the defense that Mr. Thornton was hospitalized for mental health issues, but it did not seek to illicit this information from the witness during direct examination.  Only after the witness mentioned his three-month long stay at St. Elizabeth's on cross examination did the government admit to being aware that he underwent a competency evaluation.  The government claimed that the only information available to them was the fact that Mr. Thornton was found competent.  They additionally claimed that the actual report was unattainable due to the passage of time.  Again the government choose to ignore its duty to investigate evidence favorable to the defendant.

The Court was easily able to locate two reports from Mr. Thornton's stay at St. Elizabeth's.  This was the first showing that, contrary to the government's position, Mr. Thornton was at first found incompetent to stand trial.  The defense was denied the chance to review the report, investigate its findings, or cross the witness on his mental condition at the time of perceiving the incident after the Court determined that the evaluation was not close enough in time to the incident to make it relevant.  To this date, the defendant has been unable to review the competency evaluation of this witness, and the types of mental problems that Mr. Bernard

6

Thornton was suffering are still unknown to the defendant.  Competency is perhaps the lowest

standard of mental awareness.  If Mr. Thornton's incompetency was the result of drug abuse,

many drugs of abuse can cause permanent brain damage with attendant consequences to

awareness and acuity.  Information that might demonstrate that an ostensible eyewitness does not

meet this low standard of competency at the time of witnessing the alleged incident is clearly

exculpatory.

This report takes on additional cumulative importance coupled with other Brady evidence

suppressed from the defense.  The defense was not aware that Mr. Thornton could have been

suffering from mental health issues that would effect his competency to stand trial.  These issues

could have potentially affected Mr. Thornton's perception and memory of the incident.  Mr.

Thornton was also the only witness present with Mr. Hunter while he had to be forcibly removed

from the cell at CCB and put on the van for transportation from CCB to the cellblock at Superior

Court.

Defense counsel was not able to investigate Mr. Thornton's current mental state on

August 30, 2005, his memory capabilities, or if he has suffered any brain damage both at the time

he was interviewed by the FBI about this incident and at the times he testified in front of the grand

jury and at trial.  Defense counsel was not able to cross him on what he remembered from the use

of force at the CCB because at the time that Mr. Thornton was testifying, the defense was not

aware of the incident at CCB.

Mr. Thornton's mental health evaluations are not to be confused with the impeachment

evidence that the government did provide to the defense concerning Mr. Thornton's illustrious

criminal past.  Cf. United States v. Oruche, 484 F.3d 590, 599 (D.C. Cir. 2007) (finding that no

Brady violation exists where the witness' credibility has already been thoroughly impeached). The reports from St. Elizabeth's do not relate so much to Mr. Thornton's past as a criminal, any propensity to lie or credibility issues, so much so as they bring into question Mr. Thornton's mental capabilities for perception, memory, and the possibility that he could have been confused where he saw Mr. Hunter assaulted or easily influenced by FBI questions concerning the incident.

This is a particularly egregious suppression in light of the government's closing argument concerning the credibility of Mr. Thornton. The government presented to the jury that despite his criminal past, Mr. Thornton was the witness with the least motive to lie, and therefore his credibility was ironically the best out of all the other government witnesses. As the government was able to bolster Mr. Thornton's credibility by arguing his lack of a motive to fabricate, the defense was prevented from exploring or arguing Mr. Thornton's ability to correctly perceive and remember events in the past.

3.    *The Government Failed to Disclose the Prior Use of Force Incident Between the Metropolitan Police Department and Mr. Hunter*

Once again, the defendant was again only introduced to Brady information upon eliciting it during cross examination of the government's fourth witness, Officer McNeill.[3] Only when Officer McNeill volunteered information concerning the strikingly similar problems that the Metropolitan Police Department ("MPD") had with Mr. Hunter just prior to his transfer to

---

[3] The government delayed disclosing the name of Officer McNeill and refused to disclose the FBI 302 field report in which Officer McNeill first denied remembering any event in the Superior Court sally port. The government erroneously took the position "that the witness' initial statement that he did not remember the incident does not rise to the level of exculpatory evidence that would require identification of the officer under Brady." Instead, the government claimed that this report was Jencks material and would be provided on the Friday before trial. The government did eventually reconsider, and provided the defendant a copy of Officer McNeill's report a week before the Jencks submission.

Superior Court did the defendant learn of this prior incident between Mr. Hunter and law enforcement. The government withheld from the defendant until the very last minute favorable evidence that Mr. Hunter was involved in a use of force incident with the MPD just prior to his transportation to the United States Marshal's cell block in Superior Court.

During Mr. Hunter's stay at CCB, MPD technicians had to use force to remove Mr. Hunter from his cell and place him on the van. The government made a conscious decision, without consulting the Court, that any of Mr. Hunter's actions and the actions of other law enforcement during his detainment were not relevant. See supra, footnote 2. In doing so, the government violated its Brady obligations by attempting to suppress any evidence of the incident between Mr. Hunter and the MPD prior to Mr. Hunter's contact with the defendant.

When questioned by the Court, the government gave contrary explanations for exactly when and how they learned of the pervious incident between Mr. Hunter and the MPD. The government first said that it was unclear from the grand jury testimony of Officer McNeill that there was any incident with Mr. Hunter at the CCB, and it only became obvious after a pre-trial meeting with Officer McNeill. The government then recanted, stating that it had become aware of the additional incident through the grand jury testimony of Officer McNeill, but did not ascertain the details until briefly before trial.

It is clear from the response that the government knew and failed to ascertain details from Officer McNeill, nor did the government provide any mention of the incident to the defense before the trial began, at the time when the government supposedly first became sure that there was a previous incident. The government stated to the Court that Officer McNeill had mentioned something about an incident in a cell at the grand jury, but that the government did not attempt to

9

clear up the issue until a pre-trial meeting with Officer McNeill.

Under these circumstances, the government has a duty to learn of all exculpatory evidence under Kyles, and at best when the government first heard whispers of the incident at the cell, the government chose to ignore the evidence until on the eve of trial. Further, McNeill is a Metropolitan Police Officer, and his knowledge of the event as a police officer is imputed to the prosecution in this case. See Kyles, 514 U.S. at 437. Exacerbating the suppression, once the prosecutor had actual knowledge of a prior incident with Mr. Hunter occurring at Central Cell Block, and when a duty existed to disclose the information, the government did not disclose this evidence to the defendant. Instead, the defense first learned of the previous incident between Mr. Hunter and MPD during Officer's McNeill's trial testimony when Officer McNeill began to describe the incident with Mr. Hunter.[4]

Moreover, this evidence concerning what occurred at the CCB is both favorable and material to Mr. Cook's case. The government's case against the defendant relied in part on photographs taken of Mr. Hunter showing a swollen right jaw and Mr. Hunter's testimony that he was assaulted at the sally port. Where those injuries took place and who was responsible for those injuries was key to the government proving that the defendant had assaulted Mr. Hunter. Evidence that Mr. Hunter was non-complaint with MPD officers in much the same manner that he was non complaint with the defendant, and that Mr. Hunter had to be forcibly removed from his cell and placed on the van while still in the custody of the MPD mere moments before he was taken into USMS custody is clearly exculpatory.

---

[4]Although Officer McNeill was aware of the incident, he stated that he was not present, and merely heard about the problem of removing the obstinate Mr. Hunter out of his cell from the two civilian technicians who forcibly removed Mr. Hunter and placed him in the van.

10

It is obvious that any incident or use of force by MPD officers or employees could have raised a reasonable doubt as to where Mr. Hunter received his injuries. It is obvious that the incident could also have been used to impeach the veracity of the testimony of Mr. Hunter,[5] Officer McNeill, and Bernard Thornton. It is obvious that evidence that Mr. Hunter sustained injuries from Central Cell Block also lends credence to the defendant's report that he did not use force with Mr. Hunter and would justify his instructions to another Deputy United States Marshall over the phone to testify, "[W]hatever's in my report, that's what happened." (Oct. 23, 2006 Phone Tr. 5).

In the middle of the trial, when the defense was made aware of the incident, the government contended that it had satisfied all <u>Brady</u> obligations by providing the office phone number and names of the technicians to the defense for possible investigation. However, not turning over this evidence until the middle of trial is a <u>Brady</u> violation. It is absurd to believe that while in the middle of a trial, the defense could somehow divide its time and resources between preparing for witness examination and investigating an incident that occurred over two years ago. The defendant filed a motion for a mistrial and then asked the court for a continuance to further investigate the incident. Both were denied. This was favorable evidence for the defendant that gave another explanation for any possible injuries that Mr. Hunter may have sustained that morning. In addition to giving another explanation for Mr. Hunter's injuries, further evidence of Mr. Hunter's non-complaint behavior and continued refusal to give his name or voluntarily move,

---

[5] Among these repeated <u>Brady</u> and <u>Kyles</u> violations was also the government's failure to disclose Mr. Hunter's continued non-compliance and views of himself as a sovereign being who was beyond the jurisdiction of the United States. The government instead attempted to paint Mr. Hunter as a children's music teacher.

would have put the case in an entirely different light, undermining confidence in the conviction. Clearly, evidence that offered another explanation for Mr. Hunter's injuries, that Mr. Hunter had continued to be non-compliant while in custody is favorable evidence that would raise a reasonable probability of a different result for the defendant if timely and complete disclosure was provided by the government.

The expectation of the Court, in this case, that the defendant would be able to prepare for next day of trial, prepare cross examinations of government witnesses, continue to plan the defendant's strategy and at the same time have the time and resources to fully investigate an incident that occurred over two years ago undermines the provisions for a fair trial set out in Brady, Dean, and Kyles. It is unreasonable to expect that disclosure of Brady information after opening arguments is timely or satisfies the prosecution's burden for disclosure.

The cumulative effect of all of this suppressed evidence, that the defense did not receive until the trial was well under way, is that there is a reasonable probability that the result of the proceedings would have been different if the defense had access to this suppressed information at a time when the defense could have adequately utilized the information. Especially viewing the suppressed evidence in light of the posture of the government's case, that was based upon the conflicting testimony of a few different eyewitnesses, it is reasonably probable that had the defense had earlier, timely access to the impeachment and exculpatory information, the resulting jury verdict would have been different.

**B.    Mr. Cook Is Entitled to a New Trial Because His Counsel Was Impermissibly Precluded from Arguing the Insufficiency of the Government's Evidence and the Government's Failure to Carry Its Burden of Proof**

In United States v. Lawson, the D.C. Circuit differentiated between a missing witness or

evidence argument and an argument based upon the sufficiency of the evidence. 494 F.3d 1046, 1053 (D.C. Cir. 2007). The D.C. Circuit held that "Lawson's counsel was simply calling into question the sufficiency of the government's evidence, a typical,.. expected, [and anticipated] argument for a case like this. It was entirely reasonable for counsel to point out to the jury the kinds of evidence that they might have expected to see but did not.... Emphasizing the lack of one form of evidence- in this instance, testimony by Canarte- is not always or necessarily an argument that a witness not called would have provided testimony harmful to the prosecution's case." Id. at 1053 (citing Burgess v. United States, 440 F.2d 226, 235 (D.C. Cir. 1970) ("[T]he significance of the absence of a witness is not confined to an inference that if produced his testimony would be unfavorable to the party who has the power to produce him.")). The D.C. Circuit emphasized that "Lawson's counsel did not even ask the jury to infer, either directly or in a meaningful indirect manner, that Canarte would have testified against the government's case. Counsel was making a permissible argument based on absence of evidence that the government had failed to prove that Lawson sold illegal drugs." Id. (citing United States v. Henson, 486 F.2d 1292, 1298n.4 (D.C. Cir. 1973)).

Finally, the D.C. Circuit stated that a defendant must also demonstrate that "[a]ny error, defect, irregularity or variance" must "affect substantial rights." Id. (quotations and citations omitted). "An error affecting substantial rights must have a substantial effect or influence in determining the... verdict." Id. (quotations and citations omitted).

Specifically, in Lawson, the D.C. Circuit found that it was permissible and expected that the defense made the following argument:

And when you retire, ladies and gentlemen, to think about what evidence the government

13

has and hasn't presented, I submit to you that you will find yourself asking a whole bunc
of questions that are completely unanswered by the government's evidence. The
government hasn't presented to you the testimony of Aubrey Canarte. The government
hasn't presented to you a single photograph, or a single video, or anything to suggest that
this transaction occurred. And how do you know, ladies and gentlemen, that this
supposed transaction didn't occur.

Id. at 1052 (citing 9/13/05 Tr. at 129).

In this case, the defendant was impermissibly prohibited from arguing the issues of

sufficiency of the evidence and the government's burden of proof with respect to Brady

information untimely disclosed to the defendant during trial. Defense counsel is always permitted

to argue to a jury about the sufficiency of the government's evidence. Particularly in light of the

government's burden of proof, a defendant is permitted to bring to the jury's attention any

expected evidence that the government did not present. A defendant is allowed and indeed

expected to point out insufficient evidence or witnesses that were present but not called by the

government to point out to the jury that the government did not prove beyond a reasonable doubt

the offense charged.

Here, the place where the injuries occurred to Mr. Hunter was central to the government's

case. If the incident occurred somewhere else than the United States Marshal Service cellblock at

Superior Court, then the government could not prove beyond a reasonable doubt that defendant

Stephen Cook assaulted Mr. Hunter. The charges against the defendant for writing a false report

about the incident and tampering with a witness to stick to that report closely follow.

In closing arguments defense counsel sought to point out to the jury evidence that the

government did not present to highlight that the government did not satisfy its burden of proof.

The defendant's counsel was surprised at the government's objection and then shocked at the

14

Court's decision to sustain the objection. This occurred three times at the beginning of counsel's closing argument. Counsel asked to approach the bench to question the court as to why he was not allowed to argue the sufficiency of the evidence and the government's burden of proof, but the Court did not allow counsel to approach. Sufficiency of the evidence and burden of proof arguments are traditional and should be anticipated by any Court or prosecutor.

As such, defense was not able to argue to the jury that the government has not met its burden of proof because the government did not present certain pieces of evidence. This completely undermined defense counsel's closing argument and required that counsel refocus his argument while still unclear as to why he was not allowed to argue sufficiency of the evidence or the government's burden of proof, which adversely affected his presentation and in turn affected the defendant's substantial rights.

The government did not produce the van sheet with the list of names of other prisoners on the van with Mr. Hunter on the morning of August 30, 2005. Defense counsel also sought to argue that the government did not call other prisoners on the van. These prisoners were at the very least also witnesses to the incident and, by the accounts of other witnesses, also pulled off the van and onto the ground by the defendant.

Defense counsel also attempted to argue that the government did not meet its burden of proof by not introducing into evidence any reports of a similar incident with Mr. Hunter while he was being housed at Central Cell Block (CCB) before his transfer to the cellblock of Superior Court. The driver of the MPD van testified that Mr. Hunter refused to give his name while at CCB and had to be forcibly removed from his cell. The government did not call the two civilian technicians involved with removing Mr. Hunter and placing him on the MPD van, and the

government did not produce any reports from MPD memorializing that use of force.

Defense counsel sought to question whether the government had met its burden of proof with respect to where Mr. Hunter was assaulted. This became important after the untimely and incomplete Brady disclosure of such information by the government. Specifically, the defense was not able to argue that because the jury did not hear from these witnesses, there existed a reasonable doubt as to where Mr. Hunter was assaulted.

The D.C. Circuit has stated that it is completely reasonable and even anticipated that the defense would argue to a jury the sufficiency of the government's evidence. Lawson, 494 F.3d at 1053. The burden of proof lies with the government to prove beyond a reasonable doubt that the defendant is guilty. The defendant, who is not required to put on a case or present evidence to the jury, is permitted to argue to the jury that the government's evidence is insufficient to convict. Lawson allows that the defendant is permitted to point out to the jury types of evidence or witnesses that the jury might have expected the government to present in order to meet their burden of proof. For instance, arguing to the jury that the government did not prove beyond a reasonable doubt that the defendant distributed drugs because the government did not call the person to whom the defendant allegedly sold drugs, is permitted.

Here, the defendant attempted to point out similar insufficient evidence in the government's case. The defense sought to argue that there were other witness present, indeed attached through flex cuffs, that morning at the USMS Sally Port from whom the jury did not hear. The defense also sought to argue that other law enforcement personnel had used force with Mr. Hunter just prior to Mr. Hunter's contact with the defendant, and the government in not calling these witnesses or producing other evidence such as a report memorializing this use of

force, had not met its burden of proof that Mr. Hunter was assaulted at the USMS cellblock by a Deputy United States Marshal.  According to Lawson, "[c]alling into question the sufficiency of the government's evidence [is] a typical and expected argument for a case like this." 494 F.3d at 1054.  Defense counsel should have been able to argue the shortcomings of the government's case in front of the jury.

Arguing to the jury that the government did not call a witness who would be need to met the government's burden of proof is not an impermissible missing witness argument. "Emphasizing the lack of one form of evidence... is not always or necessarily an argument that a witness not called would have provided testimony harmful to the prosecution's case."  Id. at 1054.  The argument the defendant was attempting to make in front of the jury was based solely upon the government's burden of proof and insufficiency of the government's evidence and "the significance of the absence of a witness is not confined to an inference that if produced his testimony would be unfavorable to the party who has the power to produce him."  Id. at 1053 (citing Burgess v. United States, 440 F.2d 226, 235).

In United States v. Henson, the D.C. Circuit held that a party did not make a missing-witness argument because, "[t]he remarks did not directly, or in a meaningful indirect manner, ask the jury to draw an impermissible inference from [a witness's] absence."  486 F.2d 1292, 1298 n. 4 (D.C.Cir.1973).  However, that question was never reached here.  Here, the Court either hastily, or in complete ignorance of Lawson, sustained three objections by the government when defense counsel was attempting to argue the sufficiency of the evidence at closing.  Counsel was not permitted to approach either time to proffer his argument.

17

1.      *The Court's Precluding the Defense from Arguing Sufficiency of the Evidence Was*
        *Substantial Error, Affecting the Substantial Due Process Rights of Mr. Cook*

        "An error affecting 'substantial rights' must have a 'substantial and injurious effect or

influence in determining the... verdict.'" <u>Lawson</u>, 494 F.3d at 1053 (citing <u>United States v.</u>

<u>Dominguez Benitez</u>, 542 U.S. 74, 81 (2004)).  Mr. Cook was convicted on all counts stemming

from the jury finding that he assaulted Mr. Hunter while he was in the custody of the USMS.  The

government in its closing urged the jury to find that Mr. Cook had instructed fellow Deputy

United States Marshal Bryan Behringer to lie every time Mr. Cook told Behringer to "stick to his

report."  They argued this was coded language from behind the "thin blue line," that the two

marshals had knowingly lied in their reports and therefore Mr. Cook was continuing to instruct

Behringer to lie in front of the grand jury.  The government also argued that Mr. Cook's use of

the term "assisted" was a gross underestimate of the actual force used on Mr. Hunter that day and

that Mr. Cook had committed perjury by leaving out material facts of his assault on Mr. Hunter

that morning.  Once the jury determined that Mr. Hunter's injuries occurred while in USMS

custody at the sally port of the cellblock at the hands of Mr. Cook, they had no choice but to

convict Mr. Cook of the perjury and witness tampering counts based upon his report.

        Unlike in <u>Lawson</u>, where the stricken argument went towards counts of which the

defendant was eventually acquitted, defense counsel's argument here went towards the heart and

soul of the case again Mr. Cook of which he was convicted by the jury.  <u>See</u> 494 F.3d at 1053

The court's instruction to the jury in <u>Lawson</u> to disregard that portion of defendant's closing

argument was found to be a harmless error and did not affect Lawson's substantial rights.  <u>Id</u>.

However, the argument in Lawson pertained to the counts of distribution of drugs, and Lawson

18

was acquitted of all distribution charges. The court reasoned that any argument made to the government's failure to present a witness who supposedly bought drugs from the defendant still left the government's substantial possession case untouched. Id.

Here, however, counsel was arguing about the sufficiency of the evidence from the other eyewitnesses to the incident at question and a similar incident with Mr. Hunter and law enforcement earlier that morning. That argument questioned whether the government had proved beyond a reasonable doubt that the injuries to Mr. Hunter occurred while he was in the custody of the USMS and whether the defendant was the source of those injuries. Again, this information was untimely disclosed to the defendant in the middle of the trial.

Mr. Cook was convicted of the assault on Mr. Hunter. From that count, the jury found that Mr. Cook wrote a fictitious report about the incident and that his words to a fellow marshal to "stick to his report" when questioned by the FBI or in front of a grand jury constituted witness tampering. Unlike in Lawson, where the stricken argument went towards counts of which the defendant was eventually acquitted, defense counsel's argument here went towards the heart and soul of the case against Mr. Cook of which he was convicted by the jury.

Therefore, by not permitting defense counsel to call into question the sufficiency of the government's evidence to prove beyond a reasonable doubt that Mr. Hunter was assaulted by Mr. Cook while at the cellblock in the custody of the USMS, Mr. Cook suffered a substantial and injurious effect to his rights. Although the court may have been concerned that defense was making an impermissible missing witness argument to the jury, the defendant's questioning of the lack of evidence does not by itself constitute a missing witness argument, and defense counsel was not permitted to approach to clarify. This error substantially affected the right of the defendant

because his counsel was prevented from arguing the lack of sufficient evidence to convict.

## CONCLUSION

WHEREFORE, Mr. Cook respectfully requests that the Court grant his motion for a judgment of an acquittal or his motion for a new trial in the interest of justice. Each of these errors effected the substantial rights of the defendant and by themselves would require a mistrial. Collectively they show that this trial failed to meet standards of due process for the defendant.

Respectfully Submitted,

**/s/ William B. Moffitt**
WILLIAM B. MOFFITT
Moffitt & Brodnax, Ltd.
11582 Greenwich Point Road
Reston, VA 20194
Phone: (703) 834-0204
Fax: (703) 834-0206
Email: wbmoffitt_esq@yahoo.com

## <u>CERTIFICATE OF SERVICE</u>

The undersigned attorney hereby certifies that the **Post-Trial Motion** was served upon the following individual on November 6, 2007 by electronic means through the ECF system:

John M. Cummings
U.S. Attorney's Office
555 Fourth Street, NW
Washington, DC 20530
(202) 305-1637

Respectfully Submitted,

**/s/ William B. Moffitt**
WILLIAM B. MOFFITT
Moffitt & Brodnax, Ltd.
11582 Greenwich Point Road
Reston, VA 20194
Phone: (703) 834-0204
Fax: (703) 834-0206
Email: wbmoffitt_esq@yahoo.com