# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **CRIMINAL NO. : O7-192 (ESH)** |
| | : | |
| **v.** | : | **JUDGE ELLEN S. HUVELLE** |
| | : | |
| **STEPHEN COOK** | : | **Sentencing :  January 18, 2008** |
| | : | |
| **Defendant.** | : | |

## GOVERNMENT'S OPPOSITION TO
## DEFENDANT COOK'S POST TRIAL MOTIONS

The United States, by and through its attorney, the United States Attorney for the District of Columbia, hereby submits its opposition to the defendant's post trial motions.  The defendant's motion is based largely on arguments that the Court at trial previously rejected.  The government also notes that the defense's recitation of facts in support of its motion is incomplete and mis-characterizes some evidence produced at trial.

### A.  Counterstatement of the Case

### 1.  Mr. Hunter's use of a Trademark Symbol

The defense claims that the government violated <u>Brady v. Maryland</u>, 373 U.S. 83 (1963), by failing to disclose evidence of Mr. Hunter's "attitudes and behaviors" as evidenced by Mr. Hunter's use of a trademark symbol attached to his name.  It is clear from the record that the defendant and the defense were aware of Mr. Hunter's use of a trademark symbol well before trial.

First, according to the testimony of Paul Rivers, on August 31, 2005, the defendant reviewed Mr. Hunter's complaint (gov. ex. 101), which contains Mr. Hunter's signature, followed by a trademark symbol.  Second, during the defendant's telephone call with Bryan

Behringer on September 28, 2006, the defendant acknowledged that he was aware of Mr.

Hunter's complaint that contained the trademark symbol following his name (gov. ex. 501A at

pg. 15).[1]  Third, during or before the October 15, 2007, motions hearing in this case, the

government gave the defense a copy of Mr. Hunter's complaint, including the signature block

containing Mr. Hunter's name followed by the trademark symbol.[2]  Thus, contrary to the

defense's position, the defense was clearly aware of this issue well before trial, and it is clear the

government did not try to hide the existence of Mr. Hunter's use of a trademark symbol

following his name.[3]

    During trial, the defense conducted exhaustive cross-examination of Mr. Hunter

regarding Mr. Hunter's use of the trademark symbol and his underlying beliefs regarding the

meaning of the symbol to him.  They conducted this cross-examination largely over the

government's objection because, the government argued, Mr. Hunter's personal beliefs were

irrelevant and immaterial to the crimes charged.  The government maintained this position

---

[1]  Bryan Behringer: " Right, and fucking, that guy and his report.  With his trademark name."

Stephen Cook: "Yeah, and yeah, and I lau-, you know, Joe Deluco read the report."

[2]  The defense actually introduced the complaint as a defense exhibit at the motions hearing.

[3]  At trial the government also produced a copy of Mr. Hunter's Freeman's Writ of Free Passage after Mr. Hunter testified that he had altered portions of the writ.  The government had not produced this as Jencks material because it was not the subject matter of his direct examination and the government believed that the writ was simply a pre-printed form.  Mr. Hunter was also subjected to exhaustive cross examination about the writ over the government's objection.

throughout trial, particularly in light of the fact that the government did not contest that Mr.

Hunter's response to the defendant on August 30, 2005, was noncompliant.

### 2.  Competency Report for Bernard Thronton

During cross-examination, Bernard Thornton testified that following one of his arrests he

had been transferred to St. Elizabeth's for a competency examination.  The defense's motion

incorrectly alleges that the government stated that it could not obtain the competency report due

to the age of the case, and that the Court easily obtained the reports.

As the government stated at trial, the information in the government's case database

showed that Mr. Thornton had been found competent, and had entered a guilty plea following the

finding of competency.  Accordingly, the government did not attempt to locate the competency

report.

Following Mr. Thornton's testimony, the Court ordered the government to obtain copies

of the competency report, and instructed the government to keep Mr. Thornton in the jurisdiction

in case the defense wished to conduct additional cross-examination of Mr. Thornton after the

reports were located.[4]  The government never stated that the reports were unattainable, but noted

that the reports might be difficult to locate because of the age of the case and inconsistent

practices within the Superior Court regarding the retention of competency reports in the court's

case jackets.

---

[4]  At the time of trial, Mr. Thornton was incarcerated in Pennsylvania and had been brought to the District of Columbia to testify at trial.

3

The government was able to locate Mr. Thornton's competency reports, and promptly provided them to the Court for in camera review.  The Court did not order the government to produce the reports to the defense, but did notify the defense that it would be permitted to recall Mr. Thornton to question him regarding any medication he was taking; whether Mr. Thornton was under the influence of any controlled substances; or whether Mr. Thornton was otherwise impaired on August 30, 2005.  This is precisely the type of cross examination the defense claims the Court prevented it from exploring.

The defense made a tactical decision not to recall Mr. Thornton, even though he remained available to the defense throughout the trial.   Thus, the defense's claim that it was "prevented from exploring or arguing Mr. Thornton's ability to correctly perceive and remember events in the past," is without merit.

<u>3.  Mr. Hunter's Failure to
"Answer up" at the Central Cell Block</u>

The defense mis-characterizes both the evidence at trial and the information provided to the government before trial in alleging that the government failed to disclose an alleged use of force incident involving Mr. Hunter at the Central Cell Block [hereinafter "CCB"].

As the government noted at trial, before trial there was no suggestion that there had been any use of force at the CCB regarding Mr. Hunter.   As the Court knows, Mr. Hunter alleged that a United States Marshal in the building where the Superior Court is located assaulted him.[5]

---

[5]  The defense made much of the fact that in the upper block of the complaint form that Mr. Hunter completed he listed CCB as the location where the assault occurred.  In the text of his complaint, however, Mr. Hunter indicated that when he used the term CCB he was referring to the Superior Court building.

Before trial, the government identified five witnesses, Bernard Thronton, DUSM Bryan Behringer, DUSM Michael Sharpstene, DUSM Del Ramsey, and Ofc. James McNeill, who each corroborated Mr. Hunter's claim that he was assaulted by the defendant in the sallyport area of the Superior Court. No witness even hinted that Mr. Hunter was assaulted at the Central Cell Block before they transferred him to the Superior Court.

In particular, Ofc. McNeill's pre-trial statements did not suggest that there had been any use of force at CCB. During an interview on August 9, 2006, Ofc. McNeill told the Federal Bureau of Investigation that "while incarcerated at CCB and while being loaded into the transport vehicle to be moved to DCSC [Superior Court], Hunter did not answer up to Hunter's name being called by CCB personnel."[6] Ofc. McNeill then went on to describe the assault committed by the defendant within the sallyport area of the Superior Court.

On October 10, 2006, Ofc. McNeill testified before the Grand Jury in this matter. When asked about what he remembered about Mr. Hunter, Ofc. McNeill testified that:

> Basically, that particular day, when – I know that there was other guys that was pulling him out of the cell, he wouldn't answer up.[7] So it was basically that he was stating that the names we had on the list was either wrong, or he had changed his name and that wasn't his name on the list."

> Grand Jury Testimony of Ofc. McNeill at pg. 11-12.

---

[6] The FBI 302 memorializing this interview was provided to the defense before Ofc. McNeill testified at trial. It is not clear from the government's records if this 302 was provided to the defense on October 19, 2007, or at some other time before Ofc. McNeill's direct testimony.

[7] As Ofc. McNeill testified at trial, his use of the term "pulling" inmates from their cells referred only to the process of calling inmates out of their cells to get on the transport van, and did not imply that the officers had to physically pull the inmates out of their cells at CCB.

Again, Ofc. McNeill went on to describe the assault committed by the defendant within the sallyport area of the Superior Court.[8]  At no time during his interviews with the FBI, his testimony before the Grand Jury, or any other witness conference, did Ofc. McNeill allege that anybody at CCB had used force against Mr. Hunter at CCB.

The defense repeatedly alleges in their motion for a new trial that Mr. Hunter was involved in a "use of force incident" at CCB, and that the government failed to disclose this use of force incident.  Even after trial, however, there is no evidence that there was any use of force incident regarding Mr. Hunter at CCB for the government to disclose.  At trial, Ofc. McNeill testified that he was told by a civilian technician that Mr. Hunter had refused to answer up.[9]  Ofc. McNeill acknowledged that he did not know if any force was used to get Mr. Hunter to come to the van.  It is the government's recollection that Ofc. McNeill also testified that Mr. Hunter did not have any visible injuries when he was brought by the civilian technicians to the transport van.[10]

As the government stated at trial, the government did not conduct any independent inquiry into this incident because there was no allegation that any force had been used against Mr. Hunter at CCB.  It is noteworthy that Bernard Thornton, who was handcuffed to Mr. Hunter,

---

[8]  Ofc. McNeill's Grand Jury testimony was provided to the defense on October 19, 2007.

[9]  The government did not initially object to this line of questioning because it believed that Ofc. McNeill was present when Mr. Hunter refused to answer up.  As the testimony continued, however, it became clear that Ofc. McNeill did not have any first-hand knowledge about Mr. Hunter's refusal to answer up at CCB, and was testifying based on hearsay.

[10]  Bernard Thornton also testified that Mr. Hunter did not have any visible injuries while at CCB.

6

did not testify that any force was used against Mr. Hunter at CCB.[11]  Further, far from being

exculpatory, Mr. Hunter's apparent refusal to answer up when his name was called at CCB was

entirely consistent with the government's evidence at trial that Mr. Hunter had refused to answer

up when the defendant called his name in the sallyport area of the Superior Court.

Following Ofc. McNeill's testimony, at the defense's request, the Court instructed  the

government to facilitate communications between the defense and the civilian technicians  who

Ofc. McNeill identified as the civilian technicians who had delivered Mr. Hunter to him at CCB.

The government met with Ofc. McNeill and a member of the defense team during the lunch

recess.  During that meeting, Ofc. McNeill provided to the defense the names of the two civilian

technicians, as well as their supervisor's name, and contact information.  Before the trial

resumed, the defense informed the government that they had spoken with the two civilian

technicians, and that no further action by the government was required to secure the availability

of the civilian employees.[12]  The defense did not make any proffer or request a continuance after

it had spoken with the civilian technicians.  The defense did recall Mr. Hunter to conduct

additional cross examination regarding his time at CCB, which he referred to at the defense's

suggestion as "the place in the middle."  During this additional cross-examination, Mr. Hunter

maintained that he had been assaulted in the Superior Court, not "the place in the middle."

Although he remained available to the defense, the defense made a tactical decision not to recall

Mr. Thornton, and not to call either one of the civilian technicians.

---

[11]  This was consistent with Mr. Thornton's Grand Jury testimony.

[12]  It is the government's recollection that this information was reported to the Court on
the record.

<u>        B.  The Government did not Commit any Brady Violations</u>

A review of the facts in this case reveals that there were no <u>Brady</u> violations.  "There are

three components of a true <u>Brady</u> violation: (1) The evidence at issue must be favorable to the

accused either because it is exculpatory, or because it is impeaching; (2) that evidence must have

been suppressed by the State, either wilfully or inadvertently; and (3) prejudice must have

ensued."  <u>Strickler v. Greene</u>, 527 U.S. 263, 281-82 (1999).  In conducting a <u>Brady</u> inquiry, "the

question of prejudice is folded into the determination of whether a violation has occurred, . . .

'strictly speaking, there is never a real <u>Brady</u> violation unless the non-disclosure was so serious

that there is a reasonable probability that the suppressed evidence would have produced a

different verdict.'"   <u>United States v. Oruche</u>, 484 F.3d 590, 595 (D.C. Cir. 2007), quoting

<u>Strickler</u>, 527 U.S. at 281.

Under <u>Brady</u>, the government must disclose all material evidence that is favorable to the

defense.  In determining materiality, courts are:

> Confined to a determination of whether there is a reasonable probability that, had
> the evidence been disclosed to the defense, the result of the proceeding would
> have been different. The Supreme Court has emphasized that the question is not
> whether the defendant would more likely than not have received a different
> verdict with the evidence, but whether in its absence he received a fair trial,
> understood as a trial resulting in a verdict worthy of confidence. Therefore, our
> focus is on the potential impact that the undisclosed evidence might have had on
> the fairness of the proceedings rather than on the overall strength of the
> government's case. Evidence is material if the undisclosed information could have
> substantially affected the efforts of defense counsel to impeach the witness,
> thereby calling into question the fairness of the ultimate verdict.

<u>United States v. Cuffie</u>, 80 F.3d 514, 517 (D.C. Cir. 1996)(internal alteration, citations,
and quotation marks omitted).

The government did not violate <u>Brady</u> with respect to Omar Hunter's use of a trademark

symbol following his name.  First, this information was neither exculpatory, nor impeaching.

There is no evidence that the defendant knew of these beliefs, and the existence of these beliefs

did not provide the defendant with a legal basis to assault Mr. Hunter.  Mr. Hunter's beliefs are

also not impeaching, because Mr. Hunter did not deny that he failed to answer the defendant's

questions regarding his name in the form that the defendant had requested.  Second, the

government did not suppress evidence regarding the trademark symbol.  As discussed above, this

information was known to the defendant immediately following the assault, and the government

turned over a copy of the complaint with the trademark symbol on October 15, 2007.  Third, it is

self-evident that there was no prejudice, even assuming a late disclosure.  At trial, the defense

conducted exhaustive cross-examination regarding the trademark symbol, Omar Hunter's

Freeman's Writ of Travel, and Mr. Hunter's beliefs underlying these symbols and documents.

As the jury's verdict indicates, the jury was unswayed by this information.

        Similarly, there was no <u>Brady</u> violation with respect to Bernard Thornton's competency

records.  Logically, at one time the government had custody of these records, however, the

government had no obligation to disclose the records.  First, the records are not exculpatory in

nature.  Second, the defense elected not to impeach Bernard Thronton regarding his ability to

perceive the defendant's assault of Mr. Hunter.  Where potential <u>Brady</u> evidence comes to the

defense's attention during trial, the Court may only grant relief under <u>Brady</u> if the defense shows

a reasonable probability that earlier disclosure would have produced an acquittal.  <u>United States</u>

<u>v. Tarantino</u>, 846 F.2d 1384, 1417 (D.C. Cir. 1988).  In this case, the defense can make no such

showing because they were given the opportunity to recall Bernard Thronton in order to cross-

examine Bernard Thornton regarding his ability to perceive and recall the events of August 30,

9

2005, and the defense elected not to do so.  See United States v. Driver, 798 F.2d 248, 250 (7th

Cir. 1986)(Undisclosed psychological records not material where the defense recalled the witness

and had an opportunity to cross-examine the witness regarding his mental condition and drug

use.)

Finally, there was no Brady violation with respect to Mr. Hunter's refusal to answer up at

CCB.  First, Mr. Hunter's refusal to answer up at CCB is in no way exculpatory.  Mr. Hunter's

refusal to answer up at CCB, just like his noncompliant response in the sallyport of the Superior

Court, did not entitle the defendant to assault Mr. Hunter.  The defense was also permitted to

recall Mr. Hunter to ask him about this incident and established that Mr. Hunter did not recall

failing to answer up at "the place in the middle."  Thus, the defense was able to use this

information to establish that Mr. Hunter's testimony was inconsistent with Ofc. McNeill's

testimony.  Second, there was no suppression by the government of the alleged use of force by

MPD personnel at CCB.  The crux of the defense's argument is that the government had an

obligation to disclose evidence of the prior use of force at CCB to the defense.  The government

does not dispute that if it had such evidence, it would have been required to turn that information

over to the defense, but as noted above, prior to trial, there was no suggestion that force had been

used against Mr. Hunter at CCB.  Indeed, there was no evidence adduced at trial to create a

reasonable inference that a use of force involving Mr. Hunter had occurred at CCB.  Third, the

defense cannot establish prejudice with respect to this issue.  The defense's theory that Mr.

Hunter was actually assaulted and injured at CCB was presented to the jury during closing

arguments.  That theory was, however, inconsistent with the testimony of the victim himself as

well as all five eyewitnesses to the defendant's assault of Mr. Hunter.  It is clear that the jury had

10

an adequate opportunity to examine this theory before rejecting it.  The defense also represented

that it spoke to the two civilian technicians who the defense theorized may have used force

against Mr. Hunter, however, the defense did not call either technician, and has not offered any

proffer indicating that the information the technicians provided to the defense would have had an

impact on the trial.

As to all three alleged <u>Brady</u> issues raised by the defense, the defense elicited testimony

on each of these issues at trial, or, in the case of Bernard Thornton, elected not to do so.  In light

of the fact that the defense used this information during the trial, or had the opportunity to do so,

there is no prejudice and no basis the find a <u>Brady</u> violation that would mandate a new trial.  <u>See</u>

<u>e.g.</u> <u>United States v. Wilson</u>, 160 F.3d 732, 742 (D.C. Cir. 1998)("a new trial is rarely warranted

based on a <u>Brady</u> claim where the defendants obtained the information in time to make use of

it."); <u>accord</u> <u>United States v. Dean</u>, 55 F.3d 640, 664-65 (D.C. Cir. 1995)(Criticizing untimely

disclosure of exculpatory evidence but denying motion for a new trial where the defense

"effectively used, or had an opportunity to use, all the late-disclosed or unsegregated exculpatory

evidence at trial.").


C.  Objections to Defense Counsel's Closing Arguments.

The defense also alleges that the Court improperly sustained the government's three

objections to the defense's closing argument.  This allegation lacks merit.  A review of the

objections reveals that the defense's motion overstates the information excluded by the Court.[13]

_____

[13] To be fair, based on the lack of any citation to the record, the defense may not have
had an opportunity to review a transcript of the closing arguments before filing its motion.

The government also notes that in its view much of the defense's closing argument was objectionable because it was not based on reasonable inferences from the evidence.  In particular, the defense's claim that Omar Hunter was assaulted at the Central Cell Block lacked any meaningful evidentiary basis.  Nonetheless, the government did not attempt to obstruct the defense's ability to present its theories to the jury, and objected only to discreet points that the government viewed as objectionable.

### 1.  Objection Regarding the Alleged Assault at CCB.

The government's first objection occurred during the defense's argument that Mr. Hunter had been assaulted at CCB, not the Superior Court.  As part of this argument, the defense questioned Mr. Hunter's alleged deception regarding his stay at CCB; argued that both Bernard Thronton and Ofc. McNeill testified that Mr. Hunter had refused to come out of his cell at CCB;[14] and questioned how Mr. Hunter was removed from his cell at CCB (Tr. pgs. 25-26).[15]  The government did not object to any of this argument.  The defense then continued, ultimately leading to the government's objection:

Mr. Moffitt:    What did they do to get him out of the Central Cell Block?  Do you know? Was it testified to you before you in this court?  Did the people who had the burden of proof in this case, these gentlemen sitting right here, was it discussed?

Mr.  Cummings:        Objection

The Court:      Sustained.

---

[14]  This is inconsistent with the government's recollection in that Bernard Thornton  never testified that Omar Hunter refused to come out of his cell at CCB.

[15]  All citations to the transcript refer to the excerpt containing closing arguments that is attached to this motion as attachment 1.

Mr. Moffitt:    May we approach?

The Court:    No, I just sustained his objection to the last comment.

Mr. Moffitt:    All right.  (Tr. pgs. 26-27).

The defense then continued with its argument by returning to questioning what happened in the "place in the middle."   The Court did not instruct the jury to disregard any portion of the defense's closing argument on this issue.

It is clear that the Court's decision to sustain this objection was proper and not prejudicial to the defense.  The government's objection was two-fold.  First, counsel's reference to apparent discussions among the prosecution team was improper, as there was no evidence of any such discussions, and it was clearly intended to imply, without any factual basis, that the government had conspired to hide evidence from the defense.  It appears from the transcript that the Court sustained the objection on this basis alone.

Second, the defense's comments were also objectionable because the defense was making an improper missing witness argument.  Specifically, there was no evidence produced at trial that an assault had occurred at CCB.  Suggesting that the government was required to call these witnesses to meet its burden of proof clearly implied that Mr. Hunter was assaulted at CCB.  This is evident from the context of the argument.  Thus, this case is distinguishable from United States v. Lawson, 494 F.3d 1046 (D.C. Cir. 2007), where there was no issue that when the alleged crime occurred, a witness was present at the alleged crime scene, and the government failed to call that witness.   In this case, there was no reason to call the civilian technicians because there was no evidence of an assault at CCB.  Suggesting that their presence at trial was necessary to meet the government's burden of proof necessarily required the jury to speculate that an assault

13

had occurred.  In light of the fact that these witnesses were available to the defense, and the

defense was trying to not only point out gaps, but to improperly fill them, See United States v.

Reyes, No. 06-00556-1 CRB, 2007 WL 2462147 at *5 (N.D. Cal. Aug. 29, 2007)(distinguishing

Lawson,), this was an improper missing witness argument.

Finally, there can be no legitimate claim of prejudice, as the defense continued to argue

that Mr. Hunter had been assaulted at CCB even after the Court had sustained the government's

objection.  The defense also asserts in its motion that it attempted to argue that the government

had failed to produce reports related to the incident at CCB.  There was no argument offered by

the defense on this point at trial, and there was no evidence introduced at trial that suggested such

reports existed.  Indeed, the government does not believe any such reports exist because there

was no use of force at CCB involving Mr. Hunter.


## 2.  Objection Regarding the Unidentified Inmates

        The defense incorrectly states that the Court precluded the defense from arguing that the

government had failed to meet its burden by producing the other inmates who were allegedly

attached to Mr. Hunter.  The defense did not attempt to make this argument at trial.  The sole

argument the defense offered at trial regarding the unidentified prisoners was that the number of

prisoners affected the defendant's concern for his safety.  The government did not object to this

argument, and objected only when the defense argued that the government did not produce a

sheet that,  based on the evidence, and discovery discussions, the government believes does not

exist.  The following argument was offered at trial, leading to the government's objection:

        Mr. Moffitt:    Now, how many people were on the vehicle?  Was it three?  Was it five?

Was it eight?  Was it 10?  Is it important?  Let me ask you a question.  Do you think 10 prisoners is, dealing with 10 prisoners is different from dealing with three.  Do you think you have to be more concerned for your safety when you are dealing with 10 people than you have to be with three?  I submit to you, it is important.  I also submit to you, there was a sheet, that is apparently  still maintained by the marshals, that was not produced in this courtroom.

Mr.
Cummings:       Objection.

The Court:      Sustained.  (Tr. pgs. 32-33).

The defense's argument was clearly intended to imply that there was a list that was in the government's possession that would have permitted the government to easily identify and call all of the inmates who were allegedly attached to Mr. Hunter.  There was, however, no evidence in the record that such a list existed.  Ofc. McNeill had testified that he handed one or more individual van sheets over to the marshals.  There was, however, no testimony that the van sheets constituted a single list that contained the names of every inmate that was on the van.  It is the government's recollection that Ofc. McNeill testified that there was no such master list.[16]  At the time the government made the objection, the government was also aware that during pretrial discovery, the defense had inquired if a logbook containing such information existed.  The government, based on information obtained from the United States Marshals Service, informed the defense that no such logbook existed.

_____

[16]  If this is inconsistent with the evidence at trial, any inconsistency is inadvertent.  This issue was discussed with Ofc. McNeill before trial and Ofc. McNeill informed the government that there was no one sheet of paper that listed each inmate on the van, or any other practical way to identify which inmates were on a particular van.  The government believes that it elicited this testimony at trial, but acknowledges it may be co-mingling the pretrial conversations with the trial testimony.

There is no reasonable suggestion that the defense was prejudiced by the Court's decision to sustain the government's objection. It is noteworthy that after the government's objection was sustained, the defense returned to this theme by arguing that the jury should have a reasonable doubt in part because there was "no manifest" (Tr. pg. 44). Further, as to the defense's claim that they were not permitted to argue that the other inmates were not called by the government, the defense never attempted to make such an argument. Even absent such an argument, it was obvious to the jury that the other inmates were not called by the government.

### 3.  Objection Regarding the Testimony of Del Ramsey

The final objection the Court sustained was the government's objection to the defense's argument that Del Ramsey had been told to change his testimony. The Court sustained the government's objection, correctly noting: "That was not his testimony."  (Tr. pgs. 37-38).  This objection was properly sustained, and the defense offers no argument to the contrary.

### D.  The Court Properly Sustained the Government's Objections at Trial

This Court has "broad discretion in controlling the scope of closing argument." United States v. Hoffman, 964 F.2d 21, 24 (D. C. Cir.1992) (quoting United States v. Sawyer, 443 F.2d 712, 713 (D. C. Cir.1971)).  This Court's ruling regarding closing argument will be overturned only "where the effect of the trial court's ruling is to 'prevent defense counsel from making a point essential to the defense.'" Id. (quoting Sawyer, 443 F.2d at 713).  A "trial court does not abuse its 'broad discretion in controlling the scope of closing argument' where the court excludes 'statements that misrepresent the evidence or the law, introduce irrelevant prejudicial matters, or

otherwise tend to confuse the jury.'" United States v. McKinley, 70 F.3d 1307, 1314 (D. C. Cir.1995) (quoting Sawyer, 443 F.2d at 713-14 (footnotes omitted)).   Even assuming any error in restricting closing argument, such errors are further reviewed for harmlessness.  Lawson, 494 F.3d at 1053-54 (citing Kotteakos v. United States, 328 U. S.750, 766 (1946)).

For the reasons set forth above, the government maintains that the Court properly sustained the government's limited objections to the defense's closing arguments.  The government's objections were very limited in scope and did not prevent the defense from presenting its theory of the case to the jury, and its position that the government had failed to meet its burden of proof.

Even assuming error, any such an error was harmless because any such error did not "have a substantial and injurious effect or influence in determining the . . . verdict."  Lawson, 494 F.3d at 1053-54 (citing United States v. Benitez, 542 U.S. 74 (2004)(internal quotations and citations omitted).  It is clear from a review of closing argument that the defense was given ample latitude, without objection from the government, to present its theory of the case to the jury and to summarize the evidence to the jury in an attempt to persuade the jury that the government had failed to meet its burden of proof.  In particular, the defense was permitted to argue, without objection, that Omar Hunter had actually been assaulted at CCB, even though, the government submits, there was no evidentiary support for such a theory.  The Court's decisions to sustain the government's objections did not curtail the legitimate arguments of the defense.

E.  There was Sufficient Evidence for the Jury to Convict the Defendant.

In passing, the defense also asks to Court to grant a post-trial Motion for Judgment of

17

Acquittal pursuant to Federal Rule of Criminal Procedure 29, alleging that there was insufficient evidence of the defendant's guilt produced at trial.   In evaluating this claim, "the Court must consider the evidence in the light most favorable to the government and determine  whether, so read, it is sufficient to permit a rational trier of fact to find all of the essential elements of the crime beyond a reasonable doubt.   United States v. Safavian, 451 F.Supp.2d 232, 238 (D.D.C. 2006)(internal quotations and citations omitted).  In this case the government presented ample evidence in the form of testimonial, documentary, and recorded evidence that, viewing the evidence in a light most favorable to the government, it is clear that there was sufficient evidence for a reasonable juror  to convict the defendant at trial.


<u>Conclusion</u>

There were no <u>Brady</u> violations in this case and the Court did not commit error in sustaining the government's objections to the defense's closing argument.  The government presented broad evidence of the defendant's guilt at trial, including the testimony of the victim and five eyewitnesses, as well as tape recorded conversations of the defendant telling Bryan Behringer to stick to his false field report.  Given this broad range of evidence, any failure to disclose evidence to the defense earlier in the proceedings was not material under <u>Brady</u>. Further, any error in sustaining the government's objections during closing arguments did not curtail the defense's ability to effectively present their arguments to the jury.  Similarly, the weight of the government's evidence weighs heavily against the defense's claim of insufficiency. As the government noted at trial, the jury could have based its verdicts on the testimony of any one of the government's eyewitnesses in combination with the tape recordings of the defendant.

This Court may only grant a motion for a new trial if "the interest of justice so requires." Fed.R.Crim.P. 33(a). "This power should be exercised with caution, and is invoked only in those exceptional cases in which the evidence weighs heavily against the verdict." United States v. Edmunds, 765 F.Supp. 1112, 1118 (D.D.C.1991). Even if the Court finds that errors occurred, "a new trial should be granted only if the moving party has shown that the error was substantial, not harmless, and that the error 'affected the defendant's substantial rights.'" United States v. Walker, 899 F.Supp. 14, 15 (D.D.C.1995) (quoting United States v. Johnson, 769 F.Supp. 389, 395-96 (D.D.C.1991)).

In this case there were no errors committed, certainly no errors that can be said to weigh heavily against the verdict in this case. Accordingly, the Court should deny the defendant's motion for acquittal and motion for a new trial.

Respectfully submitted,

JEFFREY A. TAYLOR
United States Attorney
Bar No. 498610


/s/
John Cummings
Assistant United States Attorney
Member Maryland Bar
555 4th Street, N.W., Room 4838
Washington, DC 20530
(202) 514-7561
john.cummings@usdoj.gov

                                        /s/
_____
                        C. Douglas Kern
                        Ohio # 0072864
                        Trial Attorney
                        United States Department of Justice
                        Civil Rights Division, Criminal Section
                        601 D St. NW
                        Washington, DC 20004
                        (202) 514-3204
                         Doug.Kern@usdoj.gov

1          THE COURT:  I think you have about 15 minutes

2    left, Mr. Cummings.

3          MR. CUMMINGS:  Yes, Your Honor.

4          THE COURT:  Okay.  Bring in the jury.

5          (Jury Present)

6          THE COURT:  You have now been given a copy of

7    the exhibits which have been admitted on behalf of the

8    defendant.

9          Okay, Mr. Moffitt.

10          MR. MOFFITT:  Ladies and gentlemen, I submit

11    to you that the integrity of our entire system of

12    justice rests almost entirely on what is said from

13    that witness stand after a witness is given an oath to

14    tell the truth, the whole truth and nothing but the

15    truth.

16          It is the whole truth for a moment that I

17    want to discuss with you.  And in that vein, I want to

18    discuss the testimony first of Omar Hunter.  The

19    person who is complaining that he was abused in this

20    particular case.

21          Now, we know some interesting things about

22    Mr. Hunter.  We know that he didn't think that he

23    should have been arrested in the first place.  We know

24    that he does not believe that he is required to follow

25    the law.

1          We know that he doesn't feel that he needs to

2     be bothered with the tedious process of obtaining a

3     driver's license.  He knows that he doesn't want to

4     demonstrate that he has the skill to drive on the

5     highways and byways of the District of Columbia or

6     elsewhere without, he knows that he doesn't need to be

7     tested to do that.  He knows that at this particular

8     point, we know from him, that he does not care to

9     abide by our laws regarding insurance, regarding

10    licenses, regarding the payment of taxes.  How do we

11    know that?  Well, we get some insight to his

12    personality from what he told you about his beliefs.

13         That insight I suggest to you is very

14    important about what he is likely to do when he gets

15    on that witness stand.

16         He has told you by the simple function of his

17    birth and the movement of his mouse on the computer,

18    he defines himself as a member, a noble member of the

19    El Moroccan Empire, whatever that is.  He will tell

20    you if you read the document, and I suggest you take

21    some time to read the document because I do think it

22    is important.

23         What the document also tells you is that he

24    really does not believe in the laws of this country.

25    He believes he can act outside the laws of this

1  country.  And I believe that's very important in

2  understanding what we're confronted with by Mr. Hunter

3  in his testimony.

4          The question you have to ask yourself is, if

5  a man decides that he can live outside the laws of

6  this country, is he bound by a simple oath given to

7  him to tell the truth, the whole truth and nothing but

8  the truth?

9          Let me ask you this.  Where did Mr. Hunter

10  spend the evening beginning in August 29, 2005, and

11  ending in the morning of August 30, 2005?  When Mr.

12  Hunter took the witness stand the first time, he told

13  us quite vividly, that he traveled from 3D, Third

14  District to the Superior Court lock up.  He was called

15  back because Mr. Thornton and the MPD officer said

16  that he had a stop before he got to the Superior Court

17  lock up.  That he stopped at the MPD central cell

18  block.

19          Now, why was it so important that Mr. Hunter

20  not ever admit that?  He could not even say to you in

21  this courtroom central cell block of MPD.  Remember?

22  It became the place in the middle.  The place in the

23  middle.  Why was it significant for Mr. Hunter not to

24  tell us about the truth of the events of September --

25  the late evening of September 29th, the early morning

1    of August 30?  If the stop at central cell block was

2    insignificant, why not just simply admit it?

3              Well, we learned from Mr. Thornton and the

4    MPD officer, something that I suggest to you is of

5    significance.

6              We learned that the first time Mr. Hunter

7    refused to come out of his cell or refused to answer

8    up did not occur in the Marshal's Superior Court cell

9    block.  It occurred at the central cell block of MPD.

10   Remember?

11             If I'm wrong, you hold it against me.  But we

12   learned that.  You learned that he had to be removed

13   from his cell.  Now, how was he removed from his cell?

14   What happened?  How did they get him into the back of

15   the van?  Remember the MPD officer said they had to

16   wait for him to be brought down again.  Again, if I'm

17   wrong about that, hold it against me.

18             What did they do to get him out of the

19   central cell block?  Do you know?  Was it testified to

20   you before you in this court?  Did the people who had

21   the burden of proof in this case, these gentlemen

22   sitting right here, was it discussed?

23             MR. CUMMINGS:  Your Honor, I am going to

24   object.

25             THE COURT:  Sustained.

1          MR. MOFFITT:  May we approach?

2          THE COURT:  No, I just sustained his

3  objection to the last comment.

4          MR. MOFFITT:  All right.

5          The place in the middle.  You do know that he

6  had to be removed from his cell?  How did that occur?

7          We also know that by the time of the MPD

8  officer's testimony, these gentlemen knew about it,

9  because the MPD officer testified to that fact in the

10  grand jury.  Yet, there was no further investigation

11  of what happened.  None whatsoever.

12          What else makes us curious about what

13  happened at the place in the middle?  Remember, we

14  were told by Mr. Hunter that when this event was over,

15  he was bleeding from his mouth.  And the blonde female

16  U.S. Marshal gave him a tissue.  Remember that?  Well,

17  we know something very interesting about the central

18  cell block or about the Superior Court Marshals cell

19  block.  There was no blonde female on duty in the

20  sallyport or upstairs in the cell block.

21          So, who was this blonde female?  Who was this

22  blonde female?  And where was this tissue given to

23  him?  Where was this blood wiped from his face?  Is he

24  just simply wrong about the sex of the person that

25  gave him the tissue?

1          Did he realize who and what this person was?

2          We also know from Mr. Thornton, and think

3    back with me because this might have been an obscure

4    fact to you, when Mr. Thornton testified, Mr. Thornton

5    remember is the gentleman with the long criminal

6    record.  Now, we also know that the sallyport of the

7    U.S. Marshal's lock up in Superior Court, does not

8    allow you to have a weapon in that sallyport.  Yet,

9    what did Mr. Thornton say about whether there was a

10   weapon present when this occurrence occurred?  Think

11   with me.  Again, hold it against me if I'm, if you

12   don't trust what I'm saying or if you don't remember.

13         Mr. Thornton said he remembered a guard with

14   a shotgun.  He remembered a guard with a shotgun.  You

15   check.  You check.  Where did these injuries occur?

16   Where was the shotgun?  We know that no one in the

17   sallyport is armed.

18         Let's also talk a little bit about what Mr.

19   Hunter said about members of his family.  He told you

20   that members of his family were positioned at MPD.

21   One of them he described as a lieutenant.  All right.

22   Now let's be logical, let's make sense out of this.  I

23   ask you to use your common sense.  Don't rely on what

24   I suggest is common sense.  Use your own common sense.

25         If there were a question in the mind of a

1   member of a family who has a lieutenant in the MPD as

2   to where a particular event occurred during the course

3   of his incarceration, don't you think logic would

4   dictate that you would ask that member about that

5   process to determine exactly where it happened if

6   there were any question whatsoever in your mind about

7   where it happened?

8          This is a man who was not totally ignorant

9   and had the resources available to him, if he had any

10  question about where this occurred, to find out.

11  Simply say, call his brother, his father would call

12  his son and they would discuss this and they could

13  make a determination of where it happened if Mr.

14  Hunter had any real questions.

15         One other thing.  On direct examination, Mr.

16  Hunter was asked how he knew it had, these were U.S.

17  Marshals in the sallyport that had assaulted him.  He

18  told you that he knew from having seen the marshals'

19  uniform at DMV.  Remember?

20         Now DMV at that time was located in the same

21  place as the central cell block and not in the same

22  place as Superior Court.  Remember the judge made a

23  comment about that.

24         I suggest to you just on the face of the

25  evidence, that's ridiculous.  Why is it ridiculous?

1   Why is Mr. Hunter going to DMV?  He didn't care about

2   a license.  What is he going to DMV for?  Is that a

3   place where he hung out?  What is he doing at DMV?

4          I finally suggest to you about this several

5   things are also very important.  We have pictures of

6   Mr. Hunter when he was booked and at some time taken

7   some time later while he was at the hospital.  We have

8   no pictures that look at him when he left central cell

9   block, none whatever.

10         Now, everybody, everybody in this case is

11  consistent about one thing.  When they looked at Mr.

12  Hunter when he left, went up from the sallyport, the

13  only person except Mr. Ramsey, Mr. Ramsey says he saw

14  some blood.  Doc Long or Steve Long, who was the EMT

15  tech, said he didn't see any injuries.  Mr. Sharpstene

16  or Mr. Behringer or perhaps Mr. Billings, none of them

17  saw any injuries.  And a person trained with

18  significant medical training didn't see any injuries

19  whatsoever either.

20         You have to ask yourself these questions.

21  You have to ask yourself these questions.

22         Now, there is another piece of evidence that

23  is striking in what it says.  This is Government's

24  Exhibit 101.  I want you to look at what it says about

25  the location of this event.  That wasn't written by

1    anybody but Mr. Hunter.  Marshal Cook, nobody else

2    wrote that.

3           Now, there is an explanation that has been

4    given in this courtroom for why it says that.  This is

5    the explanation.  The explanation is when Mr. Hunter

6    and his father talked to Deputy Long, he told them

7    where central cell block was.  He told them about

8    central cell block.  I still submit to you that Mr.

9    Hunter had available to him a lieutenant in the

10   Metropolitan Police.

11          There is something else interesting.

12   Remember Mr. Hunter, he went to the hospital.  He went

13   to the hospital twice.  Why is that?  I submit that if

14   you look at his employment on the two hospital forms

15   that were submitted, he gives different employments.

16   On one he is unemployed.  The other, he is self

17   employed.  In a matter of eight hours difference, or

18   12 hours difference.  Why is that important?  Because

19   if you are not candid and truthful about insignificant

20   things, why should we believe that you are candid and

21   truthful about significant things?

22          He doesn't even remember having been,

23   according to him, to the hospital twice.  Sort of like

24   the place in the middle.

25          Let me talk to you a little bit about the

1  sallyport.  We know this is where prisoners come in.

2  We know that there are concerns about prisoners who

3  come in, in their street clothes.  We know that those

4  prisoners are not searched until they go upstairs to

5  the lock up where the flex cuffs, not handcuffs, the

6  flex cuffs are removed from them.

7        We know that there have been according to

8  everybody other incidents.  And we know that Mr.

9  Hunter was a recalcitrant prisoner.  We know that that

10  happened.  We know also, I suggest to you, that a

11  recalcitrant prisoner in his street clothes certainly

12  can elevate the threat level in the sallyport.

13        So, this particular prisoner refused to

14  answer up, to give his name.  What more simple task

15  can an individual be asked to do than give his name?

16  What more simple task can an individual be asked to do

17  than get off the van?

18        We already know that Mr. Hunter has problems

19  doing both of those.

20        Now, how many people were on the vehicle?

21  Was it three?  Was it five?  Was it eight?  Was it 10?

22  Is it important?  Let me ask you a question.  Do you

23  think 10 prisoners is, dealing with 10 prisoners is

24  different from dealing with three?  Do you think you

25  have to be more concerned for your safety when you are

1    dealing with 10 people than you have to be with three?

2    I submit to you, it is important.

3           I also submit to you, there was a sheet, that

4    is apparently still maintained by the marshals, that

5    was not produced in this courtroom.

6           MR. CUMMINGS:  Objection.

7           THE COURT:  Sustained.

8           MR. MOFFITT:  Now, we've heard a lot about

9    it's not important for a prisoner to get off a vehicle

10   and go to court.  In fact, we had one witness,

11   Mr. Sharpstene said what you do is you send the

12   vehicle back to MPD.  Ten people on a vehicle, you

13   send the vehicle back.  What happens to 10 courtrooms?

14   There are no prisoners.  All of the people who came to

15   court for that case, under those circumstances are

16   inconvenienced.  Every person, not just the judge, not

17   just the prosecutor, not just the defense attorney,

18   but every witness and every family member who came to

19   court that day.

20          Now, what has been suggested to you is that

21   this is totally unimportant and nobody would care if

22   you sent the van back under those circumstances.  Ask

23   yourself a question.  Does that make sense?  Or is

24   that Mr. Sharpstene trying to figure out a way to

25   excuse the way he behaved on that day?

1          All right.  From this evidence, can you tell
2    whether Mr. Cook reached in the van and pulled Mr.
3    Hunter out?  Can you tell whether Mr. Cook climbed up
4    into the back of the van and actually got in the van
5    and grabbed Mr. Hunter by head lock and dragged him
6    out?

7          From this evidence, can you tell whether they
8    tripped?  From this evidence, can you tell whether or
9    not Mr. Hunter was 5'7" or 5'5", I mean, Mr. Cook was
10   5'7", 5'10"?  What is really interesting about that is
11   Mr. Hunter in his 101 says that the person who
12   assaulted him was 5'10".

13         But when he got to court, he now said it was
14   5'7".  And this fits along with Mr. McNeill.  Remember
15   Mr. McNeill.  He's the MPD officer.  When first
16   approached about this incident, when first approached
17   about this incident, he didn't remember anything about
18   it according to him.  None of it.

19         He didn't remember anything until he was
20   given certain facts by this gentleman right here.
21   That was his testimony.  Mr. Greenberg.  But that's
22   the character and the nature of what is happening.
23   Did Mr. Cook throw Mr. Hunter on the ground?  Did Mr.
24   Hunter ever hit the ground?  Remember the testimony of
25   the witness who was chained to him or who was flexed

1    up to him?  He said Mr. Hunter never hit the ground.

2           Did Mr. Hunter wind up on top of Mr. Cook and

3    struggling on the ground?  The witness flexed up to

4    him said that Mr. Hunter was kicked while standing up.

5    Everybody else says if he was kicked at all, he was

6    kicked while laying down.  And the important thing

7    about this is that Mr. Hunter never says that the

8    person that assaulted him wore glasses.  Why is that

9    important?  Because the glasses actually become a

10   focal point of the story told by Mr. Sharpstene.

11   Remember?

12          Mr. Cook retrieves his glasses.  He screams,

13   "you broke my fucking glasses."  And then, he

14   supposedly kicks him.  But yet, nobody ever sees Mr.

15   Cook without his glasses, even that day.

16          What happened?  What is the story?  The

17   explanation is they all saw different things.  It is

18   almost as if they're also different events.

19          I want you to understand something else.  Mr.

20   Cook, according to the government, is from the very

21   beginning trying to hide all of this.  Right?  But

22   what does Mr. Rivers tell you about this?  What does

23   he tell you?  He is in his office, after having been

24   told about this complaint and having gotten a copy of

25   this complaint.  He looks at the complaint and he

1    cannot identify, he cannot identify anyone of his

2    officers as having been involved in this.

3         Yet, the man who the government says was

4    trying to hide, talks to him about it, walks up and

5    says, it was me.  Do you want to hide?  Why would you

6    do that?  Is that consistent with the notion that you

7    are trying to hide something?  I respectfully submit

8    to you that it is not.  I respectfully submit to you

9    that it is not.

10         A report was written.  It was written upon

11    the orders of Mr. Rivers.

12         Now, I just briefly want to recount something

13    about what Mr. Rivers says.  Remember, he sat on this

14    witness stand and he pointed out the back and he said

15    he told you the distance from the elevators to the

16    sallyport.  All right?  He also told you, that he

17    would have to, from the elevators, I submit to you,

18    that this was the view.  The elevators are behind you,

19    the sallyport is through the two grates.  He told you

20    that that distance was from that witness stand outside

21    the doors of this courtroom, that's what Mr. Rivers

22    told you.

23         I want you to look at that picture.  I want

24    you to ask yourself and we've got a bigger one for

25    you, what you can see from that position.  The

1  government solves that, they solved that.  They have a

2  witness with a superior ability to hear from one floor

3  up and 45 feet away and to see through grates.  This

4  is an amazing person.  This is an amazing, as I will

5  tell you, if you look at those pictures carefully, you

6  will notice that those grates distort the light and

7  distort the image for every other human being on this

8  planet other than superman, Mr. Ramsey.

9          Frankly, I wish I had been given his gifts of

10  sight and sound.

11          Now, very interesting about Mr. Ramsey,

12  remember, another interesting thing.  He doesn't know

13  who was in the sallyport that day.  Now, his answer to

14  that, remember?  It was Behringer or Billings.  It was

15  Behringer or Billings.  Now, his report, look at his

16  report.  At least the one report that we have because

17  he destroyed the one he was supposed to have made up

18  which said all the accurate information according to

19  him.

20          Behringer or Billings.  Now, he knew this was

21  important.  He didn't take any time to determine who

22  it was.  He says Billings.  Now, he knows it was

23  Behringer.  How does he know?  He was told.

24          MR. CUMMINGS:  Objection.

25          THE COURT:  Sustained.  That was not his

1  testimony.

2        MR. MOFFITT:  He tells you, I didn't realize

3  it was Billings.  I didn't know the guys I was working

4  with.  These people are in dangerous positions.  He

5  doesn't know the guys he is working with?  Make sense?

6             This cover, I want to cover something up.

7  All right, I want to hide something.  But I'm such a

8  sophisticated human being, I wait for Behringer to

9  call me.  I don't reach out to Behringer.  I know how

10  this works.  I'm pressing, I can read Behringer's

11  mind.  I know he is going to call me.  I write my

12  report without consulting anybody.

13             I'm engaged in a cover up because Behringer

14  calls me.  I don't reach out to Sharpstene since I am

15  going to cover this up because I can't cover it up

16  with only Behringer.  I need both of them.  I don't

17  reach out to Behringer, I don't reach out to

18  Sharpstene.  But I'm engaged in a cover up.

19             Steve Cook must be endowed with some of the

20  powers of Mr. Ramsey.  He has the power to read minds.

21  He has the power to know what Behringer is going to

22  do.  He also knows what Sharpstene is going to do

23  because that's supposedly how this cover up begins.

24             Yet, this man who was supposedly intent on

25  covering this up never reaches out and calls

1   Behringer, never reaches out and calls Sharpstene,

2   never reaches out and calls Ramsey, nor does he reach

3   out and call anybody who was there that day.

4          Brilliant, absolutely brilliant, to know

5   before hand what these people are going to do.

6   Brilliant.

7          In fact, he never calls about any of this.

8   But yet, he is supposed to have an intent to cover up.

9   He never calls them.  He never seeks them.  Strange

10  the ways of these cover ups.  Strange the ways.  Think

11  about it.  If you were going to cover this up,

12  wouldn't you reach out?  Each one of those people got

13  on the witness stand over there, these supposed truth

14  tellers and said that Steve Cook never reached out.

15  Interesting cover up.

16          I submit to you that there were problems.

17  People knew they would give him problems.  They knew

18  that McNeill had to be prompted to tell his story.  I

19  want you to remember something else about McNeil.  For

20  the first time in this courtroom, before he ever, he

21  has talked to Mr. Greenberg, he is going to the grand

22  jury, he now for the first time, he, years later, when

23  he didn't recollect the event in the first place, he

24  remembers telling Mr. Cook that there was a problem at

25  central cell block.  Do you remember he testified to

1    that?

2         Remember he was asked about, well, everybody

3    knows that there is a problem with a witness who does

4    not remember things and who has to get his information

5    from the investigating agent.

6         There came a point where everybody realized

7    that.  And then, began to play.  The attempt to get

8    Steve Cook to incriminate himself.  As I told you in

9    opening statement, the scripted phone calls.

10        Now, these were not phone calls like you and

11   I make a phone call and have a conversation with a

12   friend.  These were phone calls where one side of the

13   conversation had an objective.  And he was going to

14   prey upon the sympathies of Stephen Cook who now for a

15   year knew he was being investigated.  A year without

16   making any attempt to reach out to anybody.

17        They knew that.  They knew that.  He had not

18   reached out to anybody.  He had not tried to influence

19   anybody's statement, they knew that at the time they

20   made the phone call.  So let's see if we can get him

21   to do something that we can charge him with.

22        Of course, Mr. Behringer went along with that

23   because he was looking for credit for doing the job of

24   getting Stephen Cook.  So, what he was willing to do

25   was to prey upon their prior relationship, to prey

1    upon the nervousness, the frightenness, the scaredness

2    of Stephen Cook in the hope that he could get him to

3    say something that would help Mr. Greenberg.

4            What did he say?  Listen to the first

5    conversation.  I submit you listen to all of them

6    because the context of the statements are as important

7    as the statements themselves.

8            I also suggest that you line the calls up

9    this way.  Call number one is, I just wanted to give

10   you a heads up call.  Baloney.  Call number two is, I

11   am going to testify before the grand jury.  And call

12   number three is, this is what I said.

13           Now I ask you to listen to the first two

14   calls in order because it is real important.  Because

15   by the time of call number three, he is telling Mr.

16   Cook that he has already testified.  And nothing that

17   occurs in call number three can influence his

18   testimony if he has already testified.

19           Listen to call number one.  I suggest to you

20   and listen to it all.  Cook doesn't know what is going

21   on.  He says to him, what did you hear?  On page four

22   of the transcript, you need to listen to the tape

23   because you need to know the content.

24           Behringer reassures cook that he won't lie to

25   the FBI.  He won't, what Cook is concerned about is

1   his fear that everybody is being bullied.  He says, I

2   won't change my story.  No, no, no, no.  If he is not

3   going to change his story, if he tells Mr. Cook that,

4   how is he going to be influenced?  How is he going to

5   be influenced?

6           Cook is afraid, listen to his words.  He is

7   afraid that he is being made a scapegoat.  He says it

8   over and over and over and over again in those

9   conversations.  Behringer, clever soul that he is,

10  tells him that he was rousted up unexpectedly and

11  intimidated, you'll find it in the conversation.  Cook

12  is sympathizing with Behringer.  He says, this is what

13  Behringer says at page eight of those conversations.

14  "They railroaded me.  They railroaded me."  That's

15  Mr. Behringer's words.  He is trying to draw Mr. Cook

16  out.  He is trying to empathize with a man who is very

17  frightened and very scared.

18          Page 13, they discuss Mr. Ramsey.  They call

19  him a retard, who will say something that didn't

20  happen.  Mr. Behringer agrees.  On page 17, Mr. Cook

21  says it is a witch hunt.  On page 20, Mr. Cook

22  expresses no faith in the system.  He says that

23  innocent men are convicted all the time.

24          THE COURT:  You only have a couple minutes

25  left.

1          MR. MOFFITT:  I ask you, is there is a one

2    month delay in the call, from the next call?  Why?

3    They expected Mr. Cook to call Mr. Behringer after

4    this phone call.  That's why they waited one month.

5    What happened?  No call.  No call.  We got to push the

6    pumpkin just a little bit farther and a little bit

7    harder.

8          So, what do they do?  Mr. Cook never reaches

9    out to Mr. Behringer.  Mr. Behringer calls Mr. Cook.

10   You need to look at those phone calls.

11         I would suggest to you, that in the end, you

12   look at particularly page five of the third phone call

13   where there is discussion about don't tell me anything

14   you are not supposed to.  There is discussion about

15   abiding by the law.  But there is also discussion

16   about how woefully ignorant Mr. Cook is of the grand

17   jury process.

18         So I say to you, I submit to you, this case

19   must leave you with a host of reasonable doubts.  What

20   actually happened and where did it happen with

21   Mr. Hunter?  Why can't he speak about the place in the

22   middle?  What did they do to get Mr. Hunter out of his

23   cell to the place in the middle?  How did Steve

24   actually get him out of the van?  How many people were

25   in the van besides Hunter?  What did each of these

1  marshals see and what did they hear?  What happened in

2  Ramsey's missing initial report?  Did Rivers actually

3  tell Ramsey to change his report?

4          Does Ramsey really have x-ray vision and is a

5  super hero?  Can he see through the textured wires?

6  Who was the blond?  No manifest.  What does Officer

7  McNeill really remember about what happened to Mr.

8  Hunter at the place in the middle?  Who was it that

9  told Behringer that he would be left alone in the

10  sallyport?  Behringer, Sharpstene, Ramsey's excuse,

11  they were afraid.  They were afraid of what their

12  colleagues were going to do to them.

13          Ladies and gentlemen, I suggest to you that a

14  host of things call this case into question.  I'm here

15  to appeal to you for simple justice for Stephen Cook.

16  Now, I know that in this limited time I had to talk to

17  you, I forgot something.  Something that you will

18  remember.  Something that I ask you to remember when

19  you go in and deliberate.  But I ask you to take your

20  time.  Don't pick and choose what was said in those

21  conversations.  Listen to the entire conversation.

22  Listen to the inflection.  Listen to what people say.

23          I really thank you very much for your time

24  and attention.  I know Stephen Cook does as well.

25          Send him home.  Thank you.