IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| v. | ) | Crim. No. 1:07-CR-192 |
| | ) | |
| STEPHEN COOK, | ) | Hon. Ellen S. Huvelle |
| | ) | |
| Defendant. | ) | |

**DEFENDANT STEPHEN COOK'S REPLY TO THE GOVERNMENT'S RESPONSE TO DEFENDANT'S POST TRIAL MOTIONS**

COMES NOW, Defendant Stephen Cook, by and through undersigned counsel, respectfully submitting his reply to the government's response to Mr. Cook's Post Trial Motions. Mr. Cook replies as follows:

**I.   Omar Hunter's Beliefs**

Mr. Cook does not argue that the government withheld Omar Hunter's odd use of the copyright symbol as part of his signature. It is clear that the initial discovery packet contained documents with Mr. Hunter's signatures using the copyright symbol. Rather, Mr. Cook submits that the government was aware of Mr. Hunter's views concerning law enforcement and his assertion of sovereign rights, and did not disclose this evidence to Mr. Cook. It was only by chance on the eve of trial that Mr. Cook learned the significance of Mr. Hunter's use of a copyright symbol. The real issue is not Mr. Hunter's use of the copyright symbol, but the accompanying views of Mr. Hunter.

The government was well aware of Mr. Hunter's creation of the Freeman's Writ of Travel, and his beliefs that as a member of the Moroccan dynasty he was above the law. The government was so concerned about his beliefs that it attempted to argue that these beliefs were a

1

religion and as such were beyond scrutiny by cross-examination.

Mr. Cook was able to cross-examine Mr. Hunter on the Writ. However, Mr. Cook only learned about the existence of the document while Mr. Hunter testified on cross examination. The government, after deciding the document was not relevant and failing to ask Mr. Hunter if he had prepared the document, did not disclose the Writ. Thus began a long a line of Brady/Giglio violations stemming from the government's failure to disclose to Mr. Cook exculpatory and impeachment information. This exculpatory and impeachment information only became known to Mr. Cook through the cross-examination of witnesses during trial, with the government then explaining away such Brady/Giglio violations by claiming that the information was either not relevant or not fully investigated.

## II.     Bernard Thornton's Mental Health

By its own admission, the government never attempted to locate the report concerning Mr. Thornton's competency prior to trial or to disclose the fact that Mr. Thornton had undergone mental health testing prior to trial. Instead of attempting even a cursory search for the document, the government states that after viewing the government's database that showed Mr. Thornton had been found competent, the government made no further inquires. Therefore, it was not disclosed to Mr. Cook that, in fact, Mr. Thornton had been declared incompetent at first and only found competent after a three-month stay at St. Elizabeth.

The government states in its response that the Court notified Mr. Cook that he was permitted to recall the witness to question him concerning any medication or illegal substances Mr. Thornton was taking at the time and that Mr. Cook made a tactical decision to not recall Mr. Thornton. The government misstates the events at trial. After the Court notified Mr. Cook that

he could recall Mr. Thornton to cross-examine him on his use of medications or illegal substances, the government then objected to such a line of questioning, arguing that a defendant always has the opportunity to question a witness about medication and, therefore, Mr. Cook could have questioned Mr. Thornton on such during the original cross-examination. The Court sustained this objection. Therefore, it was not a tactical decision on the part of Mr. Cook not to recall Mr. Thornton as the government states in its response.

Furthermore, the government's failure to locate and disclose the report to Mr. Cook before trial prevented Mr. Cook from effectively preparing to cross-examine the witness. Mr. Thornton was disclosed as a witness upon receipt of the Jencks material the Friday before trial, effectively precluding any independent search. Mr. Cook was not able to consult an expert to explain the report or perhaps testify as to the content of the report. Mr. Cook could not effectively cross-examine a witness about his mental health issues without personally reviewing the report, and ideally without having an opportunity to consult a medical health professional. Because Mr. Cook was unaware of any questions concerning the mental health of the witness, Mr. Cook could do neither.

Without viewing the report, the government's contention that Mr. Cook could have questioned Mr. Thornton about his own report is curious. Mr. Thornton was declared incompetent, and Mr. Cook sought to impeach Mr. Thornton's ability to perceive and remember events, and any possible permanent brain damage or mental issues affecting Mr. Thornton. Mr. Cook could not effectively impeach the memory or perception of Mr. Thornton by concurrently relying on his memory and perception of any possible drug use at the time and his memory and perception of his mental diagnosis. Therefore without the report, Mr. Cook could not effectively

cross-examine Mr. Thornton.

### III.  The Incident at Central Cell Block

The government states that there was no indication at any time that Mr. Hunter was involved in an incident at the Central Cell Block of the Metropolitan Police Department. The government lists Mr. Hunter and five witnesses called during trial that corroborated Mr. Hunter's claim that he was assaulted at the sally port of the US Marshal's cellblock in Superior Court, and that none of these witnesses gave any indication that Mr. Hunter was assaulted while at Central Cell Block. Of these five witnesses listed, only one witness, Mr. Thornton, was present with Mr. Hunter while he was at Central Cell Block.[1] Witnesses present in the USMS sally port would not have been in a position to witness an event at Central Cell Block.

However, Officer McNeill did state that Mr. Hunter had been non-complaint while at Central Cell Block during his grand jury testimony. At trial, Mr. Cook's recollection is that Officer McNeill testified on cross-examination that Mr. Hunter had to be forcibly removed from his cell. While Mr. Cook does not dispute that the term "pulling" as used by personnel at the Central Cell Block is the regular word for getting all prisoners from their cells, Officer McNeill testified to an incident that happened *while* Mr. Hunter was being pulled from his cell.

Therefore, Officer McNeill offered more than a hint that force was used against Mr. Hunter while at Central Cell Block. The government did not investigate the possibility that an incident could have occurred at Central Cell Block, much like the government did not attempt to locate the actual competency reports for Mr. Thornton because they assumed he had initially

---

[1] As stated in Defendant's Post Trial Motions, Mr. Cook was not aware of the incident at Central Cell Block at the time Mr. Thornton was cross examined.

been found competent.

The government contends that providing defense counsel with the names and phone numbers of the technicians involved with pulling Mr. Hunter from his cell in the middle of a contentious trial was adequate to comply with its Brady obligations. However, disclosure in the middle of trial is not always adequate to comply with the timely submissions requirement of <u>Brady</u> obligations. Where <u>Brady</u> evidence is disclosed during the trial, the defendant has a burden to show a probability sufficient to undermine confidence in the outcome of the case if discovery was provided earlier. <u>United States v. Wilson</u>, 160 F.3d 732, 742 (D.C. Cir. 1998). The evidence disclosed to Mr. Cook during the trial required further investigation, not merely the opportunity to cross-examine witnesses. At that point in time, Mr. Cook had already invested his resources and there was simply not enough time to properly investigate. Indeed, the FBI required months to remind Officer McNeill of any incidents at the sally port.

Additionally, the government again misstates the events at trial. Mr. Cook filed a motion for a mistrial after learning of the events at Central Cell Block. After that motion was denied, Mr. Cook did, in fact, requested a continuance for time to further investigate. That continuance was denied.

Intentions or assumptions of the government, however benign at the time, do not override the government's duty to investigate. This is clearly evidenced by the government's response in which explanations are given for withholding evidence from the defendant. The government did not fully investigate the possibility that Mr. Thornton was incompetent and was only revived after a three-month hospital stay. They did not investigate the Writ by asking Hunter a simple question of whether or not he wrote it. Additionally, they objected at trial to the relevancy of any

of these items, and offered their relevancy determination as an explanation for why the government failed to follow up on these simple matters. Regardless of these explanations, the defendant was prevented from receiving exculpatory evidence, was only made aware of such evidence on cross-examination of the witnesses at trial, a time at when the defendant had already spent resources on other issues and counsel was not in a position to investigate or fully incorporate such information into the theory of the case.

### IV.     The Evidence of a Van Sheet

The government contents that there was no evidence in the record that a "van sheet" or complete passenger manifest existed. To the contrary, Brian Behringer testified that he saw Mr. Cook throw the van sheet on the ground before entering the van. Officer McNeill testified that he handed the van sheet to Mr. Cook before the doors of the van were opened. There was testimony explaining what witnesses meant by "van sheet." Mr. Behringer[2] testified to the importance of obtaining the names of the individuals on the van and comparing the names of the individuals on the van to the list provided by MPD. There was evidence in the record that a manifest of the prisoners on the van did exist. Whether or not this list was ever in the possession of the government while investigating this case, there was evidence on the record that this van sheet did exist[3].

Therefore, Mr. Cook should have been allowed to argue that the government did not meet

---

[2] The issues of the importance of obtaining the names of the individuals on the van and ensuring that their names corresponded with the list given to the Deputy United States Marshals by MPD was explored on cross-examination with at least one of the Deputies that testified. Mr. Cook acknowledges that it may not have been Mr. Behringer specifically.

[3] The government was obviously able to locate at least one of the prisoners, Mr. Thornton. Without the existence of at least a partial list in their possession, the record is unclear as to how the government was able to identify and locate Mr. Thornton.

its burden of proof because the van sheet (or sheets as the case may have been) was never introduced by the government. A defendant is not prohibited from arguing that the government did not present sufficient evidence to meet its burden of proof simply because the evidence that was lacking was not easily identifiable. The standard of reasonable doubt is not a low burden that allows the government a pass when unable to locate or produce evidence that is difficult to find. Despite the government being able to locate a full and complete passenger manifest of the prisoners, there was evidence that other prisoners were on the van and a passenger manifest existed at some point in time. Mr. Cook should have been able to argue to the jury the missing evidence from the government's case.

**V.    Defense Counsel's Arguments at Closing**

Defense counsel was not attempting to impermissibly fill the gaps for the jury during closing arguments. The government relies on United States v. Reyes in their argument that defense counsel was making an improper missing witness argument. 2007 WL 2462147 (N.D. Cal Aug. 29, 2007). However, in Reyes the defense counsel argued to the jury specifically what the witnesses not called by the government would have said. Id. at *3. The defense counsel not only specifically instructed the jury that witnesses not called would have testified against the government but additionally placed words in their mouths. The court then found that these arguments were impermissible missing witness instructions. In the case at bar, defense counsel neither told the jury that witnesses not called by the government would have testified against the government nor put words in their mouths.

The government may have intended to only object to discreet points in defense counsel's closing arguments. However, at the time, defense counsel was unaware as to any specificity in

the government's objections.  Defense counsel asked to approach on several occasions to clarify and was not permitted to do so.  Because the Court did not inform defense counsel as to the nature and width of the objections, defense counsel was in the dark and thrown from his argument.

CONCLUSION

WHEREFORE, Mr. Cook respectfully requests that the Court grant his motion for a new trial in the interest on justice.  The evidence withheld from the defendant and the preclusion of defense counsel's burden of proof argument at closing show that this trial failed to meet standards of due process for the defendant.

Respectfully Submitted,

**/s/ William B. Moffitt**
WILLIAM B. MOFFITT
Moffitt & Brodnax, Ltd.
11582 Greenwich Point Road
Reston, VA 20194
Phone: (703) 834-0204
Fax: (703) 834-0206
Email: wbmoffitt_esq@yahoo.com

**CERTIFICATE OF SERVICE**

  The undersigned attorney hereby certifies that the **Defendant's Reply to Response to Post-Trial Motion** was served upon the following individual on November 28, 2007 by electronic means through the ECF system:

John M. Cummings
U.S. Attorney's Office
555 Fourth Street, NW
Washington, DC 20530
(202) 305-1637

                Respectfully Submitted,

                **/s/ William B. Moffitt**
                WILLIAM B. MOFFITT
                Moffitt & Brodnax, Ltd.
                11582 Greenwich Point Road
                Reston, VA 20194
                Phone: (703) 834-0204
                Fax: (703) 834-0206
                Email: wbmoffitt_esq@yahoo.com