**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **CRIMINAL NO. : O7-192 (ESH)** |
| | : | |
| **v.** | : | **JUDGE ELLEN S. HUVELLE** |
| | : | |
| **STEPHEN COOK** | : | **Sentencing : January 18, 2008** |
| | : | |
| **Defendant.** | : | |

**GOVERNMENT'S MEMORANDUM IN AID OF SENTENCING**

_____The United States, by and through its attorney, the United States Attorney for the District of Columbia, hereby submits its Memorandum in Aid of Sentencing. For the reasons stated herein, the government requests that the Court impose a sentence within the advisory guideline range of 37-46 months.

**Statement of Facts**

1. The evidence at trial established that on August 29, 2005, an officer of the Metropolitan Police Department (MPD) arrested Omar Hunter in Washington, D.C., for failing to have a valid driver's license. This arrest took place without incident. MPD officers transferred Mr. Hunter to the Central Cell Block, again without incident. While processing Mr. Hunter, MPD took pictures of Mr. Hunter that demonstrated that Mr. Hunter did not have any visible injuries when he entered the Central Cell Block. At the Central Cell Block, Mr. Hunter was housed with another inmate, Bernard Thornton, who later confirmed that Mr. Hunter had no visible injuries at the Central Cell Block.[1]

---

[1] The defense has suggested that correctional officers assaulted Mr. Hunter while he was at the Central Cell Block. Not a single witness provided any testimony in support of this claim. Officer James McNeill did testify that, just prior to Hunter's departure from the Central Cell Block, officers told Officer McNeill that Mr. Hunter had refused to provide his name at the Central Cell Block when asked to do so. This testimony is clearly hearsay and thus unreliable;

2.    Shortly thereafter, in the early morning hours of August 30, 2005, MPD officers transferred Mr. Hunter to the sallyport area of the DC Superior Court (DCSC) in Washington, D.C. Prior to transferring Mr. Hunter, MPD officers bound Mr. Hunter's left hand with a "zip cord" that attached to the arm of Bernard Thornton and several other unidentified prisoners. Although Mr. Hunter's right hand was free, Mr. Hunter had limited freedom of movement because his left arm was attached to the other prisoners.

3.    Upon Mr. Hunter's arrival at the sallyport of the DCSC, the defendant entered the police van in which Mr. Hunter was transported and told the occupants of the van to provide their names. When the defendant asked Mr. Hunter for his name, Mr. Hunter responded with words to the effect of "the name on your sheet is Hunter." Mr. Hunter did not threaten the defendant, did not threaten any other prisoner, and did not refuse any command to get off of the van.

4.    In response to Mr. Hunter's reply, the defendant pulled Mr. Hunter off the van and struck him repeatedly in the face and upper body with a closed fist. The defendant also kicked Mr. Hunter in the facial area. In response to this attack, Mr. Hunter tried to cover his body with his remaining free arm. Mr. Hunter did not provoke this attack and did not fight back against it. The defendant made this attack in full view of several other law enforcement officers, as well as the other inmates attached to Mr. Hunter. When the defendant completed his attack upon Mr. Hunter, another Deputy

---

moreover, neither Officer McNeill nor anyone else suggested that anyone had to use force to remove Mr. Hunter from his cell at the Central Cell Block. To the contrary, Officer McNeill noted that Mr. Hunter was not injured on August 30, 2005, when Officer McNeill placed Mr. Hunter on a van to transport him to the DCSC. The defense cross-examined Officer McNeill at some length on this subject, but failed to develop any evidence or testimony to suggest that Hunter was beaten or injured at the Central Cell Block.

United States Marshal escorted Mr. Hunter and the other inmates out of the sallyport to a holding cell.  Mr. Hunter subsequently obtained medical attention for his injuries which included visible swelling and abrasions to Mr. Hunter's head and facial area.[2]

5.  On or about September 1, 2005, in response to a request from a supervisor, the defendant filed an official report with the United States Marshals Service in which he falsely claimed that he merely "escorted" Mr. Hunter off the van in response to Mr. Hunter's alleged non-compliance.

6.  On or about September 28, 2006, and October 23, 2006, the defendant spoke on the telephone with Deputy United States Marshal Bryan Behringer, who had witnessed the incident. Upon learning that Behringer had received a subpoena to testify before a federal Grand Jury in regard to this incident, the defendant repeatedly gave Behringer the unsolicited admonition to "stick to the report."  The defendant knew that the report in question was false.  The defendant went on to tell Behringer that they would all face dire consequences if he deviated from the false story that he had submitted in his official report about the incident.

7.  At the conclusion of the trial for this matter, and in light of the aforementioned facts, the jury found the defendant guilty of one count of depriving Omar Hunter's civil rights while acting under color of law and resulting in physical injury;[3]  one count of making false statements to the United States[4]; and two counts of tampering with a witness.[5]

---

[2]  Mr. Hunter's Victim Impact Statement is attached to this Memorandum.

[3]  18 U.S.C. §242

[4]  18 U.S.C. § 1001

[5]  18 U.S.C. § 1512(b)(1)

**Statutory Penalties**

8.  Pursuant to 18 U.S.C. § 242, the defendant faces a maximum sentence of 10 years of imprisonment for depriving another of his civil rights and causing him bodily injury. Pursuant to 18 U.S.C. § 1512(b)(1), the defendant also faces a maximum sentence of 10 years of imprisonment for each count of tampering with a witness.  Pursuant to 18 U.S.C. § 1001, the defendant faces a maximum sentence of 5 years of imprisonment for making a false statement to the United States. On each of the aforementioned counts, the defendant faces a fine of $250,000.00, and a term of supervised release of no more than 3 years.  In addition, the defendant must pay a special assessment fee of $100.00 per felony conviction to the Clerk of the Court for the District of Columbia.

**Applicability of the Sentencing Guidelines**

9.  In light of the Supreme Court's decision in United States v. Gall, _____ U.S. _____, 2007 WL 4292116, at *7 (December 10, 2007), this Court should consider all of the applicable factors set forth in 18 U.S.C. § 3553(a) after determining the applicable advisory guideline range.  These applicable factors include "the nature and circumstances of the offense and the history and characteristics of the defendant" (18 U.S.C. § 3553(a)(1)); the need for the sentence imposed to reflect the seriousness of the offense; to provide just punishment for the offense; to afford adequate deterrence to criminal conduct; to protect the public from further crimes of the defendant; to provide the defendant with needed correctional treatment (18 U.S.C. § 3553(a)(2)); the Sentencing Guidelines and related Sentencing Commission policy statements (18 U.S.C. § 3553(a)(4) and (a)(5)); and the need to avoid unwarranted sentence disparities (18 U.S.C. § 3553(a)(6)).

10.  In United States v. Booker, 125 S. Ct. 738 (2005), the Supreme Court held that the mandatory application of the United States Sentencing Guidelines violates the Sixth Amendment principles articulated in Blakely v. Washington, 124 S. Ct. 2531 (2004).  Thus, the Court invalidated

the statutory provision that made the Guidelines mandatory.  18 U.S.C. § 3553(b)(1);  Booker, 125 S. Ct. at 756.  Nonetheless, and as the Supreme Court recently stated, a district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range.  See United States v. Gall, _____ U.S. _____, 2007 WL 4292116, at *7 (December 10, 2007) ("As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark.").

     11.   The Guidelines are the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions.  See United States v. Rita, ___ U.S. ___, 127 S.Ct. 2456 (2007).  See also United States Sentencing Comm'n, Supplementary Report on the Initial Guidelines and Policy Statements 16-17 (1987); see also 28 U.S.C. § 994(m) (requiring Commission to "ascertain the average sentences imposed . . . prior to the creation of the Commission"); Comprehensive Crime Control Act of 1984, S. Rep. No. 98-225, at 168 (Commission should produce a "complete set of guidelines that covers in one manner or another all important variations that commonly may be expected in criminal cases").  Moreover, the Sentencing Commission has continued to study district court and appellate sentencing decisions in order to "modify its Guidelines in light of what it learns."  Booker, 125 S. Ct. at 766-67 (the Sentencing Commission will continue "collecting information about actual district court sentencing decisions . . . and revising the Guidelines accordingly.").

     12.   The Guidelines are designed to calculate sentences in a way that implements the considerations relevant to sentencing as articulated in § 3553(a).  Any Guidelines calculation is based on the individual characteristics of the offense and the offender, as required by §3553(a)(1).

Thus, the Guidelines seek to fairly and consistently implement the offense-specific characteristics that comprise the "individualized assessment" that the Supreme Court commends in Gall. See Gall, at * 7.

### Sentencing Guidelines

13. The Federal Sentencing Guidelines calculation contained in the Presentence Report correctly places the defendant's total offense level at 21, with criminal history category I, and a resulting guideline range of 37-46 months. There is no dispute regarding the base level of 16 pursuant to U.S.S.G §2H1.1, which includes a base offense level of 10 and a 6 level increase for the specific offense characteristic of acting under color of law pursuant to U.S.S.G. §2H1.1(b)(1)(B). The Presentence Report also includes an unopposed 2 level upward adjustment for obstruction of justice pursuant to U.S.S.G. §3C1.1. In addition, the Presentence Report correctly includes a 2 level upward adjustment pursuant to U.S.S.G. §3A1.3 because Mr. Hunter was restrained at the time the defendant attacked and beat him. This computation results in a base offense level of 20 for the violation of 18 U.S.C. § 242. The Presentence Report correctly groups the false statements and witness tampering charges. As a result of this grouping, a one level increase must be applied to the defendant's sentence, for a final level of 21.

14. The defense objects to the victim related adjustment for physical restraint because only one of Mr. Hunter's hands was restrained. The defense also objects to the grouping of the false statement and witness tampering charges. Both of these objections are without merit.

15. The defense's argument against the applicability of the 2 point adjustment for restraint of the victim ignores the plain language of the sentencing guidelines. The term "physically restrained" is defined in the application note (K) of U.S.S.G. §1B1.1 as "the forcible restraint of the victim such as being tied, bound, or locked up." The reference to being "tied, bound, or locked up"

is not intended to be an exclusive list of the types physical restraint that are covered by §3A1.3. United States v. Jones, 32 F.3d 1512, 1518 (11th Cir. 1994); United States v. Stokley, 881 F.2d 114, 116 (4th Cir. 1989). As one court noted, "physically restrained within the meaning of § 3A1.3 does not turn on whether the victim was in danger, but on whether the victim was unable to leave." United States v. Santiago, 200 Fed.Appx. 928, 934 (11th Cir. 2006), cert. denied __ U.S. ___, 127 S.Ct. 1341 (2007). Courts have upheld the application of the physical restraint adjustment when the victim of a sexual assault was dragged by the ankle during the assault, United States v. Brings Plenty, 335 F.3d 732 (8th Cir. 2003), and when a defendant pushed and grabbed his victims to keep them from leaving a room during a sexual assault, Arcoren v. United States, 929 F.2d 1235 (8th Cir.), cert. denied, 502 U.S. 913 (1991).

16. It is self-evident that an inmate handcuffed (or, in this case, "zip cuffed") to another inmate will be substantially handicapped in retreating or protecingt himself from attack. Thus, Mr. Hunter's state of restraint at the time of the incident clearly falls within both the plain language and the common judicial construction of the term "physically restrained." The fact that Mr. Hunter was lawfully restrained because he was in custody is of no consequence. See United States v. Evans, 85 F.3d 617, 1996 U.S. App. LEXIS 31885 (4th Cir. 1996)(rejecting argument that §3A1.3 enhancement does not apply where the victim was handcuffed incident to a lawful arrest).

17. In a case with facts similar to this case, the sentencing judge applied the physical restraint enhancement when an inmate was only partially restrained. In United States v. Serrata, 425 F.3d 886 (10th Cir. 2005), the government prosecuted three correctional officers for violating 18 U.S.C. § 242 when they assaulted an inmate. The inmate engaged in a verbal altercation with the officers, but he eventually agreed to have one of his hands placed in handcuffs. The testimony at trial indicated that, just as the inmate began to surrender his second hand for handcuffing, the officers assaulted him.

Id. at 890.  The sentencing judge in that case assigned a two level upward adjustment to the sentence for each defendant because the victim was restrained at the time of the assault, even though only one of the victim's hands was restrained.  Id. at 907-09.[6]

18.  The defense also argues that all of the defendant's acts of obstruction should be grouped with his civil rights conviction.  Such a grouping would result in no additional increase to the defendant's offense level of 20 (or 18 based on the defense's claim that the adjustment for restraint of the victim should not apply).  Here, the defense's argument ignores both the application notes to §3D1.2 and the fact that the defendant engaged in multiple acts of obstruction.  The Presentence Report  correctly applies a two level upward adjustment to the defendant's guideline range for the civil rights violation because of the defendant's acts of obstruction.  As the defendant committed multiple acts of obstruction, only the most serious of those acts are subject to grouping with the underlying civil rights count.  As explained in application note 5 to U.S.S.G. §3D1.2:

> Sometimes there may be several counts, each of which could be treated as an aggravating factor to another more serious count, but the guideline for the more serious count provides an adjustment for only one occurrence of that factor.  In such cases, only the count representing the most serious of those factors is to be grouped with the other count.  For example, if in a robbery of a credit union on a military base the defendant is also convicted of assaulting two employees, one of whom is injured seriously, the assault with serious bodily injury would be grouped with the robbery count, while the remaining assault conviction would be treated separately.

U.S.S.G. § 3D1.2, application note 5, para. 2.

19.  This case contains three acts of obstruction: a single count of making false statements (which carries a base offense level of 6) and two counts of witness tampering (which each carry a

---

[6]  The Court of Appeals subsequently vacated these sentences in light of Booker and Blakely.

base offense level of 14). Thus, the Court should group one of the most serious counts of obstruction (i.e., one of the witness tampering counts) with the civil rights count. This method of grouping results in a base offense level of 20. Such a method avoids any concerns about "double counting" the two point enhancement of the civil rights charge for obstruction of justice. This method of computation leaves the remaining witness tampering count and the count of making false statements, which group together with a base offense level of 14. The end result of this method of computation is no different than the conclusion of the Presentence Report, which determined a combined offense level of 21 and a guideline range of 37-46 months. By contrast, under the defense's method of computation, the defendant would not receive any punishment whatsoever for two of the counts of which he was convicted.

## Defense Request for Downward Departure or Variance

20. In noting their objections to the draft Presentence Report, the defense argued that the facts of this case warranted a downward departure or variance. Such an argument lacks factual or legal support.

21. First, Mr. Hunter's conduct did not justify the defendant's use of excessive force. While Mr. Hunter's response to the defendant regarding his name may be characterized as non-responsive, it does not constitute an act of non-compliance that warranted the use of force. For example, no evidence indicates that Mr. Hunter failed to comply with any instruction to get off of the transport van. Further, no evidence indicates that the defendant acted in self-defense. No testimony or evidence demonstrates that Mr. Hunter posed any threat to the defendant or anyone else during this incident. Even the defendant's self-serving and discredited report makes no claim that Mr. Hunter posed any kind of threat at the time of the attack.

22. Under these circumstances, Mr. Hunter's conduct does not rise to a level that would provide the Court with a basis to grant a departure pursuant to U.S.S.G. §5K2.10 for provocation by the victim.  Section 5K2.10 provides that :

> If the victim's wrongful conduct contributed significantly to provoking the offense behavior, the court may reduce the sentence below the guideline range to reflect the nature and circumstances of the offense. In deciding whether a sentence reduction is warranted, and the extent of such reduction, the court should consider the following:
>
> (1) The size and strength of the victim, or other relevant physical characteristics, in comparison with those of the defendant.
>
> (2) The persistence of the victim's conduct and any efforts by the defendant to prevent confrontation.
>
> (3) The danger reasonably perceived by the defendant, including the victim's reputation for violence.
>
> (4) The danger actually presented to the defendant by the victim.
>
> (5) Any other relevant conduct by the victim that substantially contributed to the danger presented.
>
> (6) The proportionality and reasonableness of the defendant's response to the victim's provocation.

An examination of these factors demonstrates that the defendant is not entitled to relief pursuant to §5K2.10.  Mr. Hunter was physically restrained, negating any height or weight advantage he may have held over the defendant; the defendant made no attempt to avoid this confrontation, and chose instead to escalate it; the defendant has not claimed that he viewed Mr. Hunter as a threat; Mr. Hunter did not present a threat given the circumstances of this encounter; and the defendant's response was entirely disproportionate to Mr. Hunter's statement about his name.  The facts in this case are also clearly distinguishable from those cases in which the sentencing court applied a §5K2.10 departure.  See, e.g., United States v. Koon, 518 U.S. 81, 101 (1996)(Officers/defendants were initially using legitimate force in response to Rodney King's flight, non-compliance, and

continuing efforts to escape custody, but continued to use force, resulting in conviction, after King

had become compliant); United States v. LaVellee, 439 F.3d. 670, 788 (10th Cir.

2006)(Officer/defendant used excessive force after inmate made sexually explicit remarks to female

officer, threatened officer, and made threatening move toward officer/defendant); United States v.

Harris, 293 F.3d 863 (5th Cir. 2002), aff'd after remand, 408 F.3d 186 (5th Cir.

2002)(Officer/defendant used excessive force after intoxicated prisoner kicked the officer, violently

thrashed around police car, and started to bang his head against plexiglass divider).  In each of these

cases the victims of excessive force had engaged in substantial acts of provocation that may have

warranted a use of force, albeit less force than was ultimately used.  As the sentencing court in the

Koon case noted:

> Koon and Powell were convicted of conduct which began as a legal use of force
> against a resistant suspect and subsequently crossed the line to unlawfulness, all in
> a matter of seconds, during the course of a dynamic arrest situation. However, the
> convicted offenses fall under the same Guideline Sections that would apply to a
> jailor, correctional officer, police officer or other state agent who intentionally
> used a dangerous weapon to assault an inmate, without legitimate cause to initiate
> a use of force. . . The two situations are clearly different. Police officers are
> always armed with 'dangerous weapons' and may legitimately employ those
> weapons to administer reasonable force. Where an officer's initial use of force is
> provoked and lawful, the line between a legal arrest and an unlawful deprivation
> of civil rights within the aggravated assault Guideline is relatively thin. The
> stringent aggravated assault Guideline, along with its upward adjustments for use
> of a deadly weapon and bodily injury, contemplates a range of offenses involving
> deliberate and unprovoked assaultive conduct. The Guidelines do not adequately
> account for the differences between such 'heartland' offenses and the case at
> hand.

> Koon, 518 U.S. at 102-03 (approving distinction drawn by the sentencing court when
>  applying §5K2.10).

In the instant case, at no time did the defendant's assaultive conduct fall within the realm of a

legitimate use of force because Mr. Hunter did not engage in any action that was that was in any way

threatening or otherwise provocative.  As such, the advisory guideline range, without a departure or variance, accurately reflects the defendant's deliberate and unprovoked conduct.

23.  Similarly, there is no basis to grant a departure or variance based on the defense's claim that sub-standard working conditions at the D. C. Superior Court (hereinafter "DCSC") excuse or mitigate the defendant's actions.  As an initial matter, the defense does not posit any causal relationship between the defendant's actions and conditions at the DCSC.  As the Court noted at trial, the conditions at DCSC are irrelevant as long as the defendant maintains that there was no use of force.  The facts in this case are also inconsistent with any claim that the conditions at the DCSC played a role in this assault. The defendant was in total control of the situation, having unfettered freedom of movement, a restrained inmate, and multiple law enforcement officers as backup.  The defendant's working conditions at DCSC in no way compelled him to attack Mr Hunter, compelled him to lie about it afterward, or compelled him to ask others to lie about it.

### Sentencing Recommendation

24.  The government recommends that the Court sentence the defendant within the advisory guideline range of 37-46 months.  The government opposes a sentence below the advisory guideline range because such a sentence would fail to meet the criteria set forth in 18 U.S.C. §3553(a).

25.  The government submits that its recommendation for a sentence within the guideline range in this case is appropriate not only in light of the collective knowledge embodied in the sentencing guidelines, but also in light of three disturbing aspects of the defendant's behavior in this case: 1) the defendant used blatantly excessive force without provocation; 2) the defendant demonstrated a brazen attitude about the use of excessive force; and 3) the defendant took numerous

deliberate and well-considered steps to derail the investigation of this incident, and demonstrated a willingness to expose others to criminal prosecution in order to avoid accepting responsibility for his own actions.

26. First, despite the defense's suggestions to the contrary, the defendant used excessive force against Mr. Hunter without provocation. Mr. Hunter made no threatening movements or statements that justified any use of force. The defendant's decision to assault Mr. Hunter was indefensible as a law enforcement matter; other officers who witnessed the attack immediately and unambiguously understood the attack to be unjustifiable. In contrast to many cases involving violations of 18 U.S.C. § 242, this case did not involve a situation wherein a law enforcement officer, alone and isolated, must use force against a potentially dangerous subject. Here, Mr. Hunter was physically restrained during the entire incident. The vulnerable party during this incident was Mr. Hunter, not the defendant. Furthermore, the assault occurred in a confined environment where the defendant had additional officers to assist him in the face of any threat that Mr. Hunter might pose. These circumstances demonstrate that the defendant attacked Mr. Hunter out of malice, not fear for his own safety. This fact alone weighs heavily in favor of a sentence within the advisory guideline range. As the Fifth Circuit noted in a case where a woman was kicked while she was handcuffed on the ground:

> [W]e think that an underlying consideration in applying the guideline [3A1.3] is that the physical restraint of a victim during an assault is an aggravating factor that intensifies the wilfulness, the inexcusableness and reprehensibleness of the crime and hence increases the culpability of the defendant. It is true, as the district court concluded, that Freeman was not handcuffed to facilitate the commission of the offense against her - Clayton's use of unreasonable force. Nevertheless, Clayton took advantage of the restraint Freeman was under as she lay on the ground, handcuffed. She posed not the slightest threat to him in this condition. She could not defend herself against an assault, and could not flee from harm. Because Clayton took advantage of this restraint and the particular vulnerability of the victim, it seems to us that both the letter and spirit of the guideline applies to impose an additional

sentence on Clayton, beyond the one mandated for his use of unreasonable force.

United States v. Clayton, 172 F.3d 347, 353 (5th Cir. 1999).

The defendant took advantage of Mr. Hunter's inability to flee or defend himself when he pulled Mr. Hunter off the van, threw him to the ground, and punched and kicked him. It is indeed fortunate that Mr. Hunter's injuries were not serious, particularly in light of the defendant's decision to kick Mr. Hunter in the face. See United States v. Serrata, 425 F.3d 886, 910 (10th Cir. 2005)(finding enhanced sentence was appropriate because the boots worn by a correctional officer when he kicked an inmate qualified as deadly weapons)(reversed on Booker grounds). Thus, the attack on Mr. Hunter is fairly regarded as a serious offense which requires a significant period of incarceration. 18 U.S.C. § 3553(a)(2)(A).

27. Second, the brazenness of the assault raises significant concerns that should be reflected in the defendant's sentence. The defendant made no effort to conceal his attack from his fellow law enforcement officers. Clearly, the defendant had no fear of being reported or prosecuted for this attack. The defendant appears to have placed his faith in the "thin blue line" described by Deputy United States Marshal Del Ramsey. The defendant also believed that he was immune from any accusation that came from a prisoner such as Mr. Hunter. As the defendant stated: "They're, they're fucking bandits. Who cares what they say." (Gov. Ex. 501A, pg. 7). It is clear from the defendant's recorded remarks that he had no regard whatsoever for the basic humanity of the inmates in his care. Moreover, the defendant's shamelessness in committing this crime, as well as the willingness of others to lie for the defendant, indicates the presence of a sub-culture among some officers within the United States Marshals cellblock that tacitly condoned the use of excessive force and promoted a "code of silence" in regard to that excessive force. A sentence within the guideline range in this

case will reflect society's intolerance for abusive acts and dishonest "codes of silence" on the part

of law enforcement officers. Additionally, such a sentence will deter others from repeating the

defendant's actions. Indeed, given the inherent difficulties of prosecuting an excessive force case

such as this one, a significant period of incarceration may be one of the few effective tools available

to change a sub-culture that appears to condone the use of excessive force.[7] Such deterrence is an

appropriate goal in sentencing this defendant. 18 U.S.C. §3553(a)(2)(B). By contrast, a lenient

sentence in this case might well be construed, albeit incorrectly, as tacit approval for the use of

excessive force, or evidence of a preferential treatment for law enforcement officers.

28. Third, while the defendant's attack on Mr. Hunter was brief and relatively spontaneous,

the same cannot be said of the defendant's attempts to cover up the attack. No one asked the

defendant to provide an account of his interaction with Mr. Hunter until the day after the attack.

Thus, the defendant had ample time to consider reporting the incident honestly. He also had time

to consider what he would say and do if asked about the attack. It is reasonable to believe that the

defendant knew that other law enforcement officers had witnessed the assault, and that his actions

had placed those officers in a difficult position. When Supervisory Deputy United States Marshal

(SDUSM) Paul Rivers asked the defendant about the incident the next day, the defendant made the

conscious and deliberate decision to lie. He then filed a false field report in which he denied any

physical confrontation with Mr. Hunter. Later that same day, when the defendant learned that

SDUSM Rivers had also asked Bryan Behringer to submit a field report, the defendant forwarded

a copy of his false report to Bryan Behringer. The government submits that the defendant gave a

copy of his false report to Bryan Behringer for one reason: to encourage Bryan Behringer to file a

---

[7] The defendant himself noted that he was surprised he was being prosecuted in this case because of "all the shit they could've gone forward with."  Gov. Ex. 501A at p.3.

false report that was consistent with the defendant's false report.  Nothing else explains the defendant's actions.  This act clearly placed Bryan Behringer in a difficult position:  tell the truth and contradict the defendant, thus crossing "the thin blue line," or adopt the defendant's false version of events and face disciplinary action or criminal prosecution.

29.   Both the defendant and the witnesses to the incident knew that the repercussions of turning on a fellow officer could be severe.  For example, on the morning that Deputy United States Marshal Del Ramsey was scheduled to appear before the Grad jury, an unknown party slashed an "X" on the back of a spare dress jacket that Ramsey kept in the offices of the United States Marshals Service in the Superior Court building.  This act of vandalism appears to have occurred in response to widespread rumors that Ramsey was going to testify against a fellow law enforcement officer.  Additionally, multiple witnesses testified during the trial of this matter as to the possible harms that could befall a law enforcement officer who was perceived to be cooperating with the government's investigation of this incident.  The defendant placed Bryan Behringer in this dilemma with no regard for the harms that might befall Behringer or the similarly situated officers who witnessed the assault.  Although the law enforcement witnesses to this incident must be held accountable for their own dishonest actions, it is clear that these witnesses would not have had reason to lie, but for the defendant's unwillingness to take responsibility for his actions.

30.   Moreover, when the defendant learned that Bryan Behringer had been called to testify before the Grad jury, the defendant asked Bryan Behringer to lie to the Grand jury.  It should be noted that Behringer never solicited the defendant for advice as to how to testify; the defendant offered that advice spontaneously.  Even when Bryan Behringer stated that he was worried about committing perjury, the defendant still asked him to lie:

Bryan Behringer: Ah, Jesus, man. Fuck. I don't want, I mean, what I don't want, I mean, this is my biggest fear is, is like alright, I say what I gotta say at Grand Jury. But then, you know, I was just reading about it in the paper the other day, somebody, you know, 6 or 8 months after trial, they found out that they were lying to the Grand Jury.

Stephen Cook: Well how are they going to find that out? They don't, they can't find, there's no way they can find that out. Stick to your report and that's, that's it, that's the end of it.

Transcript from September 28, 2007, Conversation, pg. 5 (Gov. Ex. 501A)

Stephen Cook: That's all you have to say. They can dig all they want, Bryan. They can't make you say, they, and they're gonna tell you all sorts of crazy shit. We got conflicting reports. So and so said this. So and so said that. They're fucking full of shit. They're lying. They're not, they're doing whatever they can to make this fucking case. These people are just like me and you, dude. They're just, you know what kind of fucked up academy the FBI goes through. You know how these fucking attorneys are. Fuck them. Don't let them bully you. They're nothing. They're just like me and you. They got nothing, there's nothing they can do to you if you just say yeah, whatever's in that report is what happened. There's not a damn, goddamn thing they can do.

Bryan Behringer: Uh, fuck, but if that, it, I know, I know that, I know that, I know what you're saying, I know, I'm just playing it out here, you know, and talking, it's like, I mean

Stephen Cook: Yeah, yeah.

Bryan Behringer: It's in front of the Grand Jury for God's sakes, dude.

Stephen Cook: I know.

Bryan Behringer: That's, that's, if I lie to the Grand Jury, I'm fucked. And if, see, that's not, you know, obviously no one will know if I lied un-, unless it comes out that way. But

Stephen Cook: Yeah

Bryan Behringer: It's, like, I, you know, when, if, if it does, and if it would go to trial and it comes out that I did for some reason, I mean, I'm screwed that way.

Stephen Cook: Bryan, the, the only way that, that it would ever come out is if you said yeah, I lied. I mean, that's how they, that's how they fucking catch people. How are they gonna know?

Transcript from October 23, 2007, Conversation, pg. 7 (Gov. Ex. 502A)

The defendant's willingness to ask a fellow law enforcement officer to lie to a federal Grand Jury highlights the egregiousness of the defendant's premeditated conduct to conceal his criminal acts, as well as his utter lack of respect for both his fellow federal law enforcement officers and the laws that he had sworn to uphold. The defendant's betrayal of his oath of office is particularly troubling given the critical role that Deputy United States Marshals play in the criminal justice system. Among their other duties, Deputy United States Marshals provide security for judges, witnesses, victims, defendants, and federal court staff.

31. When the defendant assaulted a handcuffed prisoner, filed a false report regarding the assault, and on two occasions asked a fellow law enforcement officer to lie to a federal Grand Jury about the assault, he contributed to an erosion in the public's trust of all law enforcement officers. Such an erosion of the public's confidence in law enforcement officers diminishes the public's willingness to cooperate with law enforcement institutions. Such cooperation is vital to effective law enforcement. Indeed, the United States Attorney's Office for the District of Columbia is acutely and painfully aware of the many criminals who avoid prosecution because witnesses do not trust law enforcement agents, and refuse to cooperate with them.

32. A sentence in this case that falls within the advisory guideline range will demonstrate that law enforcement officers are not above the law, and that they will be held to a high standard. Such a sentence will minimize the damage that the defendant has caused to the public's confidence in law enforcement officials, and will "promote respect for the law." 18 U.S.C. 3553(a)(2)(A).

33.    A sentence within the advisory guideline range would also satisfy 18 U.S.C. § 3553(a)(6), because such a sentence would be consistent with previous sentences for violations of 18 U.S.C. §242, particularly where a civil rights violation is accompanied by acts of obstruction. See, e.g., United States v. Lemoure, 474 F.3d 37 (1ˢᵗ Cir. 2007)(Sentence of 48 months where officer allegedly beat a motorist during a traffic stop and then enticed others to provide false testimony about the beating; jury failed to reach a verdict on 18 U.S.C. §242 count, however, excessive force guideline U.S.S.G. §2H1.1 used to calculate sentence for convictions related to acts of obstruction); United States v. Bailey, 405 F.3d 102 (1ˢᵗ Cir. 2005)(Sentence of 41 months where officer participated in beating by striking prisoner in the body and then provided false statements regarding the beating in a report and in testimony to the Grand Jury); United States v. Donnelly, 370 F.3d 87 (1ˢᵗ Cir. 2004)(Sentence of 46 months following guilty plea where officer had conspired to use excessive force and subsequently struck prisoner with Tourette's syndrome in the head and body and then engaged in acts of obstruction regarding the assault).   While sentences below the advisory guideline range are not uncommon, they are usually accompanied by an acceptance of responsibility and/or provocation by the victim.   See e.g., United States v. Harris, 408 F.3d 186 (5ᵗʰ Cir. 2005)(Sentence of 15 months following §242 conviction after trial where the victim provoked attack and officer admitted to investigators that he struck the victim); United States v. Strange, 370 F.Supp.2d 644 (N.D. Oh. 2005)(Sentence of 21 months following guilty plea to §242 violation for premeditated assault on an inmate in retaliation for that inmate's assault of female guard and no acts of obstruction); United States v. Houchin, 2007 WL 3374595, no. 4:07-CR-00025 GTE (E.D. Ark. Nov. 6, 2007)(Sentence of 12 months following guilty plea to §242 violation where officer used excessive force against victim who had assaulted the officer earlier in the day and officer filed false report regarding the assault).   In this case, the defendant has yet to accept responsibility for his

actions, and was found guilty of engaging in multiple acts of obstruction in the form of false statements and witness tampering.  Further, as noted above, Mr. Hunter did not engage in any acts of provocation.  Accordingly, a sentence within the advisory guideline range would be consistent with prior sentences for similarly situated defendants.

WHEREFORE, the United States respectfully recommends a sentence within the applicable advisory guideline range of 37-46 months of incarceration, followed by a three  year period of supervised release.

_____Respectfully submitted,

JEFFREY A. TAYLOR
United States Attorney
Bar No. 498610

By:               _____/s/_____
John Cummings
Assistant United States Attorney
Member Maryland Bar
555 4th Street, N.W., Room 4838
Washington, DC 20530
(202) 514-7561
john.cummings@usdoj.gov

_____/s/_____
C. Douglas Kern
Ohio # 0072864
Trial Attorney
United States Department of Justice
Civil Rights Division, Criminal Section
601 D St. NW
Washington, DC 20004
(202) 514-3204
Doug.Kern@usdoj.gov

# PHYSICAL IMPACT:

*Please check all physical injuries that resulted directly from the crime*

| | |
|---|---|
| √ **Red marks, bruises, black eyes, knots** | _____ **Concussion** |
| √ **Scratches, cuts, scrapes, bite marks** | _____ **Burns** |
| _____ **Welts, lost hair** | _____ **Complications with** |
| √ **Broken blood vessels, bleeding** | **Pregnancy** |
| _____ **Stitches** | _____ **Sprains, broken bones** |
| _____ **Unconsciousness** | _____ **Internal injuries** |

<u>*(Describe the injuries)*</u>

. Swollen right jaw/near fracture

*Please list any long-term health problems resulting directly or indirectly from injury (e.g., headaches, chronic health problems, contracted a disease, hearing problems, blindness or loss of vision, scars, aches and pains).* N/A

*Do you have any pre-existing physical conditions that the defendant purposely took advantage of to harm or control you?* N/A

*Were you hospitalized as a result of your injury? (If yes, for how long and for what reasons? While in the hospital, did you receive any surgery or testing? Was there a period of rehabilitation after the hospitalization? Did you receive rehabilitation treatment?)* N/A

*Did you miss out on doing an important obligation as a result of the physical injury (e.g., employment, school)? Were there any consequences of missing time from this obligation?*

As a performing artist there were many obligations that I had to forgo as a result of my injury

*Please provide a Dr.'s statement about the nature of injuries, treatment, information about short/long-term health implications. Attach copies of medical bills.*

# *EMOTIONAL IMPACT*

*Please describe your immediate reactions, especially those that were intense, to being assaulted or victimized. The following checklist can be used as a guideline if you think it is helpful .*

| | |
|---|---|
| √ shock | √ helplessness |
| √ sadness | √ numbness |
| √ confusion | √ fear of being mutilated |
| √ feeling betrayed | √ fear of being murdered |
| √ thoughts about dying | ___ wishing you were dead |
| ___ afraid of everything | ___ panic/phobic reactions |
| √ fear of being re-victimized | √ fear of law enforcement |
| √ embarrassment or shame | √ blaming self for what happened |
| √ physical ailments | ___ thoughts of suicide/attempts |
| ___ uncontrollable crying | √ uncontrollable or intense anger |
| √ unable to concentrate | ___ desire to be alone; withdrawing |

*Please describe any of the items you checked and how the crime has impacted you emotionally.*

My initial reaction was one of shock. Next was that of total confusion. I expected a higher level of ~~perfess~~ professionalism from the Marshal Service.

*Since you were assaulted, how have you felt about the violence you endured? The following checklist is to help you to remember the impact.*

____ don't trust people
____ sleep problems
√ "flashbacks" or nightmares about the crime
____ anxiety, shaking, feeling panicky or jumpy
____ absent-mindedness, trouble concentrating
√ avoiding places/people that remind you of incident
√ changed feelings of personal safety or well-being
√ more withdrawn and isolated
√ more anger outbursts and irritability
√ crying or feeling depressed
____ suicidal thoughts more of the time
____ trouble getting along with friends/family
____ if you are religious - less faith in God
____ less confidence in abilities and judgement

*Please describe in your own words how the crime has changed your life.*

Where there are good and bad in all areas of
Law enforcement I felt at the time like there is
no protection, from law enforcement. I still find
myself trying to balance my emotions as a result
of this incident.

*Since the crime was committed, how has your life changed? Try to describe any changes*
*RESULTING FROM THE CRIME in the following:*

____Your sense of safety

__/__Your day-to-day routine (e.g. things you don't do anymore for fear of further
victimization or problems with routines, such as sleep problems)

__✓__Your attitudes about your neighborhood, your community, or society at large

____How you function at your job, school, or any other role (other than family)

Made me closer to my family.

*Describe the impact of the crime on other family members and/or how family members get*
*along now.*

____family is falling apart--a lot of anger and hostility towards each other.

____family members seem to be going off in their own directions

____family members do not seem to understand each other's reactions to the crime

__/__family members blame the victim or other members for what happened

__✓__family members feel a lot of guilt--they feel they should have been able to protect the
victim

*Describe any changes that you have noticed.*

The incident helped made my family gain a sense of
what may possibly happen to their children.

# FINANCIAL IMPACT

| Type of Cost | Cost | Reimbursement to date |
|---|---|---|
| **Hospital Emergency** | Approximately $400.00 | ⊘ |
| **Other medical** | | |
| **Mental Health** | | |
| **Destroyed Property** | | |
| **Lost wages from rehabilitation** | Loss of additional income Approx. $300⁰⁰ | |
| **Lost wages from court attendance** | 2 days pay Approx. $240⁰⁰ | |
| **Lost wages resulting from job loss** | N/A | |
| **Installed new locks** | | |
| **Moving expenses** | | |
| **Other** | | |

*Please describe any financial loss and give a total amount of loss to you (total cost less the reimbursement)*

$940.00 –

loss of income from part-time work as a musician. Required to pay hospital bill now approximately $400 and loss of annual salary for two days of court appearances.

## CONCLUSION

*What would you like to see happen to the defendant in terms of the following:*

1) *jail term - Please say what you think is fair and why*

relief from duty - because he obviously ~~~~ dishonored his badge and organization. ~~~~ However I DON'T WISH JAIL ON MY WORST OF ENEMIES. So the rest is hard to say

2) *Do you want the defendant to give you back any of the money that you lost as a result of the offense? If not, why not.*

Not a bad idea. However my concern is that he understand the impact that he made on everyone involved in the incident

3) *Do you want the defendant to be required to get treatment while either incarcerated or on probation? If you knew the defendant, would you recommend any particular type of treatment?*

____ *alcohol abuse*          ____ *drug treatment - specify which drug(s)*

____ *batterer treatment*          ____ *psychiatric treatment*

4) *Do you have fears about the defendant contacting you in the future? Would you like the defendant to be ordered to stay away from you as a condition of probation/parole?*

~~~~ Of course ~~~~ it would be wise to keep the distance. However I would like to reason with him one day in the future.

5) *Would you like to attend a parole hearing if/when the defendant is being considered for parole?*

NO

12/27/07
**Date**

Omar B Hunter
**Signature**

HONORABLE ELLEN SEGAL HUVELLE, UNITED STATES DISTRICT JUDGE

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **Docket No.: <u>CR-07-00192-001</u>** |
| | : | |
| **vs.** | : | SSN: <u>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</u> |
| | : | |
| **COOK, Stephen** | : | Disclosure Date:  <u>December 17, 2007</u> |

## RECEIPT AND ACKNOWLEDGMENT OF
## PRESENTENCE INVESTIGATION REPORT

This is to acknowledge that each of the undersigned has received and reviewed the Presentence Investigation Report (PSR) in the above-entitled case. The undersigned further acknowledges that:

### For the Government
(CHECK APPROPRIATE BOX)

( ✓ )  There are no material/factual inaccuracies therein.

( )  There are material/factual inaccuracies in the PSI report as set forth in the attachment herein.

_____                    12/27/07
**Prosecuting Attorney**                                                    **Date**

### For the Defendant
(CHECK APPROPRIATE BOX)

( )  There are no material/factual inaccuracies therein.

( )  There are material/factual inaccuracies in the PSI report as set forth in the attachment.

_____          _____
**Defendant**          **Date**                              **Defense Counsel**          **Date**

## NOTICE OF OBLIGATION OF THOSE EXECUTING THIS FORM

Pursuant to Local Rule 32(f)(2), those executing this form shall first submit any material inaccuracies or disputes in writing by **December 31, 2007**, to U.S. Probation Officer **Michael Penders**, telephone number <u>(202) 565-1379</u>, fax number <u>(202) 273-0242</u>.

Pursuant to Rule 32(b)(6)(B), effective December 1, 1994, it shall be the responsibility of the Attorney for the Government and the Defense Counsel to provide each other with a copy of the objections at the same time the objections are filed with the probation office.

## FOR THE COURT

**By:**     Gennine A. Hagar, Chief
United States Probation Officer