IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| v. | ) | Crim. No. 1:07-CR-192 |
| | ) | |
| STEPHEN COOK, | ) | Hon. Ellen S. Huvelle |
| | ) | |
| Defendant. | ) | |

## DEFENDANT STEPHEN COOK'S SENTENCING MEMORANDUM

NOW COMES Defendant Stephen Cook, by and through undersigned counsel, respectfully submitting his sentencing memorandum and requesting that this Honorable Court fashion a sentence which will comport with sentencing factors contemplated in 18 U.S.C. § 3553(a) factors, i.e. a sentence that is sufficient but not greater than necessary to comply with the goals of sentencing as expressed in subparagraph 2 of this Section. In support of this request, Mr. Cook states as follows:

## INTRODUCTION

On October 30, 2007, the jury returned a guilty verdict against Steve for a violation of 18 U.S.C. § 242, Deprivation of Civil Rights Under the Color of Law Resulting in Bodily Injury, a violation of 18 U.S.C. § 1001(a)(1), False Statement to the Government of the United States, and two violations of 18 U.S.C. § 1512(b)(1), Tampering with a Witness. Immediately following the guilty verdicts, Steve was taken into custody. At the time of the sentencing hearing, Steve will have remained in custody for over two and a half months. Because of Steve's status as a former law enforcement officer, he has served all of the past two and a half months **in solitary confinement.**

The Pre-Sentence Report, applying the sentencing guidelines, calculated a total offense level of 21 and a criminal history category of I, resulting in an advisory sentencing guideline range of between 37 and 46 months.

Steve suggests that the Pre-Sentence Report has not correctly calculated the advisory guideline range. However, assuming *arguendo* that the guideline range of 37 to 46 months is correctly calculated, Steve suggests that, pursuant to the 18 U.S.C. § 3553(a) factors, such a sentencing range significantly over-represents the seriousness of his offense. Thus, Defendant respectfully requests either a downward departure or a variance sentence.

## I.    OBJECTIONS TO THE ADVISORY GUIDELINE CALCULATION

Steve stands on his objections submitted to the probation officer concerning the application of a two-level offense level enhancement for restraint of the victim and the failure of the probation officer to properly group all of the obstruction counts together and count them as specific offense conduct taken into account by the Section 242 guideline.

Assuming *arguendo* that this Court finds that the restraint of the victim enhancement should apply, Steve suggests that a departure or variance should apply because Mr. Hunter was not totally restrained from defending himself as were the other victims in the cases where the restraint enhancement has been applied.

In *United States v. Evans*, 85 F.3d 617 (4th Cir. 1996) (unpublished), the enhancement applied where a police officer had arrested the victim and

> handcuffed Wriston's (the victim" hands behind his back and took him to [Jail]. There Evans became angry because he believed that Wriston had spat in the police car. Evans punched Wriston in the ribs four or five times. Later,... [h]e took Wriston out of his cell, again cuffed his hands behind his back, seated him in the booking area, and kicked him in the head.... He and another officer took Wriston upstairs in the elevator... [and] punched Wriston multiple times about the body.... At no time did Wriston offer any resistance to

Evans.

*Id*. at *1.  In *United States v. Serrata*, 425 F.3d 886 (10th Cir. 2005), the case that the government relies upon to state that the restraint in this case was typical, the correctional officers brought the victim into a confined hallway away from other prisoners, cuffed one of the victim's hands, after being threatened by the officers that they would "put a fist in his face," and "we're all going to fuck him up."  *Id*. at 890.  Then being convinced that he was going to be beaten, the victim refused to give his other hand to be cuffed.  However, after being persuaded to give the officers his free hand to be cuffed, the victim was thrown to the ground, "breaking one of his teeth.  After [the victim] was lying on the ground face first with both hands behind his back, [the defendant] 'stomped' on [the victim's] forehead, with his boots," and the other officers proceeded to kick him as well.  *Id*.

This case is far outside the heartland of the facts justifying a two level enhancement for restraint in those typical cases.  Mr. Hunter was flex-cuffed to another prisoner, but his other arm was completely free.  Steve did not place the restraint upon Mr. Hunter for the purpose of beating him while he was helpless.  Rather, Steve attempted to appropriately remove Mr. Hunter, a non-compliant prisoner, from a van, and when Mr. Hunter struggled against removal and ultimately fell upon Steve, Steve struck Mr. Hunter in the head.  These facts are so far from the facts underlying the restraint in the typical case, that even if this Court finds that the enhancement should apply, the Court should depart at least one or two offense levels as to accord due weight to the less serious facts of this case.

## II.    SECTION 3553(a) SENTENCING FACTORS

18 U.S.C. § 3553(a) mandates that a court "impose a sentence sufficient, but not greater

than necessary, to comply with the" sentencing goals described in this subparagraph 2 of this

section. In imposing a sentence that is "sufficient, but not greater than necessary," the court

should look to the seven statutory factors listed under Section 3553. These factors include:

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant;

> (2) the need for the sentence imposed–

>> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

>> (B) to afford adequate deterrence to criminal conduct;

>> [C] to protect the public from further crimes of the defendant; and

>> (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

> (3) the kinds of sentences available;

> (4) the kinds of sentences and the sentencing range established [by the Sentencing Guidelines];...

> (5) any pertinent policy statement [issued by the Sentencing Commission];...

> (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

> (7) the need to provide restitution to any victims of the offense.

18 U.S.C. § 3553(a) (2007).

Post *Booker v. United States*,[1] a court should follow the following sentencing procedure in

calculating the appropriate sentence

---

[1] *Booker v. United States*, 543 U.S. 220 (2005), and its progeny have held that the sentencing guidelines are advisory and but one of the many other Section 3553(a) factors that must be considered by a court in fashioning an appropriate sentence. Thus, while a court still must consider the advisory guidelines, the guidelines are afforded no more authoritative weight than any of the other statutory factors.

4

> a district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range.... The Guidelines are not the only consideration, however. Accordingly, after giving both parties an opportunity to argue for whatever sentence they deem appropriate, the district judge should then consider all of the § 3553(a) factors to determine whether they support the sentence requested by a party. In so doing, [s]he may not presume that the Guideline range is reasonable. [S]he must make an individualized assessment based on the facts presented. If [s]he decides that an outside-Guidelines sentence is warranted, [s]he must consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance. We find it uncontroversial that a major departure should be supported by a more significant justification than a minor one.

*Gall v. United States*, 128 S.Ct. 586, 596-97 (2007) (citations omitted).

Furthermore, the Supreme Court has noted that offenses involving a violation of Section 242 encompass a wide range of conduct, necessitating that a sentencing court painstakingly examine the Section 3553 factors to determine an appropriate sentence. The Court held in *Koon v. United States*, 518 U.S. 81 (1996):

> Most Guidelines prescribe punishment for a single discrete statutory offense or a few similar statutory offenses with rather predictable fact patterns. Petitioners were convicted of violating 18 U.S.C. § 242, however, a statute unusual for its application in so many varied circumstances.... A violation of § 242 can arise in a myriad of forms, and the Guideline applicable to the statute applies to any violation of § 242 regardless of the form it takes.

*Koon*, 518 U.S. at 101 (citations omitted). Thus, especially in the case of a violation of Section 242, where the guideline cannot ensure uniformity and proportionality in the sentence because of the myriad of conduct that can lead to a violation, "sentencing judge [should] consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." *Gall*, 128 S.Ct. at 598 (citing *Koon*, 518 U.S. at 113).

**A.      The Nature and Circumstances of the Offense And The History and Characteristics of Mr. Cook Demonstrate That a Lenient Sentence Would be Sufficient, But Not Greater than Necessary to Achieve the Sentencing Goals**

1.    **Mr. Cook's Dedicated Service to the United States Marshals Service**

While employed at the United States Marshals Service ("USMS"), Stephen Cook was

working in his ideal profession.  As a young child, Steve dreamed of working in law enforcement

and becoming a member of the United States Marshals.  Despite being employed in one of the

toughest divisions of the USMS, at the Superior Court for the District of Columbia, Steve was

always enthusiastic about his job, unlike so many other Deputy United States Marshals

("DUSM") at the Superior Court, who were constantly attempting to be reassigned.  Steve

always volunteered for extra hours and shifts.  *See* Letter of Support 001, Letter and Certificate

of Appreciation from USMS.  His love for his occupation and his hard work in protecting the

employees of the Superior Court, other members of the USMS,[2] and prisoners in his custody

persevered, despite the fact that he was not making much money as a DUSM.  Like other persons

that have jobs they love, Steve's satisfaction as a DUSM was inversely proportional to his

remuneration.

As a result of his conviction, Steve will no longer be able to continue in his beloved

profession as a Deputy United States Marshal.  Nor will Steve be able to obtain employment in

any law enforcement position following his conviction.  The loss of his career in law enforcement,

the profession that Steve dreamed of joining as a young boy and the only profession that Steve

ever considered, is possibly one of the most difficult punishments that Steve will face.

2.    **The Deplorable Conditions at Central Cell Block of the Superior Court**

At Superior Court, the USMS is severely lacking in resources to properly handle all the

---

[2] As brought out at trial, Steve was an asset and was relied upon by the other DUSMs in tough situations. Despite his smaller stature and even temperament, in situations where other DUSMs could not control recalcitrant prisoners, the Marshals would call upon Steve to diffuse the dangerous situation.

prisoners that it processes.  The Marshal to prisoner ratio is much lower in the Superior Court for

the District of Columbia than anywhere else under the USMS's watch.  While all other police

departments employ many type of non-violent methods to compel prisoners' compliance with

order, the USMS for the Superior Court has no official mechanism to control recalcitrant

prisoners.  Thus DUSMs, such a Steve, are forced to employ ad hoc procedures and make spur of

the moment decisions in dealing with non-compliant prisoners.  Considering the low Marshal to

prisoner ratio, the under-manned Marshals are required to make quick and decisive actions to

maintain the safety of other Marshals, court personnel, and prisoners.  In such a setting, anything

less than quick and decisive actions to quell non-compliant prisoner could lead to a full-scale riot.

*See infra*, Section B (arguing that provocation by Mr. Hunter in the form of contumacious non-

compliance was objectively dangerous to Steve because of the possibility of starting a riot with

the other prisoners in the van).

### 3.    The Nature and Circumstances of the Offense Suggest that a Variance or Departure Is Warranted

Steve's offense, the violation of Omar Hunter's civil rights resulting in bodily injury, was a

single, one-off illegal act committed by Steve.  Steve's conduct resulting in the conviction was

much less egregious than other similarly situated defendants convicted of similar offenses.

In *Koon v. United States*, 518 U.S. 81 (1996), the Supreme Court upheld a district court's

decision to depart from a guideline sentence for the police officers convicted of violating Rodney

King's civil rights resulting in bodily injury.  In that case, the district court had imposed 30

months imprisonment on Defendant Koon, even though the guidelines recommended 70 to 87

months imprisonment.  *Id*. at 89.  The relevant conduct underlying the violation of Section 242

resulting in bodily injury was as follows:

As the videotape begins, it shows that King rose from the ground and charged toward Officer Powell. Powell too a step and used his baton to strike King on the side of his head. King fell to the ground. From the 18th to the 30th second on the videotape, King attempted to rise, but Powell and Wind each struck him with their batons to prevent him from doing so. From the 35th to the 51st second, Powell administered **repeated blows to King's lower extremities; one of the blows fractured King's leg.** At the 55th second, Powell struck King on the chest, and King rolled over and lay prone. At that point, the officers stepped back and observed King for about 10 seconds. Powell began to reach for his handcuffs.

At one-minute-five-seconds... on the videotape, Briseno, in the District Court's words, **'stomped' on King's upper back or neck.** King's body writhed in response. At 1:07, Powell and Wind again began to strike King with a series of baton blows, and Wind **kicked him in the upper thoracic or cervical area six times....** At about 1:29, King puts his hands behind his back and was handcuffed....

King was taken to a hospital where he was treated for a **fractured leg, multiple facial fractures, and numerous bruises and contusions.**

*Id*. at 86-87 (emphasis added).

In *United States v. LaVallee*, 439 F.3d 670 (10th Cir. 2006), the Tenth Circuit upheld the departure sentence of 30 months as reasonable for an correctional officer that was convicted of a violation of Section 242, resulting in bodily injury of the inmate. The relevant conduct underlying the conviction consisted of the following severe beating inflicted upon a 'surly' inmate:

Testimony at trial demonstrated that Howard Lane, a USP-Florence prisoner, wrote several letters containing sexually explicit remarks to a female USP-Florence officer. After the discovery of the letters, Mr. Verbickas escorted Mr. Lane to Captain Hine's office, **where the Captain told Mr. Verbickas and Mr. Britt to 'take this piece of shit down to SHU and give him a treatment.'** Mr. Verbickas and Mr. Britt applied restraints to Mr. Lane's wrists and took him to the SHU. As he was led to the SHU, Mr. Lane threatened the officers and struggled against the restraints. When the trio arrived at the SHU, Ms. Gutierrez opened a cell door as the other officers escorted Mr. Lane inside. Mr. Britt returned to the officers' station.

**[Defendant] Verbickas punch[ed] [prisoner] while he was standing against the wall of the cell, his hands still restrained behind his back.... [Defendant] then placed him on the floor and... kicked him in the ribs so as to avoid leaving visible injuries and the concomitant need to file an incident report. [Defendant] then**

8

> grabbed [prisoner] by his collar and the seat of his pants, lifted him waist high, and
> dropped him on his face. Blood oozed from [prisoner's] lip. Finally, [defendant]
> threw Mr. Lane up against the wall, leaving a blood stain. Because [prisoner] suffered
> visible facial injuries as a result of the beating, the officers discussed how they would
> falsify their incident reports to avoid an investigation.

*Id*. at 678-79 (emphasis added).

Steve's conduct was much less serious than these brutal beatings inflicted upon prisoners by law enforcement officers. Yet the suggested guideline sentence of 37 to 46 months is much greater than the defendants received in the aforementioned more severe cases. In the case *sub judice*, Mr. Hunter's non-compliance forced Steve to enter the van to escort him out. While being physically removed from the van, Mr. Hunter resisted Steve's attempts at removal, resulting in Mr. Hunter and the other three prisoners who were flexed to Mr. Hunter falling on top of Steve. While Mr. Hunter was on top of Steve, trial testimony indicates that Steve punched Mr. Hunter in the head. While there were two other Marshals on duty at the time, they did not intervene in the melee and did not need to pull Steve away from Mr. Hunter. Rather, Steve, under his own volition, removed himself from Mr. Hunter and continued with his duty of booking the prisoners at the Superior Court's cell block. That was the extent of the entire incident leading to a conviction for a violation of Section 242.

Moreover, while the forced used in *Koon* and *LaVallee* resulted in blood oozing from the victim's face, blood stains on the prison wall, visible facial injuries, fractured bones, multiple facial fractures, and numerous bruises and contusions, the resulting injury in this case was a single contusion to Mr. Hunter's face. Furthermore, while Mr. Hunter reported to Providence Hospital on the day of the incident, he left before he could be treated. Mr. Hunter returned to Providence Hospital on September 1, 2005, and on that day he was treated for his one contusion and

9

released.  The doctor advised Mr. Hunter to take some ibuprofen and he was released in

'satisfactory condition.'  *See* Defendant Exhibit 2A, Medical Records of Omar Hunter.  Clearly,

these injuries are outside of the heartland of the injuries conceived by the Sentencing Commission

and Congress when establishing punishment for a deprivation of civil rights with bodily injury.

Thus, because the offense was but one short incident, occurring in a moment of anger

while dealing with a recalcitrant prisoner, done without any planning or deliberation, and resulting

in little bodily injury to the victim, Steve respectfully requests that this Court either grant a

departure or variance sentence which is sufficient, but not greater than necessary to achieve the

sentencing goals.

**B.      Omar Hunter's Behavior in Provoking the Offense Behavior Compels this Court to Grant a Downward Departure or a Lenient Variance Sentence**

Steve respectfully requests that this Honorable Court grant a departure from the guideline

or a variance sentence because Omar Hunter's contumacious behavior provoked the conduct

leading to Steve's conviction.

As a policy statement, the Sentencing Commission specifically encourages a departure

from the guidelines based upon a "victim's wrongful conduct [that] contributed significantly to

provoking the offense behavior."  U.S.S.G. § 5K2.10.  The Sentencing Commission listed six

non-exhaustive factors that a court may consider in making this departure:

(1) The size and strength of the victim, or other relevant physical characteristics, in comparison with those of the defendant.

(2) The persistence of the victim's conduct and any efforts by the defendant to prevent confrontation.

(3) The danger reasonably perceived by the defendant, including the victim's reputation for violence.
(4) The danger actually presented to the defendant by the victim.

10

(5) Any other relevant conduct by the victim that substantially contributed to the danger presented.

(6) The proportionality and reasonableness of the defendant's response to the victim's provocation.

U.S.S.G. § 5K2.10.

While this is a favored policy consideration by the Sentencing Commission, under the advisory sentencing guideline regime, a court may find that a victim's conduct mitigates a defendant's sentence as a matter considered as to Section 3553(a)(1), the nature of the offense. Thus, while a finding under § 5K2.10 is sufficient to grant a defendant a departure, it is not necessary, as a court could find, even if against the policy of the Sentencing Commission, that a victim's provocation is a Section 3553 factor that mitigates the sentence.

In *Koon*, the Supreme Court upheld a departure of five offense levels based upon U.S.S.G. § 5K2.10 because "the victim's wrongful conduct contributed significantly to provoking the offense behavior." *Koon*, 518 U.S. at 89. The *Koon* Court found that "the same Guideline range applies both to a government official who assaults a citizen without provocation as well as instances like this where what begins as legitimate force becomes excessive. The District Court did not abuse its discretion in differentiating between the classes of cases, nor did it do so in concluding that unprovoked assaults constitute the relevant heartland." *Id.* at 105.

The Court found that even though Rodney King's:

provocative behavior eventually subsided. The Court recognizes that by the time the defendants' conduct crossed the line to unlawfulness, Mr. King was no longer resisting arrest. He posed no objective threat, and the defendants had no reasonable perception of danger. Nevertheless, the incident would not have escalated to this point, indeed it would not have occurred at all, but for Mr. King's initial misconduct.

*Id*. at 102 (citation omitted). The Court continues:

11

Messrs. Koon and Powell were convicted of conduct which began as a legal use of force against a resistant suspect and subsequently crossed the line to unlawfulness, all in a matter of seconds, during the course of a dynamic arrest situation. However, the convicted offenses fall under the same Guideline Sections that would apply to a jailor, correctional officer, police officer, or other state agent who intentionally used a dangerous weapon to assault an inmate, without legitimate cause to initiate a use of force.

Where an officer's initial use of force is provoked and lawful, the line between a legal arrest and an unlawful deprivation of civil rights... is relatively thin. The stringent aggravated assault Guideline, along with the upward adjustments for use of a deadly weapon and bodily injury, contemplates a range of offenses involving deliberate and unprovoked assaultive conduct. The Guidelines do not adequately account for the differences between such 'heartland' offenses and the case at hand.

*Id*. at 102-03. The Court further held that "a finding that King's misconduct provoked lawful force but not the unlawful force that followed without interruption would be a startling interpretation and contrary to the ordinary understandings of provocation. A response need not immediately follow an action in order to be provoked by it." *Id*. at 104.

In *LaVallee*, the Tenth Circuit departed two levels by finding that a prisoner's 'surly' behavior significantly provoked the prisoner guard's brutal beating of the prisoner. *LaVallee*, 439 F.3d at 701. In this case, the prisoner had written sexually explicit letter to a female correctional officer, and after finding the letters, the defendant's supervisor told the defendant, in front of the victim, to "take this piece of shit down to SHU and give him a treatment;" an obviously thinly veiled suggestion to beat the prisoner. *Id*. at 678. While being held in restraints and being led to receive his "treatment," the prisoner struggled against the officers. *Id*. Once down at the SHU, the defendant gave the victim a brutal beating. *Id*. at 679.

The Tenth Circuit upheld the two level departure based upon Section 5K2.10, holding that:

victim provocation is an 'encouraged factor.' Further, the provoking conduct need not immediately precede the offense behavior. In this case, there was testimony that Mr. Lane

made sexually explicit remarks to a female officer, threatened Mr. Verbickas immediately before the assault, and made an aggressive move toward him. Indeed, the District Court noted Mr. Lane's 'surly' behavior in granting the departure.

*Id*. at 708 (citations omitted).

It is beyond peradventure that when compared with these two case, it is clear the Steve deserves a significant departure based upon Omar Hunter's wrongful conduct that provoked the offense. In the case *sub judice*, Mr. Hunter was non-compliant and contumacious to authority during his entire custody following his arrest. Mr. Hunter refused to leave his cell at Central Cell Block and had to be physically removed by the Metropolitan Police Department. After arriving by van at the Superior Court cellblock, Steve attempted to process Mr. Hunter and the other prisoners that Mr. Hunter was flex-cuffed with. Mr. Hunter obstinately refused to give Steve his name and contumaciously ignored Steve's order to leave the van. Mr. Hunter's behavior forced Steve to appropriately enter the van and physically remove Mr. Hunter. Mr. Hunter's struggle against Steve during the physical removal resulted in Mr. Hunter and the other flex-cuffed prisoners falling on top of Steve. In this melee and in the heat of the moment not knowing if he was being attacked by the prisoners and Mr. Hunter, Steve struck Mr. Hunter in the head.[3]

As to the Section 5K2.10 factors, Mr. Hunter was persistent in his contumacious provoking conduct. During his entire custody, he refused to comply with the law enforcement officer, who repeatedly had to resort to physical control of the victim. Moreover, Steve both perceived a reasonable danger from Mr. Hunter and there was an actual danger presented by Mr.

---

[3] Testimony at trial was conflicting as to how Steve struck Mr. Hunter. Most of the witnesses testified that Steve merely punched Mr. Hunter in the head, while on witness testified that Steve kicked Mr. Hunter in the head repeatedly. However, it is highly unlikely that Mr. Hunter was kicked in the head by Mr. Cook. As part of his uniform for the USMS, Steve wore steel-toed boots to work everyday. If Steve had kicked Mr. Hunter in the head with the steel-toed boots, Mr. Hunter would have suffered a much greater injury than a mere contusion.

Hunter and the other prisoners.  First, Steve is diminutive in stature in relation to other members of the USMS, being only five feet, seven inches tall and weighing only one hundred and fifty five pounds.  Furthermore, Steve, without help from any other Marshals, was dealing with multiple prisoners.  While these prisoners were flex-cuffed together, they still had a substantial amount of freedom of movement and could have easily attacked and severely injured Steve.  Thus, Steve's perception of the danger of the situation was objectively reasonable.  At any moment, Mr. Hunter's contumacious conduct could have precipitated the other prisoners joining him and banding against Steve.  Further, Steve pulled Mr. Hunter out of the van, with the result of the prisoners' falling on top of him.  At this point Steve was in an extremely vulnerable position and in imminent danger of being attacked by either Mr. Hunter or one of the other inmates.

Further, Steve's response was proportional to the provocation by Mr. Hunter.  The conduct underlying the conviction was a quick strike to Mr. Hunter's head.  While unlawful, such behavior is not unreasonably disproportionate to the provocation offered by Mr. Hunter.  In fact such a response is much less severe than the responses of the defendants in *Koon* and *LaVallee*. In each of those cases, the victim received a brutal beating at the hands of the law enforcement officers.  Moreover, the provocation in this case was much greater than the provocation in either *Koon* or *LaVallee*.  In *LaValle*, the provocation was the writing of sexually explicit letters and subsequent 'surly' behavior.  A victim's contumacious refusal to comply with authority and subsequent struggle against removal from a van is surely more provocative than the mere writing of sexually explicit letters.  While the victim in *LaVallee* did struggle against being brought to the SHU, this was because of the beating that he was promised.  Thus, any contumacious behavior of the victim in *LaVallee*, beyond the letters, was provoked by the prison guard's promise of a

14

beating. Yet, the court still departed based upon the provocation.

In *Koon*, the severe beating of Rodney King continued even after he had been subdued. The Court still upheld the departure, finding that the provoking behavior could occur during some previous initial misconduct, and that even if the assault continued past the point where the victim presented no reasonable danger, a departure would be appropriate because but/for the initial misconduct, the assault would not have escalated. In this case, there is no temporal gap between the misconduct of Mr. Hunter and the reaction of Steve, but rather Steve's reaction is simultaneous to Mr. Hunter's wrongful conduct. Mr. Hunter provoked the offense by refusing to comply with Steve's order and leave the van, and in the struggle to remove Mr. Hunter from the van, this offense occurred. When Mr. Hunter fell upon Steve, Steve's actions rose to the level of illegality underpinning this conviction. At the time Steve was still presented with the reasonable danger of a non-compliant prisoner on top of him.

Finally, it should be noted that Steve has dealt with **thousands** of prisoners while employed with the USMS and never had an incident before this. There were never any other claims that Steve had struck any prisoners, despite the fact that Steve has dealt with a multitude of non-compliant prisoners during his employment. Because Steve's behavior was so aberrant from his other interactions with non-compliant prisoners, it is clear that Mr. Hunter's contumacious behavior in refusing to get off the van and struggling with Steve against removal was the catalyst of the offense.

Therefore, because Mr. Hunter's wrongful conduct was a significant contributor in provoking the offense of conviction, this Court should grant Steve a departure or a variance sentence. Presumably, because of the more seriousness of the offenses and the less provocation

15

presented in both *Koon* and *LaVallee*, Steve believes he should receive a departure greater than

the departure offered in those cases and a sentence more lenient than those cases.

**C.    The Court Should Depart or Grant a Variance Sentence Because Mr. Cook's Conduct Represents Aberrant Unlawful Behavior**

Steve respectfully requests that this Court grant a departure or variance sentence based

upon the fact that Mr. Cook's conviction represents a single instance of unlawful behavior

blighting the rest of Mr. Cook's otherwise law-abiding life.

As a policy statement, the Sentencing Commission encourages departures based on

aberrant behavior where "the defendant committed a single criminal occurrence or single criminal

transaction that (1) was committed without significant planning; (2) was of limited duration; and

(3) represents a marked deviation by the defendant from an otherwise law-abiding life."  U.S.S.G.

§ 5K2.20.  Furthermore, this Court need not rely upon the strict test set out by the Sentencing

Commission, but may, in this Post-*Booker* sentencing regime, look to the aberrant behavior of the

defendant as a Section 3553(a) factor in imposing a lenient sentence.

In *LaVallee*, the Tenth Circuit upheld a departure based upon aberrant behavior for the

prison guard convicted of violating the civil rights and causing bodily injury to an inmate.

*LaVallee*, 439 F.3d at 701.  The court held:

> The aberrant behavior exception may apply in an exceptional case when 'the defendant
> committed a single criminal occurrence or single criminal transaction that (1) was
> committed without significant planning; (2) was of limited duration; and (3) represents a
> marked deviation by the defendant from an otherwise law-abiding life.  The conduct for
> which Mr. Verbickas was convicted meets the three requirements of § 5K2.20(b), and
> there is substantial evidence in the record that this was also an exceptional case, thus
> warranting a departure.

*Id*. at 708 (citations omitted).  In that case, the court found the aberrant behavior departure

applied, even though that the guards of the prison had a history of abusive behavior and the

16

defendant and other guards filed a false report in an attempt to cover up the severe beating of the victim.

> Because [the victim] suffered visible facial injuries as a result of the beating, the officers discussed how they would falsify their incident reports to avoid an investigation.  The reports ultimately filed with USP-Florence stated that [the victim] kicked both [Defendant] Verbickas and Ms. Gutierrez, and Mr. Lane threw himself up against the wall.  To support this version of events, Ms. Gutierrez testified that she inflicted an injury on herself.

*Id*. at 679.

In the case *sub judice*, there is no indication that Steve's conduct underlying his offense was anything but aberrant behavior.  First, his offense was committed without any planning. Testimony at trial shows that Steve only hit Mr. Hunter in the heat of the moment, as he was pulling the non-compliant prisoner from the van.  Thus, there was absolutely no planning involving the Section 242 violation.  Furthermore, while Steve was convicted of three obstruction offenses for submitting a false report and informing a testifying colleague to stick to his report, these actions were done without any significant planning.  Steve wrote his report, after being demanded to do so by his supervisor, on the day after the incident.  Moreover, but for his former colleague calling him, Steve would have never contacted his former colleague concerning his grand jury appearance.  Again, much like Steve was responding to Mr. Hunter's provocation, Steve was merely responding to his worried colleague's concern when Steve told him to stick to the report.  Finally, the Government attempted to bring a conspiracy count, but the count was dismissed for insufficient evidence prior to the jury deliberations.  Thus, there was no evidence that any planning went into a cover-up of the Section 242 offense.

Second, Steve's offense against Mr. Hunter was of very limited duration.  Testimony at trial shows that in the heat of the moment while dealing with a non-compliant prisoner, Steve

17

struck Mr. Hunter. The offense lasted for but a second. Moreover, the obstructive conduct was

of very limited duration as well. It consisted of the mere writing of a report and two telephone

calls, neither initiated by Steve, but by the grand jury witness. It is clear that in *LaVallee*, the

obstructive behavior lasted much longer and involved some type of forethought and planning. In

this case, the obstructive behavior consists of Steve leaving only one part out of his report, that he

struck Mr. Hunter while removing him. There was no discussion between Steve and the other

Marshals about the need to cover-up the incident or any type of affirmative behavior to obstruct

the investigation, beyond the exclusion of mentioning the offense in his incident report.

Finally, the offense represents an aberration from Steve's normally law-abiding life. As

seen in the Pre-Sentence Report, Steve has absolutely no previous criminal history. Moreover,

during his over three years employment with the USMS, and during contact with thousands of

other prisoners, there is no indication that Steve had ever abused anyone. While there were

claims against Steve, as there are against all Marshals working with prisoners, the Internal Affairs

division cleared Steve of any wrongdoing. In fact, the USMS always praised the responsible and

hard work done by Steve. *See* Letter of Support 001. Based upon his record with the USMS, it

is clear that this behavior was an aberration.

Aside from this incident, Steve has been a shining example of what every American citizen

should be. Upon graduating from high school in 1994 and seeking to serve his country, Steve

volunteered with the United States Army. During his service with the army, Steve completed

tours of duty in both Korea and Bosnia and was honorably discharged in October of 1998. His

commanding officer has described Steve as "one of my most reliable, competent and level-headed

soldiers," and "of high character,... always treat[ing] everyone around him with respect and

dignity." *See* Kaiser Gill Letter of Support 003.

Upon his discharge, Steve entered a community college and then was offered employment

with the USMS, where he has worked since 2003. There is no indication that Steve has ever

engaged in illegal drug use or done anything that was not in conformity with the law.

In fact, in all the letters of support for Steve, his family, friends and community all write

about how Steve's convictions are "shocking" as the rest of Steve's life was firmly rooted in

moral and law-abiding principles.

> I was distressed to hear about the charges brought forth against [Steve] and his
> conviction. The actions that Stephen allegedly took, which resulted in his convictions are
> in direct contrast to my observations of Stephen and the person I know him to be.... I
> never observed Stephen acting in an uncontrollable or violent manner. Actually, the other
> soldiers nicknamed Stephen 'hippie' for his constant promotion of peace and harmony,
> something very atypical of a soldier. (Kaiser Gill Letter of Support 003)

> I was very distraught when I heard that [Steve] had been convicted of these very serious
> charges. This is not the Steve that I know. The Steve that I know could almost be called
> a pacifist.... Steve is not one who would resort to force or violence when other means can
> be utilized. (Evan Lonergan Letter of Support 006)

> His conviction is so shocking to me because it does not, in any way, reflect the Steve I
> know. I have known Steve... for his entire life.... [W]hat always,... separated Steve from
> the rest of the pack was his unrelenting honesty.... The Steve I know is a good and decent
> and honorable man who has always taken full responsibility for his own actions. The idea
> that he would deprive anyone of their rights and then lie or ask others to lie about it on his
> behalf is so utterly at odds with his whole life history as to be simply incomprehensible to
> me. (Timothy P. Murphy Letter of Support 009)

> [I]t becomes increasingly clear to me how shocking it s that I would have to tell someone
> about the kind of person Steve is... because I know that Steve's strong moral character
> stands out so distinctly... to anyone he meets.... Honor, duty, and an unfailing sense of
> personal responsibility are the traits that exemplify his time as a calvary scout in the U.S.
> Army and a member of the Marshals Service. (Gerald M. Blair Letter of Support 011)

> [Steve] always upheld the qualities and values of a solider. He was a non-violent and
> compassionate individual. I am VERY surprised to hear of his conviction. (Sam Leonard
> Letter of Support 018)

These letters of support and attestations to the honesty, honor, and moral responsibility of Steve clearly demonstrate that the conduct that led to his conviction was an aberration from an otherwise law-abiding life. Thus, Steve asks this Court to either depart pursuant to Section 5K2.20 or alternatively grant him a variance sentence based upon the Section 3553(a) statutory factors.

**D.     Mr. Cook's Status as a Former Law Enforcement Officer in a Highly Publicized Case Involving a Violation of a Prisoner's Rights, Necessitating that Mr. Cook Serve His Sentence in Solitary Confinement, Suggests that a Variance or Departure Is Warranted**

Steve suggests to the Court that it should consider as a Section 3553(a) factor his status as a law enforcement officer, who was charged with abusing a prisoner in a case that was highly publicized. Steve posits that this circumstance of the offense necessitates either a departure or a variance sentence.

In *Koon*, the Supreme Court held that "[t]he Court of Appeals did not dispute, and neither do we, the District Court's finding that '[t]he extraordinary notoriety and national media coverage of this case, coupled with the defendants' status as police officers, make Koon and Powell unusually susceptible to prison abuse.'" *Koon* , 518 U.S. at 91. Thus, the Supreme Court upheld the susceptibility of prison abuse as a factor that could mitigate a defendant's sentence.

In *LaVallee*, the Tenth Circuit upheld a departure of two offense levels where the district court "determined that Mr. Verbickas was especially susceptible to abuse in prison." *LaVallee*, 439 F.3d at 701. The court held that:

> The fact that police officers are susceptible to abuse in prison does not, alone, warrant a downward departure.... However, when a district court determines that the defendants' susceptibility to abuse is compounded by 'widespread publicity and emotional outrage... [this] is just the sort of determination that must be accorded deference by the appellate courts.'

20

*Id*. at 708 (citations omitted).  Specifically, the Tenth Circuit found that a departure was reasonable where the district court determined that the case was outside the heartland of typical Section 242 convictions:

> because it was part of a vast investigation, spanning several years, that involved not only the abuse of inmates by correctional officers, but also the conspiracy to abuse inmates... There was [also] evidence that the investigation was reported on in a publication distributed among federal inmates; that because of the Appellants' notoriety they were on 23-hour lockdown; and that other inmates threatened the Appellants' lives...

*Id*. at 708.

In this case, during Steve's two and a half months in custody awaiting this sentencing hearing, he has been kept in solitary confinement as a result of his status as a law enforcement officer convicted of abusing an inmate.  Thus, any punishment that Steve receives involving imprisonment will be more severe than the punishment of a typical inmate, as Steve will need to serve his sentence in solitary confinement, away from the general population.  All courts recognize that the type of punishment of a defendant is proportional to the length of the sentence. Probation is less restricting than home confinement which is less restricting than incarceration. Thus, any sentence of probation would be longer than a sentence of incarceration because it is less restrictive.  In the same way incarceration in a general population is less restrictive than incarceration in solitary confinement for the entirety of a sentence.  The sentencing guidelines merely consider general incarceration, but should it not be true that a defendant sentenced to solitary confinement by the nature of his characteristic, which is a harsher sentence than general incarceration, should receive less time because of the more harsh conditions?  To find otherwise would be against the well-regarded sentencing goal of proportionality.

Furthermore, this case has gained some widespread notoriety in the press and it is likely

that many prisoners have been made aware of Steve's offenses.  WTOP Radio ran a story stating

that: "Deputy Stephen Cook dragged the prisoner from a police van while the man was still bound

and repeatedly beat him in the head."  Mark Segraves, WTOP Radio, Aug. 7, 2007, *available at*

http://wtop.com.  The Washington Post ran a similar, stating that Cook was alleged to have

dragged Omar Hunter onto the ground and beat him in the head repeatedly.  Henri E. Cauvin,

*Marshal Charged With Beating Prisoner*, Coverup, Wash. Post. B4 (Aug. 8, 2007).  The

Washington affiliate of ABC News ran a story about Steve resulting in this viewer comment on

their website: "I say put his butt on the otherside [sic] of the bars and let them go to town.".

ABC News, *Deputy U.S. Marshal Charged With Beating D.C. Inmate* (Aug. 8, 2007), *available

at* http://www.wjla.com.  The case has gone beyond the local news media as well, with The

Examiner, a San Francisco, California, newspaper running a story about Steve's case.  Scott

McCabe, *U.S. Marshal Indicted on Charges of Beating Inmate, The Examiner* (Aug. 8, 2007),

available at http://www.examiner.com.[4]  Without a doubt, this case has gained enough widespread

notoriety to necessitate Steve being kept in isolation during the pendency of his incarceration

because of the high risk of abuse while in prison.

      Isolation, in many instances, is recognized as a form of torture.  *See* Stephen Soldz,

*Isolation Torture Routine at Guatanamo*, CounterPunch (Nov. 21, 2007) (indicating that

---

[4] An internet search reveals the widespread coverage of the case, with the case being covered in all of the local news agencies, *see NBC News, U.S. Marshal Indicted in Alleged Prisoner Beating* (Aug. 16, 2007) available at http://www.nbc4.com, and by websites that track instances of police brutality.  *See* http://www.badcopnews.com (running an entry stating that "Washington DC U.S. Deputy Marshal Steven Cook convicted by jury after beating handcuffed man and witness tampering").  The truth of the matter is that with the state of modern technology, even if a case does not receive attention in the mainstream media, any prison inmate can learn whether a defendant has been incarcerated due to a law enforcement brutality offense.  Any inmate that has access to a computer need only go to a website such as Badcopnews.com to learn of law enforcement defendants who have been convicted of brutality against prisoners.  Thus, even though the *Koon* Court stated that a departure or variance is only justified for a law enforcement officer convicted of brutality where there is widespread exposure, with today's modern technology, easy access to the internet, and websites that track police brutality convictions, any law enforcement officer convicted of a brutality offense will be subject to a high risk of abuse while in prison.

isolation is employed as a very effective form of interrogation on the prisoners at Guatanamo).

Steve would not be subject to isolation, a punishment akin to torture, because of any

wrongfulness on his own part, but rather because of his status as a law enforcement officer and

because the publicity of this case would subject him to probable abuse while in prison. Thus, the

fact that Steve's incarceration will necessarily involve isolation because a incarceration in isolation

will subject him to probable abuse by other inmates should be taken into consideration to grant

him a variance sentence or to depart from the guideline sentence.

**E.     A Guideline Sentence of Between 37 and 46 Months Imprisonment Would Be
         Greater than Necessary to Serve as a Deterrent For Future Crimes**

Furthermore, Steve asks this Court to take into consideration as a Section 3553 factor that

the guideline sentence for incarceration will not have any greater specific or general deterrent

effect. Because Steve has lost his job with the United States Marshals Service and because he will

be precluded from any other law enforcement employment, there is no chance that an offense such

as this would ever occur again. While this offense was aberrant behavior on the part of Steve and

would never happen again anyway, it is impossible for Steve to ever commit this offense again

because of his ostracization from law enforcement.

Moreover, while the Government seems to want to put Steve's head on a stick to serve as

a warning to all other law enforcement officers, it is clear that Steve's conviction and

incarceration thus far has served an adequate deterrent message to other employees of the USMS.

*See* Government's Sentencing Memorandum, paragraph 27. The employees of the USMS are

fully aware of what happened here. Many of them sat through the entire trial, from arraignment

to the sentencing hearing. Further, this case has been publicized to supervisors and other USMS

employees as a message about cracking down on prisoner abuse. Many of these USMS

employees have seen Steve while incarcerated prior to sentencing and have been witnesses to the incredible hardship that being incarcerated in isolation has been for Steve for even these two and a half months.[5]  These officers have also seen Steve lose the job that he has cherished so much. Clearly, a severe sentence within the guideline range will be greater than necessary to serve as a deterrent to future crimes.

**F.    This Court Should Impose a Sentence That Avoids Unwarranted Disparity With Other Similar Cases Involving Similar Offenses**

The Government relies on a number of cases that it posits are similar to the case *sub judice*.  However, a look at the facts of these cases reveal no similarity.  In *United States v. Lemoure*, 474 F.3d 37 (1 st Cir. 2007), the defendant was sentenced to 48 months imprisonment for his seven convictions of obstruction offenses for obstructing an investigation into a brutal beating of a civilian by police officers, including conspiracy to obstruct justice, three counts of witness tampering, one count of obstruction of justice in violation of 18 U.S.C. § 1503, and two counts of perjury.  *Id*. at 39.  The court still departed from the 51 to 63 month guideline range.

In *United States v. Bailey*, 405 F.3d 102 (1st Cir. 2005), the defendant was convicted of a violation of Section 242, conspiring to obstruct justice, and perjury and sentenced to 41 months imprisonment for an incident involving the abuse of a prisoner in the jail's psychiatric unit and the subsequent cover-up.  The prisoner, who was on suicide watch, had all of his clothes removed and

---

[5] In its Sentencing Memorandum, the Government tries to have it both ways.  The Government argues that a message must be sent to the other Marshals because of the brazenness in which Steve committed the offense, knowing that he would not be prosecuted for the offense.  The Government argues that this 'code of silence' necessitates that Steve's punishment be harsh to send a deterrent message.  However, then the Government argues in the next paragraph that Steve did significant planning in an attempt to cover-up the offense.  The Government posits that because other officers witnessed the assault, Steve was nervous and had to take substantial steps to hide his abuse.  The Government cannot have it both ways.  If they argue that Steve made deliberate efforts to cover-up because of many witnesses to the event, then the Government can also not argue that a severe punishment is needed to break the 'code of silence.'

was covered in only a paper "johnny." The prisoner complained that he was cold, needed a blanket and upon being refused his request began screaming. The defendant told the prisoner that he had enough of his behavior and was going to "bang him out" later that evening. After the prisoner's dinner, the defendant and another guard entered the victim's cell in an unauthorized manner to "slap him around." The defendant and other guard entered the victim's cell, "slapped his face several time and then delivered multiple knee strikes...." *Id* at 107. The prisoner was then punched several times in the rib and shoulder with the prisoner complaining of back pain. Afterwards, the defendant bragged that he had "beat the fuck out of" the detainee. *Id*. Following the beating, the guards conspired to write false reports and obstruct the investigation, with the Defendant testifying falsely before the grand jury. *Id*.

In *United States v. Donnelly*, 370 F.3d 87 (1st Cir. 2004), the defendant was convicted of seven counts, including four counts of violations of Section 242, two conspiracy counts, and for obstruction of justice. This case involved a 26-month long conspiracy at the jail to brutalize inmates who were disrespectful. One of the violations of Section 242, involved the defendant "beat[ing] the Tourette's out of" a prisoner. *Id*. at 95.

To imply that these cases are similar to Steve's conviction is simply disingenuous. If anything, Steve's relevant conduct underlying his offenses represent the least serious examples of relevant conduct that could constitute the convictions. Steve violated Section 242 after having to physically remove a contumacious prisoner and after that prisoner fell on top of him. Steve only committed witness tampering after the grand jury witness, under direction of the FBI, called Steve and asked Steve about what he should do at the hearing. Steve's response underlying the conviction, no matter how bad the Government tries to portray it, was 'stick to your report.'

25

Thus, Steve's conduct is in no way as serious as the conduct in the cases that the government

cites.

In fact, in cases where the beatings were much more brutal than the conduct that Steve

engaged in, courts have imposed well below guideline sentences. *See United States v. Harris*,

408 F.3d 186 (5th Cir. 2005) (upholding 15 months variance sentence for police chief who kicked

and beat a suspect with a baton, resulting in the suspect bleeding the head, and then bragged

about the severe beating that he had inflicted); *United States v. Houchin*, 2007 WL 3374595

(E.D. Ark. Nov. 6, 2007) (imposing 12 month sentence, departing 50 percent from a 24 to 30

month advisory guideline where offense represented aberrant behavior and where injury to

prisoner was not severe). [6]

In 2005 and 2006, the national median sentence for a violation of Section 242 was 21

months.[7] *See* United States Sentencing Commission, Statistical Information Packet, Fiscal Year

_____

[6] Courts have also given extreme variances and departures for violations of Section 242. *See, e.g., United States v. McDougle*, 82 Fed.Appx. 153 (6th Cir. 2003) (imposing departure sentences for violation of 242 resulting in death after the beating of a mentally handicapped patient of 60 months for one co-defendant, departing from the recommended range of 262 to 327 months and 135 months for another co-defendant, departing from 324 to 405 months).

[7] Furthermore, according to the Sentencing Commission, only about 60 percent of persons convicted of violations of Section 242 receive a prison sentence with approximately 40 percent of defendants receiving either probation, home confinement, or a combination of both. *See* United States Sentencing Commission, Statistical Information Packet, Fiscal Year 2005-2006, D.C. Circuit, *available at* http://www.ussc.gov/ JUDPACK/2006/dcc06.pdf.

Nor is the Court precluded from imposing a sentence of probation for Steve's offenses. In *Gall*, the Supreme Court upheld a variance sentence of 36 months probation as reasonable where the advisory guidelines recommended 30 to 37 months imprisonment for a conspiracy to distribute 2,500 grams of ecstasy. *Gall*, 128 S.Ct. at 592-93. In recognizing that probation was a sufficient sentence, the Court held:

We recognize that custodial sentences are qualitatively more severe than probationary sentences of equivalent terms. Offenders on probation are nonetheless subject to several standard conditions that substantially restrict their liberty. Probationers may not leave the judicial district, move, or change jobs without notifying, and in some cases receiving permission from, their probation officer or the court. They must report regularly to their probation officer, permit unannounced visits to their homes, refrain from associating with any person convicted of a felony, and refrain from excessive drinking. Most probationers are also subject to individual 'special conditions' imposed by the court." *Id.* at 596 (citations omitted).

2005-2006, D.C. Circuit, *available at* http://www.ussc.gov/JUDPACK/2006/dcc06.pdf.  Mr.

Cook suggests that because his conduct underlying his offense represents the least serious

conduct constituting violations of his offenses, this Court should depart or grant a variance

sentence well below the guidelines and well below the national average for Section 242 violations.

## G.    Mr. Cook Did Not Affirmatively Seek Out the Grand Jury Witness to Tamper With His Testimony

Steve requests that this Court to consider, Steve made no affirmative efforts to obstruct

the Grand Jury's investigation.  Steve did not call Mr. Behringer, nor did he seek out Mr.

Behringer to ask anything of him.  Mr. Behringer called Steve on three occasions in an effort to

save himself by importuning Steve to obstruct by repeating stick to your report.  It was Mr.

Behringer who brought up the Grand Jury testimony.  It was Mr. Behringer who continually

asked Steve what he should do.  Because Steve had no affirmative intention of seeking out the

witness for the purpose of obstruction, a departure or variance in his favor is appropriate here.

## CONCLUSION

Based on the foregoing reasons, where the victim provocations was a significant cause of

the offense, where the offense was aberrant behavior on the part of Steve, where the conduct

consisting of the offense was much less serious than other cases, where the injury to the victim

was much less serious than other injuries in other cases involving the same offenses, where Steve

will be forced, through no fault of his own, to serve his sentence in solitary confinement, where no

further deterrent goal is served by further confinement, where a lesser sentence is necessitated by

similar cases involving similar conduct, and where Steve, except for this incident, had previously

served dutifully with the United States Marshals Service and the United States Army, Steve

respectfully requests that this Honorable Court, in considering these and other Section 3553(a)

factors grant him a variance or departure sentence from the 37 to 46 month advisory guideline

range.

Respectfully Submitted,

STEPHEN COOK
By Counsel

**/s/ William B. Moffitt**
WILLIAM B. MOFFITT
Moffitt & Brodnax, Ltd.
108 North Alfred Street, Suite 100
Alexandria, Virginia 22314
Phone: (703) 684-9400
Fax: (703) 684-9401
Email: wbmoffitt_esq@yahoo.com

## <u>CERTIFICATE OF SERVICE</u>

I, William B. Moffitt, hereby certify that Stephen Cook's Sentencing Memorandum was filed on the 16th day of January, 2008, with the Clerk of the District Court for the District of Columbia using the ECF filing system.  The ECF system will send electronically serve the following individual:

John M. Cummings
Assistant United States Attorney
555 Fourth Street, N.W.
Washington, DC 20530

**/s/ William B. Moffitt**
WILLIAM B. MOFFITT
Moffitt & Brodnax, Ltd.
108 North Alfred Street, Suite 100
Alexandria, Virginia 22314
Phone: (703) 684-9400
Fax: (703) 684-9401
Email: wbmoffitt_esq@yahoo.com

1/6/08

HONORABLE JUDGE HUVELLE

REGARDING STEPHEN JOHN COOK

YOUR HONOR,

OUR NAMES ARE GARRY & COLLEEN COOK. WE ARE THE PARENTS OF STEPHEN COOK. WE ASK YOU TO SHOW MERCY WHEN YOU SENTENCE OUR SON ON JAN. 18, 2008. WE COULD WRITE VOLUMES OF WHAT WE ALREADY KNOW TO BE THE GOOD QUALITIES OF OUR SON, BUT WE URGE YOU TO READ THE OTHER CHARACTER LETTERS THAT WERE SENT TO YOU. PLEASE READ THE ATTACHED LETTER FROM THE U.S. MARSHAL SERVICE AND THE CERTIFICATE OF APPRECIATION FROM THE OPERATIONS SECURITY EVALUATION GROUP.

THANK YOU,

Garry Cook

Colleen Cook

000001

**U.S. Department of Justice**

United States Marshals Service

*D.C. Superior Court*

Washington, DC 20001

January 10, 2004

Steven Cook
Deputy U.S. Marshal
D.C. Superior Court
500 Indiana Avenue NW
Washington D.C. 20001

Dear Deputy Cook:

I have been informed that your recent contributions to evening cellblock operations have been above and beyond those expected of deputies on their evening cellblock rotation. I want to personally thank you for your professional service. It is only with the help of deputies such as you that the cellblock is able to function in this time of reduced detention officer staffing.

The example you set in the block in the evenings helped set standards for other deputies and made it easier to keep the flow of prisoners out of the cellblock moving well. Not only were you eager and ready to perform the often unpleasant cellblock related tasks during your assigned rotation, but were willing to help out long after that rotation was past.

The example you have set demonstrates your excellent work ethic and reflects great credit on this office and the Marshals Service. I am placing a copy of this letter in your local personnel file.

Sincerely,

Todd W. Dillard
United States Marshal
Superior Court
District of Columbia



# Operations Security Evaluation Group

## Certificate of Appreciation

Presented to

### STEPHEN COOK

For your outstanding support of a highly sensitive, Special Operations intelligence mission of national significance.

Given under my hand this the 1ST day of February 2007

BRYAN P. FENTON
Lieutenant Colonel, Special Forces,
Commanding

"ALSO I HEARD THE VOICE OF THE LORD SAYING, WHOM SHALL I SEND, AND WHO WILL GO FOR US? THEN SAID I, HERE I AM; SEND ME."

SEND ME

# Concrete Connection, Inc.

January 14, 2008

**Re: Stephen John Cook Offer of Employment**

**The Honorable Judge Huvelle,**

**Please accept this letter as an offer of employment to Stephen John Cook upon his release. This offer includes a full time position with relocation assistance including assistance in obtaining adequate housing in the Greenville, South Carolina area.**

**We are greatly anticipating the release of Mr. Cook and feel he will be a great asset to our organization and will bring many needed skills to our work force.**

**If further information is needed, I can be reached at (864)236-5997.**

**Sincerely,**

**Keith R. Herringshaw, President**

000002

November 30, 2007

Kaiser Gill
4380 King St., #708
Alexandria, VA 22302

To the Honorable Judge Huvelle,

I am writing this letter on behalf of Stephen Cook, whose case you recently presided over. I was distressed to hear about the charges brought forth against him and his conviction. The actions that Stephen allegedly took, which resulted in his conviction are in direct contrast to my observations of Stephen and the person I know him to be.

I was Stephen's commanding officer in the Army from May, 1997 to February, 1999. During this timeframe, our unit deployed to Bosnia-Herzegovina to conduct peacekeeping operations for eleven months. Stephen was one of my most reliable, competent and level-headed soldiers.

One of our missions in Bosnia was to patrol hostile areas, where the residents were abrasive and often belligerent to our forces. We employed a great deal of patience and restraint during these confrontations. I routinely hand-picked Stephen to lead my security detail, because I considered him to be most capable in these situations. I knew Stephen to always be professional and controlled regardless of the conditions and the environment around him. Stephen remained calm and was able to diffuse all situations in a diplomatic and appropriate manner.

I never observed Stephen acting in an uncontrollable or violent manner. Actually, the other soldiers nicknamed Stephen "hippie" for his constant promotion of peace and harmony, something very atypical of a soldier. I considered Stephen to be of high character, who always treated everyone around him with respect and dignity.

I left the military in 2002 to become a Special Agent in the Federal Bureau of Investigation (FBI) and was assigned to the FBI's New York Division. As a law enforcement officer for over 5 years, I worked with several other law enforcement officers from multiple local, state and federal agencies. I always considered Stephen to be a fine fellow officer, who approached his responsibilities with the utmost professionalism, just as he had as a soldier years ago.

I spent ample time with Stephen during our deployment and several training missions, as well as keeping in periodic contact with him over the years, thus I feel I was exposed to him enough to a good assessment of his character. I hope I have been able to convey the level of respect I have for Stephen and the wonderful attributes he possesses; I wish I could do more. This is a tragedy in so many ways; I just hope that Stephen's service and dedication to his country as well as the goodness of his character is considered as his case proceeds.

Sincerely,

Kaiser Gill

000003

To: Honorable Judge Huvelle
Re: Stephen John Cook

It is hard for me to sit down and write a letter like this for the benefit of a member of my family, especially Stephen. I am Steve's uncle and have known Steve all his life. While I have not always been close by, I have followed Steve through high school, into the military, and through his career in law enforcement. In watching Steve as he grew up, two things always stuck out in my mind. Steve had excellent character and a very strong belief system in what was right.

While Steve and I did not always agree on everything I was always impressed with the passion he had for what he believed in. Steve got out of high school and went into the military where he volunteered to go where he was needed most. He never shied away from hard work or danger. He wanted to be where he could make a difference. He served in South Korea and Bosnia. Upon leaving the military Steve decided he wanted to be in law enforcement. Again he chose an area where he felt he could make a difference, the US Marshall's Service. Steve never tried to take the easy route.

Honesty is another trait that I admire in Steve. While most people fear the consequences of bad decisions and attempt to hide them or cover them up, Steve was never afraid to face those consequences. That is what is most confusing to me about this situation. The fact that Steve was convicted of falsifying reports and attempting to cover something up is extremely out of character for him. It is my true belief that if Steve did the things he was convicted of, he would have taken responsibility for his actions. Steve always came forward when he was wrong and never tried to cover up mistakes that he made. This is why I believe a true injustice is occurring.

In closing I hope that what I and others have written will give you a true perspective on the type of person Stephen Cook really is. All Steve ever wanted to do was serve his country and the people around him. He is an honest, hard working person who has spent most of his adult life serving others. I pray that you can be lenient in your sentencing.

Sincerely,

Michael S. Murphy

000004

Honorable Judge Huvelle
Regarding Stephen John Cook

What do I say about a brother? I have known Steve since second grade and he is my best friend. From playing together as kids learning how to swim, growing together as teenagers and reaching adulthood our friendship has never wavered. I have more faith and trust in him than most of the people I'm related to. He was always sticking up for and defending those who could not do it themselves, despite his own size and the challenge before him. His home was always my home and mine was his. No matter where I was or what I was doing I knew that if I needed help he would be there as soon as possible and do anything he could. I feel the same about him. He helped get me through a rough time in my life when my parents separated and pulled me back in when I got wrapped with the wrong people and a drug addiction. A lot of who I have become and decisions I have made in my life have been shaped by the values not instilled in me by just my mom, but also those shaped by the brotherhood I have with Steve and the values that we set on ourselves. Steve always got along with everybody. He has a great sense of pride, integrity and honesty. That is why I'm so shocked

at what is occuring here. I feel that justice is truly blind and has turned its proverbial back on Steve. I'm sure you have heard so many times in other cases, "he does not deserve this". I truly feel in my heart that Steve does not deserve this and I wish you could know him the way that his friends, family and I know him. He loved his job and took more pride in serving his country than anyone I know. He talked about being a marshal constantly. I have a great sense of pride in Steve and everything he has accomplished even as he sits in a cell as I write this. He served in the Army as a cavalry scout and continued to serve his nation by joining the Marshals. He always wanted to be at work and volunteered for everything when no one else would. Everyone he worked with liked him and respected him except for a few with personal problems and their own agendas. I'm writing you this letter to beg for the mercy of the court. He is already serving the most severe punishment he can inside his mind. He has lost the career he valued and the feelings he has of failure to himself, his friends and his family consume him. Please do not break this man anymore.

Sincerely,

Christopher J. Murphy

Christopher J. Murphy

12/06/07

Evan Lonergan
100 Ottawa Trl
Shohola, PA 18458

Honorable Judge Huvelle
Re: Stephen John Cook

Your Honor,

I'm writing this letter on behalf of my good friend, Steve Cook. I understand that you presided over his case and will be sentencing him in January. I'd like to tell you a few things about him before his sentencing. I've known Steve for a little over ten years now. We were in the Army together and spent the better part of a year deployed to Bosnia. That was from 1997-1998. During that time, we lived in a tent and slept about five feet away from each other every night. Needless to say, we became very close friends and, in fact, I would say that I know him better than anybody and he knows me better than anybody. That friendship did not weaken when Steve left the Army in 1998 and I shortly after in 1999. We have stayed in touch and even visited each other on a number of occasions.

This is why I was very distraught when I heard that he had been convicted of these very serious charges. This is not the Steve that I know. The Steve that I know could almost be called a pacifist. This may sound like a contradiction but I assure you, it is not. Steve is not one who would resort to force or violence when other means can be utilized. For instance, one time in Bosnia, during a platoon soccer game, a fight broke out between two of our platoon mates. Steve was the first, and only one, to step in and break it up. As you can probably imagine, with that many men on a small base and in those circumstances, it was very common for fights to break out over minor disagreements. However, Steve was always the cool-headed one who would be there to diffuse the situation.

I would also like to take this opportunity to tell you a story about Steve that not many people know about. In April of 1998 I arrived back in Bosnia from a two week leave. I went home after 7 1/2 months of being away to see the birth of my little girl, Hannah. She was not born until the day before I had to go back. I was only able to spend a day with my new daughter. When I came back, it was business as usual. Our platoon was tasked with conducting a foot patrol through an area of the country that was not well known to us except that it was heavily mined. When we arrived, we dismounted our vehicles and an order of march was given. I was assigned to "take the point" which means I was leading the patrol. I immediately began to think of my wife and two kids back home and my father who had the misfortune of stepping on a landmine in Vietnam in 1968 while he

was leading a foot patrol. He was severely injured and almost killed. As I looked at Steve, I could tell he was thinking about the same things. Without hesitation he volunteered to take point for me. I don't like telling that story because I feel that I acted a bit cowardly. I know Steve doesn't feel that way, to him, it was no big deal. To me, it meant that I could always count on him as a friend to help me when I needed it.

As I mentioned earlier, Steve and I kept in contact after we got out of the service. I went on to become a State Trooper in Pennsylvania and shortly after that, Steve took a job with the US Marshall Service. He would stop at my house on his way home to Ilion, NY for the holidays and usually stay for a night. One time, he even went out and worked a patrol shift with me voluntarily. If something happened, he would not have been compensated by his job, but he didn't care. He just wanted the opportunity to "ride with me" again and back me up on traffic stops and other incidents. I was glad to have him.

Your Honor, I know that you have a difficult decision to make, but after reading this letter and the many other letters that I'm sure you have received, I hope that you can see Steve as I do. A good man in a bad situation. He's lost his job, a job which he loved. He's been convicted of several felonies which will remain on his criminal record for the rest of his life and make it very difficult to get a decent job. His reputation is in ruins and his family is devastated. As you're reading this letter, Steve will have probably been in jail for over three months. The punishment should fit the crime. Steve has been punished severely so far. You probably have guidelines that you must follow for his sentencing but I beg you to be lenient and consider giving Steve a minimal sentence.

I want to thank you for reading this letter and hope that it, as well as the others, makes your decision a little easier.


Respectfully,

Evan Lonergan

**CYNTHIA M. DENNIS**
**9370 Willow Wood Dr.**
**Clarence, NY  14031**
**(716) 472-3472**

November 24, 2007

To: Honorable Judge Huvelle
Re: Stephen John Cook

Dear Judge Huvelle:

I am Stephen's aunt on his mother's side therefore I have known him all his life.  To say I was "stunned" over the verdict is to put it mildly.  Stephen is and always has been one of the most honest, hardworking, and trustworthy people I have ever known.  I have always been very proud of him and continue to be so.

When Steve accepted the position with the U.S. Marshall's, we were all so proud of him.  After serving in the Army, he was so excited to think he might be able to make a difference in this, often, crazy world we live in.  I suspect you're not aware of the fact that Steve was also accepted at SUNY @Stony Brook to pursue a career in Astronomy.  Instead he chose the Marshall's, hoping to give something back to his country and help in attempting to make it a better place.  Obviously he has done something right, evidenced by the many awards and commendations he has received, both with the Marshall's and the U.S. Army.

Steve has a wonderful sense of humor.  He loves his family and the times we share when everyone gathers at his mom and dad's home.  My sister and her husband raised him to understand the difference between right and wrong.  Family and friends are the core of Stephen's life.  The fact that he included the Marshall's in that circle makes the verdict even that much harder to accept!  In my opinion, Steve is an exemplary model of what an American citizen should aspire to be.  How can the people that he dedicated his life to do such a thing to him?

I'd also like to share a little about the environment that Steve grew up in.  My parents raised us to be responsible, contributing members of society.  None live off the system, even though at times things may have gotten rough.  Our pride in our ability keeps us going.  Some of us fared better than others but no one member is more important.  Stephen is like my own son.  Our children were raised by all of us.

Seeing what has happened to him has shaken all of us.  He put his life on the line every day and this is his reward?  I refuse to believe that he could do something like what he has been convicted of.  Stephen is, and always has been, honest to a fault.  I would trust him with my life and my children's lives.

000007

I believe the system erred in this case. An innocent man is being punished for something he did not do. The Marshall's have lost a good man. I don't want to lose a wonderful nephew! Please review his case and send him back to us. I truly want and need to believe in the system again.

Sincerely,

Cynthia M. Dennis

Your honorable Judge Huvelle;

I am writing on behalf of my brother Stephen John Cook. When I was told to give an account of my brother's character I was confronted with a pause. How can I give an account of someone who has almost single-handedly influenced my life into the beautiful, honorable existence that it is today? I will try to put this into words. Stephen, when we were young was integral to everything I was and was going to be, he was my mentor, my guide, my teacher, and my older brother. This transcends childhood to growing older as he is always a hallmark of my life, as he continues to be today.

Being my only brother, Stephen is not only my model, but my inspiration for what life should be and also what life should be strived to be. Steve is the mold for which I model my action. He has been integral, not only to my life but, to the countless others that he has touched by his strong grasp of friendship, honesty, and humanity. Stephen is not only the most honorable, honest and faithful of friends; he is the foundation of friendship. Stephen is the prototype of what a brother, son, nephew, grandson, and friend should be and I beg that this character helps determine his fate in the face of these erroneous charges.

Your honor, I ask that you not look upon my brother, Steve, as a malcontent, but as a human being. I ask that within your mercy you look to a man who is not the man he has been portrayed to be, but to the man he is and a man who through 28 yrs of knowing him is incapable of being guilty of the things he's charged with. Stephen is a shining example of human nature and the hope that entails. Always when we were young I looked to him for example. When I fell he was there to pick me up, when I cried he would make me laugh, and when our family met challenges he made me stop and learn from them.

Steve was as dependable as one could imagine as a Cavalry Scout, in the US army; his fellow soldiers leaned on him for leadership and camaraderie, and his glowing record speaks for itself. His fellow Marshals look to him for that same dependability, and he never let them down. Please do not let the accusations of one overshadow all the good he has accomplished, and has yet to accomplish.

Steve helped me in so many ways that I hadn't even realized them until I got older. Now as a young adult I look in the mirror and do not see my own reflection, but

that of a man that has been taught and shown the way to be human. That reflection has the influence of my only brother, and my best friend; and that person that I see, is someone I am proud to be.

I ask for your mercy and the mercy of the court, for Stephen Cook is not a bad man, he is a human who faces the impossible accusations made by someone who does not know him and the wonderful man he is. Please do not judge him by this one outlandish attack on him, but by the things he's done for so many. My brother is an important facet to so many lives and I hope his character can help determine his fate, and I hope that within your mercy Your Honor, you can see beyond the situation, and see the brother, the son, the friend.

I hope this finds your hands and your heart,

Sincerely,

Shaun Cook

If you would like to speak to me directly for any reason, please feel free to call me anytime. 303-512-3070. Thank you for your time and mercy.

# Timothy P. Murphy
**1C Misty Hollow
Ballston Lake, NY 12019
518.899.4353
tmurphy2@nycap.rr.com**

November 9, 2007

Honorable Ellen Segal Huvelle
Federal District Court
Washington, DC

Dear Judge Huvelle:

I am writing on behalf of my nephew, Stephen John Cook. Steve was convicted in your court of depriving someone of their civil rights, of lying about it and of trying to get others to lie about it as well. His conviction is so shocking to me because it does not, in any way, reflect the Steve I know.

I have known Steve, of course, for his entire life. I was in the waiting room at the hospital, sitting with my mother, while my sister gave birth to him. I was asked and agreed to be his godfather. I have watched with great interest his progress from childhood through adolescence and finally into adulthood with great pride and deep admiration. I will not pretend that my nephew is a saint. He isn't. Like everyone else, he found his share of trouble. But what always, always separated Steve from the rest of the pack was his unrelenting honesty. If you asked him about a situation, you got an honest answer, even when, in cases large and small, it was obviously in his own best interest to make something up. I remember an occasion during his senior year in high school when his mother caught him in his room in a compromising situation with a young woman and asked him if they were having sex. It would have been easy for him to deny it, because by now his life-long truth-telling had resulted in his parents believing what he told them. So he could easily have lied and gotten away unscathed. But he did not lie. Instead, he immediately admitted that they were indeed "involved." No hesitation. No fumbling excuses. Just the truth. Not exactly a murder confession, I realize, but a serious situation for a couple of 18-year olds and one that I think demonstrates his inherent honesty. When my sister would yell at him about something he had admitted to, he would say to her, "if you don't want to know the truth, don't ask me about it."

And I think the fact that there is no episode in his life that anyone can cite as evidence of his tendency to do the things of which he has been convicted makes this point even more germane. Further, I believe his record of service in the Army and the Marshal's Service reflects this same devotion to honestly and integrity. If he did something wrong, he reported it and admitted it.

The Steve I know is a good and decent and honorable man who has always taken full responsibility for his own actions. The idea that he would deprive anyone of their rights and then lie or ask others to lie about it on his behalf is so utterly at odds with his whole life history as to be simply incomprehensible to me. The

truth is, your honor, that if he had done the things he was convicted of, I am absolutely confident that he would have admitted it up front; would have written up a formal report and literally turned himself in. It might not be the smart thing to do, but it would be the honorable thing to do, and I know – I know – that Steve would do the honorable thing.

Did you know that Steve didn't have to go into law enforcement? After his service in the Army, Steve worked hard and excelled at the local community college, earning his associate's degree. He was accepted at and planning to attend Stony Brook University on Long Island to study astronomy when the opportunity to join the United States Marshals Service came up. It may seem incongruous having to decide between a career in astronomy and one in law enforcement (though perhaps no more incongruous than having to choose between city planning and the law), but being a U.S. Marshal was his dream job. Since adolescence he had admired and respected the work and dedication of the marshals. He spoke of it often during his high school years. He was particularly impressed with what he described as the honor attached to the work; of how, while it may not be the best paying job in the world, helping to make the country a safer place for all citizens was good and honorable work. I simply cannot conceive of any situation that would cause him to deviate so radically from the principles that he so long admired. You honor, it is just not in his nature. It's as simple as that.

I don't know what rules you have to work under in considering Steve's sentence but I hope you will take into account his clean record, his deep regard and respect for the law that drew him into law enforcement work in the first place and the good life he has lead as you make your decision.

Thank you for your consideration.

Sincerely yours,

Timothy P. Murphy

November 11, 2007

To The Most Honorable Judge Huvelle,
Regarding Stephen John Cook

Dear Judge Huvelle,

I chose to write to you today, Veteran's Day, as I felt this day was a most appropriate and fitting day to talk to you about my nephew, Stephen John Cook. You know my nephew, as he came before you, charged with a crime, and was subsequently found guilty of said crime. To say that we, his family, were shocked and saddened by this conviction, is an understatement. To say that his Mom and Dad and brother and each member of his family have been devastated, is an understatement. I fear that his parents will never recover from this, believing as they should, that their son is an innocent man.

As I said, I am Stephen's aunt, so I have known this fine, young man for his entire life. Yes, I am extremely biased towards Stephen and the kind of man he is; but even if we weren't related, I would still have nothing but praise for him and his character.

Stephen comes from a loving family, as you may have witnessed during the trial, as his Mom and Dad were ever-present there in the courtroom. His extended family consists of a close-knit group of small-town folks, who have the same values and love of country that Stephen has. Honesty, integrity, faith, hard work, LOVE OF COUNTRY, and belief in the American dream are just some of the qualities you will find in Stephen John Cook.

Stephen's service to this great country of ours started a long time ago, as he proudly and valiantly served in the U.S. military. His courage and positive nature about his duty remained with him throughout his praise-worthy tenure in the military.

This same love of country and belief in justice created a desire in him to pursue another area of service to this great country of ours; that of becoming a U.S. Marshall. His pride in this pursuit was obvious to all who spoke with Stephen, and his determination to become the best that he could become was his goal. Stephen worked diligently on this, knowing he had

000010

found a career that he loved and one that he could use all of his accumulated talents, from his life experiences, to do an outstanding job. For the above statements, and much much more, are the reasons why we can not believe that someone of Stephen's character could possibly be guilty of something that would certainly take him away from a career that he so loves and has worked tirelessly to achieve.

As I stated at the beginning of this letter, I chose to sit down and write this on Veteran's Day. The reason why, to me, is crystal clear. You will not find a better "Patriot" than Stephen John Cook. You will not find a more loving and supportive family, than Stephen's. We are all so very proud of the boy he was and the man he has become. We all felt that this wonderful country of ours was in good hands, if men like Stephen were "watching our backs." I have been a public school teacher for over 33 years. Over that time span, I have interacted with hundreds and hundreds of children and their parents. I'd like to think that those interactions have given me a pretty good sense about people and an even better judge of people's character. Honest, hard-working, patriotic people come in all shapes and sizes, races and religions. Those values ALWAYS shine through. Stephen John Cook has them, has always had them, and I believe, even though he is going through this ordeal, will continue to have them. That is the man he is.

So, in closing, Your Honor, I pray that some of what I have told you about Stephen will clarify the kind of person he is to you. I pray that in your wisdom and certainty to do the right thing for this man, you will consider some of the things I have shared with you about Stephen and his family. I sincerely thank you for your time and attention to my letter. If anything at all needs clarification, I would be most happy to speak with you at any time.

Very truly,

Kathy Murphy

Kathy Murphy
126 Elm St.
Ilion, NY 13357
315-895-7218

December 7, 2007

To Honorable Judge Huvelle,

I can honestly say that when I learned it would be possible for me to contribute a character letter for Stephen Cook, there was not the slightest hesitation. For a man who has been more like a brother than a friend to me over the course of nearly 16 years, this is the very least that I can do. However, as I set myself to the task, it becomes increasingly clear to me how shocking it is that I would have to tell someone about the kind of person Steve is. Not because of the circumstances that have led to my writing such a letter, but because I know that Steve's strong moral character stands out so distinctly, is evident to anyone he meets. Even those who don't get the opportunity to know him very well can readily sense what a wonderful, generous and interesting man he is.

From the earliest days, I was struck by Steve's uniquely open and charismatic personality. He was, and still is, a man determined to make the mot of life, face it challenges without flinching and enjoy its rewards fully. Incredibly funny and fun to be around, this kind of engaging spirit attracts others to it. Those of us fortunate enough to become his lifelong friends learned quickly that his outgoing nature and sharp wit were complemented by a large heart and a loyal soul – Steve is someone you could trust to stand beside you in good times or bad. Moreover, I can you from personal experience that even people who had no cause to like or admire Steve could not help but respect him.

The qualities that make Steve a good friend, and a continuing source of pride and inspiration to his family, are the same things that drove him to serve his country with such distinction. Honor, duty and an unfailing sense of personal responsibility are the traits that exemplify his time as a cavalry scout in the U.S. Army and a member of the Marshals Service. Still, as much as he has put into his career, I know that Steve has taken something away from it as well. In the last few years, he has continued to mature and develop a distinct awareness of his purpose, becoming exactly what America asks of its children: an upstanding, fully contributing member of adult society.

As unlikely as it is that these meager words can have a significant impact on these proceedings, I am not disheartened by that. In fact, I am hopeful that any judgment about Stephen Cook is not made solely on the things that people say about him, regardless of what side of the aisle they occupy. The truth is, if you look closely, it is impossible not to recognize that this is a decent, honest and respectable man…because Steve's character has always stood out so clearly in the eyes of those who meet him.

Sincerely,

*Gerald M Blair*

Gerald M. Blair

Sandra L Lutts
5045 Sheriff Rd NE
Wash., DC 20019

Nov 12, 2007

To: Honorable Judge "Huvelle"
Re: Stephen John Cook.

I have been affiliated with Mr Cook for several years. During this time he has proven to be a person of high moral fiber and integrity. He is honest, dependable and a person of his word.

In his chosen field of law enforcement, its not easy to let these characteristic's show, if they weren't truly from the heart.

000012

The charges bought against him, should certainly be

be reinvestigated ~~then~~. because he is truly a credit to his job, family and society.

Thanking you in advance...

Sandra Butts
Supervisor ABP.
H. 202-398-4310
W 202-638-8060
C 202-413-9511

Honorable Judge Hevelle RE: Stephen John Cook,

      Your honor I am writing on behalf of my friend Steve Cook. I am asking to please show him lenience when he stands before you. I have known Steve for 15 years and have always know him as a man of outstanding character. His family and he have always made me feel welcome and a part of their family whenever I've been there. He has always been the type of person to put others before himself. If I needed something or just an ear to listen I knew I could count on him to be there for me. He always knows how to make you laugh when you're down. He is truly a loyal son, brother, and friend. I'm a father to an 8 month old baby girl and would leave her in Steve's care without a moment's hesitation nor would I worry about her well being. Steve served his country with honor, serving during the time of conflict. I think that alone shows strength of heart and character when someone is brave enough to join the military and put himself into harms way for his country.  I don't know what else to say to let you know how good of a person Steve is. I can say this honestly, I have always been proud to call him a friend and for me I don't call just anyone my friend.

      To take Steve away from his family and friends would not only break him, but it would break us as well. He would be sorely missed.


Respectfully,
Daniel M French

000013

January 3, 2008

To Honorable Judge Huvelle:

I am honored to write a letter with the purpose of speaking to the character of Stephen John Cook, and I am proud to say that I have the distinct pleasure of being his relative and also his friend. Coming from a large family and a small town and, it may seem only natural for a friendship among family members to form since we went to the same high school; however, our case is extremely special. Due to the fact that our family is so large, Stephen and I didn't share our holidays or birthdays together while we were growing up; there are no pictures or memories to speak of during our younger years of life. In fact, we didn't even know that we were second cousins until I was nearly fourteen and he was nearly eighteen years old. We met in high school, and through conversation, we found out that we were related.

Upon our realization, Stephen and I decided to get to know each other better since we were from the same family that we both loved dearly, and we eventually became good friends. Despite the age difference, the two of us had a lot in common, and we enjoyed each other's company a great deal. We formed a tight bond that has held true and strong for the last thirteen years. He is someone I can confide in and trust as well as someone with whom I can laugh and have fun.

When we first began to grow close, Stephen was there for me in a way an older brother might be. That is, he offered advice, guidance and assistance wherever and whenever necessary. He was also a good role model; he earned good grades, had the respect of teachers and coaches, formed a variety of strong friendships, and excelled at sports. He was the kind of guy everyone wanted to be around; outgoing, confident, educated, witty articulate, and fun. Lighting up any room in which he walked, Stephen's charisma and genuine goodness has extended far beyond his high school years.

As we began to grow and mature, my "new" cousin and role model became my good friend, and I can now say that I know him well. To date, Stephen's character is the same as it was the day I met him, perhaps more fully developed due to worldly experiences and increasing maturity; he's an honorable man who has served our nation with pride and confidence, his career with honesty and integrity, and our friendship with loyalty, trust and love. It is without reservation that I present to you my memories and my views of Stephen J. Cook with the hope that my voice, in combination with others, may help you to see more clearly into the true nature of his character. Stephen is a person who friends call brother, and who family calls friend.

Thank you for your time and consideration.

Respectfully yours,

Anne Murphy

000014

Honorable Judge Huvelle
Re: Stephen John Cook

You're Honor,

My name is Robert Kerry and I am a retired Army Non-Commissioned Officer. During my tenure as Platoon Sergeant in the Second Cavalry, I had the opportunity to serve with Stephen Cook; he was one of my soldiers. During the two plus years I was Stephen Cook's Platoon Sergeant I never had any trouble with him. He was an exemplary soldier and was often sought out by younger soldiers for advice and counsel. During our deployment to Bosnia-Herzegovina in 1997-1998, I depended on Steve many times by placing him in junior leadership roles. Had I not trusted him and had faith in his abilities, I would never have put him in those positions, because it would have endangered the lives of his fellow soldiers, which I was not willing to do. Had Steve decided to make the Army a career, I have no doubt that he would have been successful. He was a very likeable individual who seemed to get along with everyone. His demeanor was such that, even during difficult missions, he constantly had a smile on his face. His lust for life was contagious. He was definitely an asset, not only to the platoon but to the company and Squadron as well.

Thank You for your time

Sincerely,

Robert W. Kerry

Honorable Judge Huvelle:

My name is Leta Sterling, and I am writing to tell you about my friend, Stephen John Cook.

You did not have a chance to learn the type of young man he is.

Everyone who knows Stephen was absolutely shocked to have this happen to him, of all people!

I never knew Stephen as a child, only as a teenager and young man. I am one of his mother's best friends, and that is how I met him.

I have several nieces and nephews, great nieces and nephews, and even great-great nieces and nephews. So, I am known as "Aunt Leta" to many, many blood relatives. But, I can count on one hand the outsiders I _allow_ to call me "Aunt Leta". Stephen John Cook is one of those people. That is because he is a special person. We all love him!

Stephen enlisted in the Army because he loved this country. He, his brother, and parents were the most patriotic family I knew. They loved this United States, and our Government and it's Judicial System. Stephen was sent to Korea and Bosnia. He made friends with the people living there. He has _never_ been prejudiced against anyone. His Army record was spotless - his Squad loved him. I wrote many letters and cards to him, and he enjoyed those letters from his "Aunt Leta."

He came home from the service, and always held a job, never living off "the system", as some "low lifes" do. He always had the dream of going into law enforcement - to try and make a difference for his country. So, when he was accepted in the U.S. Marshalls, his dream had come true. I know that his fellow Marshalls liked him, because he is that kind of person. And, in my heart, I _KNOW_ that he did ABSOLUTELY NOTHING WRONG! He's just not that type of young man. In my mind, I think he was railroaded and used as a scapegoat.

His mother fought Breast Cancer in 2001, and Stephen was there for her. His Dad had a heart attack a couple of years ago, and Stephen was there for him. They are a close-knit family who Love and Worry about each other! They go thru good and bad times together, and stand by each other whatever comes along.

I am praying to God that you will consider Stephen John Cook as the wonderful youngman that he is, and that _YOU_ will pray hard before you make your decision about the rest of his life. It is, of course, in your hands.

Thank you for listening to me, and _YOU_ are in my prayers, as well as Stephen is.

Sincerely,

Leta C. Sterling
94 N. Fifth Ave.
Ilion, NY 13357

000016

**Honorable Judge Huvelle**

**Regarding**

**Stephen John Cook**

Dear Judge Huvelle,

My name is Shawn Gregory Fuess and I am writing on behalf of Stephen Cook, my life long friend and greatest influence on my life. I use the term "greatest influence" because it is his aid and guidance that helped me have what I have today; my family.

Upon graduation I was in a personal limbo with no aspirations or direction. Stephen and I had been friends for some time when he told me that I should think about enlisting with him as his enlistment buddy. Although I had not thought of serving my country in that fashion, the idea truly appealed to me and we both enlisted with the United Stated Army as U.S. Cavalry Scouts. I do not have to tell you as one who serves our country every day in the U.S. Judicial system, but this was one of the most challenging yet rewarding experiences of my life. This decision was a life changing experience in every way possible.

During my time as a soldier I served a total of four years with two of those years deployed in Bosnia-Herzegovina. This four year long endeavor helped my growth personally, spiritually and financially. The most important event that took place during this period of my life is the meeting of Diana Radloff who is now my wife and the wonderful mother of our two children. This may be unorthodox but I have enclosed a photo taken last Christmas of my family. I feel it is very important that you see the miracle that has happened in my life because of Stephens positive influence and guidance. This all may at first seem a bit melodramatic, but from my perspective Stephen is directly responsible for guiding me into a period of life that helped shape me into the man I am today. I have since graduated from college with a degree in English Literature with a minor in Philosophy, worked my way up to a management position where I am

responsible for 10 employees and most importantly working with my wife of nine years to raise two wonderful children. All of which would not be possible if not for my friend Stephen. My children refer to him as "Uncle Steve" because of his comical and good hearted way with them. I trust him now and will in the future with my children and this is not something said lightly.

I and my family ask that you take into consideration what he has done for us as well as for his country as a U.S. Soldier and U.S. Deputy Marshall. He has never been in any trouble growing up, served his country honorably and is one of the most honorable trustworthy individuals I know. I trust very few people with the care of my family or as a personal confidant, but Stephen is one of those few.

I thank you whole heartedly for taking time from your life to read my letter and take into consideration the things I have said on behalf of Stephen. I would not have put these statements into ink if I did not truly believe in Stephen or believe in the importance of what I have said. I find it unbelievable that he has been found guilty of charges which do not reflect his personality, his beliefs or his past actions. I implore you to review all the facts of this case as I cannot believe Stephen would infringe on the civil rights of any human being, intimidate others into lying or purposefully lie about his personal actions. He has always been a man to stand for the truth and take responsibility for his actions.

Thank you,
Shawn Fuess and Family





**Sam Leonard**

915 Copperstone Lane

Fort Mill, SC 29708

Re: Steve Cook

    This letter is to define the upstanding qualities and moral character of Steve Cook. I have known Steve Cook since 1996. After serving in Korea with the U.S. Army Steve was transferred to my Platoon in M Company 3/2 ACR at Fort Polk, LA. He was my roommate for the next two years. He always upheld the quality's and values of a soldier. He was a non-violent and compassionate individual. These qualities showed during our deployment in Bosnia. While there every soldier was under tremendous stress. During that time Steve always kept a level head and was admired by his fellow soldiers for being able to "keep it together" even under the most distressing conditions.

    I was VERY surprised to hear of his conviction. I ask that the court show mercy during the sentencing. Steve has already endured losing his job, imprisonment, and being convicted. I am sure his credit has suffered and facing having possessions repossessed. He will no longer be able to vote taking away his political voice. In today's world it is hard enough to secure a decent job. He will have to do so with the black mark of being a convicted felon. It is my opinion that he has served his dept to society. If the court decides that further punishment is necessary ask for it to be parole and not time incarcerated.

Sincerely,

Sam Leonard

000018